**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

Stephon Woodley,

                Plaintiff,

    v.

John Baldwin, Illinois Department of
Corrections, Patrick Keane, John Varga,
Wexford Health Sources, Inc., and Does 1-5,

                Defendants.

Case No.

JURY TRIAL DEMANDED

## COMPLAINT

Stephon Woodley is an inmate at Dixon Correctional Center. He suffers from Stargardt's disease, a genetic condition that has left him legally blind. For years now, doctors have recognized his condition and have uniformly recommended that he be given certain visual aids. These aids are designed to help Mr. Woodley regain some of his sight so that he can perform basic tasks of everyday living, and they are needed to prevent further damage to his eyes, as well as protect him from the constant risk of injury to his body. The defendants, however, have ignored these recommendations and are refusing to provide basic visual aids to Mr. Woodley.

The defendants have also discriminated against Mr. Woodley because of his visual disability, refusing hire him in a work program that allows model inmates to earn wages and receive credit towards an early release from incarceration.

- ***Denial of portable digital magnifier***. Doctors have repeatedly recommended that Mr. Woodley be provided with a portable digital magnifier, which is designed to help people with Mr. Woodley's condition to see things up close. The defendants originally allowed Mr.

1

Woodley to buy his own digital magnifier, and with it, he excelled in Dixon's educational programming. Since the magnifier broke, however, the defendants have refused to replace it, solely because of the modest expense (roughly $300). As a result Mr. Woodley has effectively been excluded from any further educational programming, in plain violation of the Americans with Disabilities Act. And because his eyes naturally strain themselves without the magnifier, Mr. Woodley suffers additional, permanent harm to his retinas, damaging what vision he has left.

- ***Denial of additional visual aids***. Doctors have also prescribed several visual aids, including a folding cane, lighting, and a small distance "monocular" scope, which would allow Mr. Woodley to regain some distance vision and depth perception and help him safely navigate within the prison. The defendants acknowledge that Mr. Woodley should have these visual aids, but refuse to provide the based on circular reasoning worthy of *Catch-22*: the defendants will not acquire the aids without knowing that prison security will approve them, and prison security will not approve the aids until it has had a chance to inspect them. Because the defendants refuse to provide these aids, Mr. Woodley cannot safely navigate the prison, he suffers constant injuries from banging into things, and he is unable to take advantage of many programs and services that the prison offers.

- ***Employment discrimination***. A vocational program called Dixon Correctional Industries provides manufacturing jobs to model inmates, allowing them to earn wages, learn skills, and receive credits that can allow for an earlier release from incarceration. Mr. Wooley qualifies for this program, and there are many jobs within Dixon Correctional Industries that a visually impaired person can perform with reasonable accommodations. In 2010 Mr. Woodley placed his name on a waitlist for the program. Since then, inmates who put their names on the waitlist after Mr. Woodley have been hired. Prison officials have told Mr. Woodley he has not

yet been hired because no positions have opened up, but the entire workforce at Dixon

Correctional Industries has turned over while Mr. Woodley has remained on the waitlist. This

discrimination has deprived Mr. Woodley of wages, skills, and an earlier release from prison.

*     *     *

Mr. Woodley has been discriminated against by the Illinois Department of Corrections,

which has refused to provide reasonable accommodations for his disabilities in violation of the

Americans with Disabilities Act. And by ignoring the uniform medical recommendation that

Mr. Woodley be provided with specific visual aids, the individual defendants—Dixon's warden,

John Varga, the IDOC's ADA coordinator, Patrick Keane, and the IDOC's healthcare vendor,

Wexford Health Sources—have exhibited deliberate indifference to Mr. Woodley's serious

medical needs. This has caused further damage to Mr. Woodley's retinas, and it has resulted in

constant danger to Mr. Woodley as he injures himself attempting to navigate the prison.

In bringing this action, Mr. Woodley seeks the Court's assistance in requiring the

defendants to provide him with the visual aids he needs, and to address the injuries he has

suffered from the misconduct described in this complaint.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

2.      Venue is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to

this action occurred in the Northern District of Illinois, Western Division.

## PARTIES

3.      Plaintiff Stephon Woodley is a resident of Illinois. He is an inmate in Dixon

Correctional Center in Dixon, Illinois.

4.      Defendant John Baldwin is the director of the Illinois Department of Corrections.

He is sued in his official capacity.

5.      The Illinois Department of Corrections ("IDOC") is an agency of the State of Illinois.  It operates Dixon Correctional Center.  The IDOC receives funding from the federal government.

6.      Defendant John Varga is the warden of Dixon Correctional Center.  He is sued in his individual capacity.

7.      Defendant Patrick Keane was the ADA Coordinator for the IDOC who made a determination not to provide Mr. Woodley with visual aids and who rejected Mr. Woodley's requests for assistance with visual impairment that are described in this complaint.  He is sued in his individual capacity.

8.      Wexford Health Sources, Inc. ("Wexford") is corporation that is under contract to provide medical services to IDOC inmates, including inmates at Dixon Correctional Center.  It is sued under the *Monell* liability doctrine.

9.      Defendant Does 1-5 are sued herein by fictitious names for the reason that their true names are unknown to Plaintiff.  Plaintiff will seek leave to amend this complaint to allege the true names and capacities of these defendants when their identities have been ascertained.  Plaintiff is informed and believes, and based thereon alleges, that these fictitiously-named defendants are responsible in some manner for the misconduct alleged herein.

## FACTS

### Plaintiff's Visual Impairment

10.      Stephon Woodley is 37 years old.  He is an inmate at Dixon Correctional Center. He suffers from a condition called Stargardt macular dystrophy, also referred to as Stargardt's disease, or "STGD."

4

11.     STGD is a genetic eye condition that causes progressive vision loss by damaging the eye's retina. STGD's onset begins in the late teens or early adulthood. It affects an area near the center of the retina, called the macula. The macula is responsible for sharp central vision, which is needed for tasks such as reading, mobility, and recognizing faces. In people suffering from STGD, the cells in the macula become damaged and degraded over time. This causes a person with STGD to lose their central vision, and leaves them legally blind. In addition to central vision loss, people with STGD have problems seeing anything without bright lights.

12.     There is no known cure for STGD, and it cannot be corrected with eyeglasses or simple magnification. There are devices, however, that can be used to restore to a person suffering from STGD some limited, critical functions. A special, high-power digital magnifier and bright lights can allow people with STGD to regain some "near-vision" (for tasks like reading), and devices like walking canes and small "monocular" scopes can allow for distance vision and depth perception, making safer mobility possible.

13.     In February 2010, Mr. Woodley was seen by an IDOC optometrist, Dr. David Hicks. Dr. Hicks conducted an optometric examination and diagnosed Mr. Woodley as being legally blind due to macular dystrophy. As a result of this diagnosis, Mr. Woodley was given a glass magnifier.

14.     In 2012, Mr. Woodley was seen by Dr. Hicks again. At that visit, Dr. Hicks concluded that Mr. Woodley's retinal loss had deteriorated further and could no longer be accommodated by the glass magnifier. So instead, Dr. Hicks recommended that Mr. Woodley be allowed to use a portable digital magnifier. Dixon Correctional Center's ADA coordinator concurred with Dr. Hicks's recommendation, and Mr. Woodley was allowed to acquire a digital magnifier, which he purchased in June 2012 for approximately $316, at his own expense.

5

15.     A portable digital magnifier is a hand-held digital magnifier approximately the shape and size of a thick, extra-large smartphone.  It has multiple features to assist people suffering from STGD and other low-vision conditions with near-vision, particularly with reading.  A portable digital magnifier can shine a light on text to increase its contrast.  It allows the user to take a photograph of the text, which stabilizes the magnified text and allows the user to bring it close to his or her face assist with reading.  It has a "color inversion" feature that reverses the colors of text (so that, for example, the text of this document would appear in white and the background in black), which helps people with STGD identify and read letters.  And it has powerful magnification, ranging from 13x to more than 30x, allowing letters to appear much larger.  Combined, these features greatly improve the ability of persons suffering from STGD and other low-vision conditions to read documents and perform other near-vision tasks.

16.     In the summer of 2014, the charger for Mr. Woodley's portable digital magnifier broke and the magnifier became inoperable.  At the recommendation of Dixon Correctional Center's ADA coordinator, the device was replaced for Mr. Woodley at no charge.

17.     Also in 2014, Dr. Hicks recommended that Mr. Woodley be seen at the University of Illinois-Chicago Low Vision Clinic ("the UIC Low Vision Clinic").  On information and belief, the purpose referring Mr. Woodley to UIC Low Vision Clinic was to confirm his diagnosis of macular dystrophy, and to recommend visual aids that would allow Mr. Woodley to enhance his remaining sight and facilitate his performance of the basic tasks of everyday living.

18.     Mr. Woodley made two visits to the UIC Low Vision Clinic.  The first visit was in the fall of 2014.  At that visit, the clinic confirmed that he was suffering from macular dystrophy, and specifically diagnosed him with STGD.  The UIC Low Vision Clinic also confirmed that the disease had progressed to the point that Mr. Woodley was legally blind.

19.     Mr. Woodley visited the UIC Low Vision Clinic again in March 2015.  At this visit, an ophthalmological professional recommended that in addition to the portable digital magnifier he already had, Mr. Woodley should be provided with a light in his cell to aid with reading and other near-vision tasks, a small optical "monocular" scope to help him see in the distance, and a folding cane to assist him with mobility around prison and around his cell.  (This Complaint hereinafter refers to these items collectively as the "Additional Visual Aids.")

20.     Shortly after his appointment at the UIC Low Vision Clinic, Mr. Woodley was seen at Dixon Correctional Center's healthcare unit to follow up on the recommendations made by the clinic.  At that appointment, healthcare professionals at Dixon Correctional Center concurred with each the UIC Low Vision Clinic's recommendations that Mr. Woodley be provided with each of the Additional Visual Aids.

21.     Mr. Woodley's second visit to the UIC Low Vision Clinic was supposed to provide the defendants with guidance about how to accommodate Mr. Woodley's STGD so as to allow him to better perform the basic activities of daily living.  But instead of following the UIC Low Vision Clinic's recommendations, the defendants have allowed Mr. Woodley's situation to deteriorate.  As described herein, since Mr. Woodley's second visit to the UIC Low Vision Clinic, the defendants have failed or refused to provide him with the visual aids that the UIC Low Vision Clinic, and Dixon Correctional Center's own medical staff, have recommended.

22.     After Mr. Woodley returned from the second visit at the UIC Low Vision Clinic, he was not provided with the Additional Visual Aids that the clinic had recommended.  So in the spring of 2015, Mr. Woodley filed a grievance asking that the prison provide him with the Additional Visual Aids.

23.     Mr. Woodley's request for the Additional Visual Aids was denied for the following reason:  Dixon's healthcare administrators would not purchase the Additional Visual Aids for inspection without knowing that the prison's security would approve them, and the prison's security screeners would not approve the Additional Visual Aids until they had been inspected.  Therefore, the defendants would not acquire the Additional Visual Aids recommended by the UIC Low Vision clinic and the doctors at Dixon.  This circular reasoning ensured that Mr. Woodley would never receive the aids, even though they had specifically been recommended by medical professionals.

24.     In December 2015, after he received this response, Mr. Woodley filed another grievance asking that he be provided with the Additional Visual Aids.  Aware of the defendants' circular response to his earlier request, Mr. Woodley proposed a commonsense solution:  the prison's healthcare administrators could acquire the items for inspection by security, and if security did not approve the items, the healthcare administrators could return the items to the vendor for a refund.

25.     The prison's administrators were initially receptive to this idea.  On March 10, 2016, the grievance officer who reviewed Mr. Woodley's December 2015 grievance agreed that the Additional Visual Aids should be acquired for a security inspection, and on March 29, 2016 Dixon Correctional Center's chief administrative officer agreed with this recommendation.

26.     But then nothing happened.  On information and belief, nobody acquired any of the Additional Visual Aids for inspection by security.  Mr. Woodley waited for the Additional Visual Aids for months, in vain.

27. Meanwhile, Mr. Woodley lost his portable digital magnifier as well. On July 20, 2016, an IDOC "tactical" team conducted a shake-down of Mr. Woodley's cell, and in the process they broke Mr. Woodley's portable digital magnifier.

28. Mr. Woodley immediately made a request for a new digital magnifier, filing a petition that same day with Dixon's ADA coordinator, filing a grievance the next day, and filing several follow-up petitions over the next month.

29. Because a replacement portable digital magnifier would cost several hundred dollars, the IDOC's ADA coordinator, Defendant Patrick Keane, decided that the IDOC would not replace Mr. Woodley's portable digital magnifier. Instead, Defendant Keane decided that the IDOC would "accommodate" Mr. Woodley's disability with a plastic "sheet" magnifier, which was then issued to Mr. Woodley on October 29, 2016.

30. The plastic sheet magnifier was woefully inadequate for Mr. Woodley's needs. Its magnification was approximately 6x, which simply does not magnify letters large enough to allow Mr. Woodley to read print in documents. And it did not have any of the other features of portable digital magnifiers that made it possible for Mr. Woodley to read documents.

31. Mr. Woodley filed grievances about this "replacement," explaining that it did not adequately address his visual condition and that as a result he was straining his eyes and damaging his retinas. Those grievances were denied on the grounds that Mr. Woodley's portable digital magnifier had been adequately replaced, with the plastic magnifying sheet.

32. On or about January 26, 2017, Mr. Woodley was seen by Dixon Correctional Center's new medical director, Dr. Timothy Chamberlin. With this appointment, defendants' misconduct—their refusal to replace Mr. Woodley's portable digital magnifier and their failure to provide him with any of the Additional Visual Aids—came to a head.

33.     At the January 26 appointment, Dr. Chamberlin noted that the magnifying sheet was inadequate to address Mr. Woodley's visual impairment.  Dr. Chamberlin also noted that Mr. Woodley had numerous bruises and scrapes on his shins, the result of running into objects in the prison since he could not safely navigate without the Additional Visual Aids.  Dr. Chamberlin's notes reflect that after his appointment, he personally contacted the IDOC's ADA Coordinator requesting that Mr. Woodley be provided with the portable digital magnifier and the Additional Visual Aids.

34.     The appointment with Dr. Chamberlin was followed soon after with an appointment on or about February 22, 2017, with Dr. Timothy Faye, an ophthalmologist who served Dixon.  Dr. Faye also examined Mr. Woodley's plastic magnifying sheet, and also determined that it was insufficient to accommodate Mr. Woodley's visual impairment. Concurring with the UIC Low Vision Clinic and Dr. Chamberlin, Dr. Faye also prescribed that Mr. Woodley be provided with a portable digital magnifier.  And concurring with Dr. Chamberlin and the UIC Low Vision Clinic, Dr. Fay also recommended that Mr. Woodley be given the Additional Visual Aids that the defendants so far had failed to provide.

35.     In early March 2017, following on his appointments with Dr. Chamberlin and Dr. Faye, Mr. Woodley wrote multiple grievances asking that he be provided with the portable digital magnifier and the Additional Visual Aids, based on both doctors' recommendations.

36.     The defendants' response to this new round of grievances was two-fold:  first, they rejected Mr. Woodley's grievances about the portable digital magnifier by treating it as a "repeat" grievance about the plastic magnifying sheet from the year before, and reprimanded him for filing these new grievances that had already been "resolved" with the provision of the plastic magnifier.  This effectively ignored and overrode Dr. Chamberlin's and Dr. Faye's medical

10

conclusion that—contrary to the "resolution" from the year before—the plastic sheet was ***not*** adequate to address Mr. Woodley's visual impairment, and both doctors' prescriptions Mr. Woodley should instead be provided with a portable digital magnifier. Defendant Varga signed off on these grievance responses, effectively ratifying them.

37.     As to the Additional Visual Aids, grievance officers initially responded that Dixon's healthcare unit was ordering a telescopic device and an "illuminated magnifier," and that an "ambulatory aid" had been approved for Mr. Woodley. Nothing came of this, however, and Mr. Woodley was not provided with any of the Additional Visual Aids. So on June 26, 2017, he filed an additional grievance explaining that none of the Additional Visual Aids (or the portable digital magnifier) had been provided.

38.     Ignoring the sensible solution that Mr. Woodley had proposed in his December 2015 grievance, the defendants reverted to their circular reasoning to deny Mr. Woodley both the portable digital magnifier and the Additional Visual Aids. As the grievance officer who denied Mr. Woodley's June 26, 2017 grievance explained:

> Per Healthcare Administrator, security will not approve visual aids without inspecting them, and Wexford Health will not order the visual aids without knowing if the offender can have them. . . . Wexford will not order [visual aids] without security approval[.][1]

39.     In light of this response, Mr. Woodley alleges on information and belief that Wexford has a policy and practice of not procuring medical devices for inmates without knowing in advance that they will be approved by prison security, even when those devices have been prescribed by a physician to address a serious medical need. This circular policy effectively

---

[1] In this grievance response, the defendants also flatly refused to provide Mr. Woodley with the digital magnifier on the alternative grounds that they were not required to purchase a device that had been broken, even though it had been broken not by Mr. Woodley but rather by IDOC employees.

ensures that many inmates will never be provided with medically prescribed and care necessary to address serious medical needs.

40.     In light of the June 26, 2017 response, Mr. Woodley further alleges that one or more employees or agents of the "Healthcare Administrator," "security," and/or Wexford is among the "Doe" defendants who have refused to provide him with a replacement portable digital magnifier and the Additional Visual Aids.

41.     Mr. Woodley appealed this response to the IDOC's Administrative Review Board, but on September 11, 2017, the board refused to act on the grievance, on the grounds that it had been dealt with the year before in Mr. Woodley's previous grievances—again, effectively ignoring the recommendations of Dr. Chamberlin and Dr. Faye.

42.     In an effort to advocate for himself, Mr. Woodley contacted Equip for Equality, a non-governmental agency designated by the Governor of Illinois to administer the federally mandated Protection and Advocacy ("P&A") System. The P&A System was created by Congress to safeguard the rights of individuals with disabilities in each of the fifty states. In June 2017, Equip for Equality contacted the IDOC's chief legal counsel about Mr. Woodley's predicament. Equip for Equality explained why Mr. Woodley's "sheet" magnifier was inadequate to accommodate his STGD, and explained that in failing to provide Mr. Woodley with the portable digital magnifier and the Additional Visual Aids, the IDOC was violating Mr. Woodley's rights under the ADA and the Rehabilitation Act. In the fall of 2017, apparently in response to Mr. Woodley's letter, the defendants replaced Mr. Woodley's plastic sheet magnifier with a plastic magnifying glass that contained a small, weak light for illumination.

43.     On information and belief, this change was made in response to Equip for Equality's advocacy on Mr. Woodley's behalf. But the change was not made in order to actually

12

address Mr. Woodley's needs. Instead, on information and belief, the defendants were simply trying to frustrate Equip for Equality's advocacy efforts by switching out one cheap magnifier for another, thus forcing Mr. Woodley and Equip for Equality to start from square one again and explain why the new magnifier was also inadequate. All the while, the defendants were flouting the clear and uniform opinion of Mr. Woodley's doctors that he needed a portable digital magnifier and the Additional Visual Aids.

44.     Indeed, the light on the new magnifying glass is weak and does not provide anywhere near the illumination that the UIC Clinic Prescribed for Mr. Woodley, and the new magnifier had roughly the same 6x magnification power as the plastic magnifying sheet it replaced. It is therefore insufficient to accommodate Mr. Woodley's visual impairments, as Dixon Correctional Center's own doctors have already concluded. Mr. Woodley and Dixon's medical staff have notified the defendants that this new magnifier is insufficient to accommodate Mr. Woodley's visual impairment, but it has not been replaced with the portable digital magnifier and the other Additional Visual Aids that he requires.

45.     In short, despite the uniform recommendations of the UIC Low Vision Clinic, Dr. Faye, and Dr. Chamberlin, the defendants for years have refused or failed to provide Mr. Woodley with the basic visual aids he requires to address the severe visual impairment he suffers as a result of STGD.

**Effect of Defendants' failure to provide Plaintiff with visual aids**

46.     The failure of defendants IDOC, Wexford, Varga, Keane, and/or Defendant Does to provide Mr. Woodley with visual aids to address his STGD has crippled his ability to perform the basic activities of everyday living, and he has suffered, and continues to suffer, the following injuries:

47.    *Education*.  Since entering prison, Mr. Woodley has made it a mission to turn his life around, and when given the proper accommodations he has excelled.  Mr. Woodley enrolled in Dixon's GED program, which allows audio learning, and earned a GED in 2011.  From there, with the benefit of the portable digital magnifier, Mr. Woodley was also able to take seven college courses.  Mr. Woodley selected practical courses that were focused on his goal of becoming a productive member of society once he leaves the IDOC.  These included courses in accounting, small business management, logistics, and multiple courses on business administration.  Mr. Woodley earned an A in each one.  He also took numerous vocational courses, receiving certifications in skills including OSHA best practices for the workplace, custodial maintenance, and personal finance.

48.    Without the digital magnifier, however, Mr. Woodley is unable to read, and unlike the GED coursework, the college courses offered at Dixon rely on written materials.  As a result, without the digital magnifier, Mr. Woodley is effectively excluded from Dixon's college programs, in violation of the ADA and the Rehabilitation Act.

49.    Mr. Woodley's exclusion from Dixon's educational programs has the further effect of reducing his ability to earn a living once he leaves prison, particularly since, because of his visual impairment, he will be unable to engage in many manual labor fields like construction, and instead will have to seek employment in "office" fields that typically require the educational credentials he has been trying to achieve.

50.    *Privacy*.  The problems created by the defendants' failure to accommodate Mr. Woodley's visual impairment has extended beyond his coursework.  The IDOC allows inmates to review their own medical records.  This is a basic component of healthcare provision within the IDOC, since it allows inmates to understand the care they are receiving and to advocate for

14

the care they need with the IDOC's healthcare professionals. Those records enjoy privacy

protections under laws like HIPAA so that inmates do not have to disclose their health care

history with others. Because Mr. Woodley cannot read, however, he is deprived of these

protections. Instead, he must pay other prisoners to read his own healthcare records. Besides

being ineffective because many of the inmates cannot read well, and it eliminates the privacy

protections which his health care information is afforded.

51.     In the same way, because Mr. Woodley cannot read he must share confidential

communications he receives from attorneys and family members with other inmates in order to

understand them, effectively eliminating the right of confidential and private correspondence

with counsel and loved ones that inmates are afforded even while in prison.

52.     ***Other activities of daily living***. The defendants' failure to provide Mr. Woodley

with the portable digital magnifier and Additional Visual Aids also affects his ability to perform

the basic activities of daily living. The lack of additional lighting in Mr. Woodley's cell worsens

Mr. Woodley's ability to see anything there, causing constant injury and hampering basic

activities of everyday living like keeping a tidy cell, brushing teeth, using the restroom

hygienically, sleeping comfortably with clean bedclothes, clothing himself in the morning, and

maneuvering around the cell uninjured. Without the additional light Mr. Woodley has increased

difficulty with all these tasks, and repeatedly injures himself as he tries to move about his cell.

53.     The lack of a folding cane and a monocular scope for distance vision also limits

Mr. Woodley's ability to safely navigate around the prison and take advantage of various

services offered to inmates, including program services, religious services, therapeutic services

and recreation. Mr. Woodley must instead wait for those times when an ADA aide is available,

and such aides frequently are not present or are not helpful in going where Mr. Woodley needs to

go. Furthermore, even with an aide the lack of the cane and monocular scope means that Mr. Woodley inevitably injures himself running into or tripping over objects around the prison. This makes it more difficult, painful, and dangerous for Mr. Woodley to take advantage of the services that the prison offers. As a result he is frequently deterred from doing so.

54. *Eye damage*. The defendants' failure to provide Mr. Woodley with visual aids has compounded Mr. Woodley's vision loss by causing strain and additional damage to his retinas. Without the visual aids, Mr. Woodley's eyes naturally strain themselves to compensate for his degraded vision. This strain causes further physical damage to Mr. Woodley's retina. It is also extremely painful, causing headaches and throbbing pain in Mr. Woodley's eyes, for which Mr. Woodley has been prescribed pain medication by Dixon's medical staff. As a result of this strain, Mr. Woodley's retinas have already been damaged, and they will continue to be damaged unnecessarily as long as Mr. Woodley's eyes are forced to strain themselves due to lack of adequate visual aids. This has and will continue to compound the damage to the limited vision Mr. Woodley has left.

55. For this reason alone, in failing to provide Mr. Woodley with the visual aids he has been prescribed the defendants are deliberately indifferent to a serious medical need.

56. *Physical injuries*. The Additional Visual Aids were prescribed to Mr. Woodley in part so that he could safely navigate around the prison and his own cell. Without them, Mr. Woodley suffers constant injuries by banging into objects all over the prison, as described herein. He suffers these injuries multiple times per day, and his shins are scarred up and down by the injuries. Indeed, Dr. Chamberlin made a note of these injuries in the context of Mr. Woodley's need for the Additional Visual Aids, and Dr. Chamberlin requested the Additional Visual Aids

16

specifically in light of these injuries. Defendants have nevertheless failed or refused to provide the requested aids.

57. For this reason alone, in failing to provide Mr. Woodley with the visual aids he has been prescribed, the defendants are deliberately indifferent to a serious medical need.

**Discrimination against Mr. Woodley at Dixon Correctional Industries**

58. In addition to the failure to provide Mr. Woodley with visual aids as described above, the IDOC has also discriminated against Mr. Woodley by passing him over for a position in Dixon Correctional Industries.

59. Dixon Correctional Industries is a vocational program within Dixon Correctional Center that provides rehabilitative vocational employment to model inmates who have clean disciplinary records, are recommended by prison administration, and have relatively short periods (seven years or less) left on their sentences. Dixon Correctional Industries is operated by the IDOC.

60. Inmates who work for Dixon Correctional Industries, which specializes in manufacturing eyeglasses, are able to earn a wage and develop valuable skills working for a manufacturing business. These skills can be readily transferred to work in the outside world once they are released. Indeed the IDOC has allowed reporters to tour Dixon Correctional Industries, and media outlets have profiled a number of inmates who have used their experiences there to find stable employment upon their release back into society. *See, e.g.*, Shane Simmons, "This Illinois ex-convict says prison actually gave him a second chance at life," WQAD-8, (July 9, 2015), http://wqad.com/2015/07/09/ex-convict-finds-vision-after-prison/.

61. In addition to these wages and work experience, inmates who successfully participate in the Dixon Correctional Industries program are eligible for additional reductions to

their prison incarceration, which are not available to inmates who do not participate in the program.

62.     Dixon Correctional Industries hires inmates from a waitlist.  Mr. Woodley, who was otherwise eligible to work at Dixon Correctional Industries, put his name on the waitlist in April 2010.  Mr. Woodley's intention in placing his name on the waitlist for Dixon Correctional Industries was to further his rehabilitation during his time in prison through this vocational program; to earn income during his remaining time in prison; to develop skills at Dixon Correctional Industries that he could use to secure a viable job upon his release from the IDOC; and to gain an earlier release from the IDOC through the accumulation of credit so that he could resume his life in the outside world as a productive citizen.

63.     Mr. Woodley waited for years on the waitlist, while non-disabled inmates who had placed themselves on the waitlist after him were given positions with Dixon Correctional Industries.

64.     After waiting five years to be hired, Mr. Woodley filed a grievance noting that despite years on the waitlist, he had not been hired while non-disabled inmates who had entered the waiting list after him had been hired.  The IDOC official in charge of Dixon Correctional Industries, Superintendent Christopher Melvin, responded to the grievance by claiming that Mr. Woodley had not been hired because a position at Dixon Correctional Industries had not yet become available for him to fill.  On these grounds Mr. Woodley's grievance was denied.  More time has passed since Mr. Woodley's 2015 grievance, and more inmates whose names were placed on the list after Mr. Woodley's continue to be hired by Dixon Correctional Industries, while Mr. Woodley has not.

18

65. On information and belief, Dixon Correctional Industries offers positions that, with reasonable modifications, would be available to someone with Mr. Woodley's visual impairments. These include positions involving steps in the creation of lenses, the cleaning of lenses after they have been cut, the packing of lenses for shipment, and the performance of related clerical and administrative tasks. It is common for such positions to be provided to persons with visual impairments through a variety of reasonable accommodations, particularly accommodations that help an employee to read or understand written materials and perform other close-vision tasks.

66. Indeed, in their response to Mr. Woodley's grievance the defendants did not claim that reasonable accommodations within Dixon Correctional Industries were not possible, just that no positions have are yet available. That claim that is demonstrably false: because employment at Dixon Correctional Industries is reserved for inmates with only limited time left on their sentences, it is likely that the entire workforce at Dixon Correctional Industries has turned over since Mr. Woodley put his name on the waitlist in 2010.

**Effect of Discrimination at Dixon Correctional Industries**

67. As a result of being passed over on the Dixon Correctional Industries waitlist, Mr. Woodley has suffered, and continues to suffer, the following injuries:

     a. He has lost and is losing wages that he otherwise would have earned had he been hired when his turn came up on the waitlist.

     b. He has been and is being deprived of the ability to gain skills through work at Dixon Correctional Industries, and as a result he has lost earning potential in the outside world.

c.      He has lost and is losing the opportunity to earn credits through work at

Dixon Correctional Industries, and thus has and is losing the opportunity to earn

an early release from incarceration, causing damages.

## CLAIMS FOR RELIEF

### Count One
**Americans with Disabilities Act** (42 U.S.C. § 12101 *et seq.*)
(Defendants Baldwin and the IDOC)

68.     Each paragraph of this complaint is incorporated as if fully restated here.

69.     Congress enacted the ADA "to provide a clear and comprehensive national

mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. §

12101(b)(1).  Title II of the ADA states that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132.

70.     To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to

"make reasonable modifications in policies, practices, or procedures when the modifications are

necessary to avoid discrimination on the basis of disability, unless the public entity can

demonstrate that making the modifications would fundamentally alter the nature of the services,

program, or activity."

71.     The IDOC is a public entity as defined in 42 U.S.C. § 12131(1).

72.     Plaintiff has a disability within the meaning of the Americans with Disabilities

Act.

73.     Plaintiff is otherwise qualified to participate the following programs, services, or

benefits:

a.      college-level education courses offered at Dixon Correctional Center;

20

       b.      the vocational program offered through Dixon Correctional Industries;

       c.      the opportunity to advocate for his health and correspond with attorneys,

friends, and family through reasonably confidential communications;

       d.      the ability to travel around the prison and access prison services as

otherwise permitted, without unreasonable risk to safety;

       e.      the ability to read documents and perform other near-vision tasks while

incarcerated; and

       f.      the ability to live in a safe, reasonably hygienic cell.

74.     Under the Title II of the ADA and 28 C.F.R. § 35.130(a), the IDOC is responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

75.     Despite Mr. Woodley's known and obvious disability the IDOC failed to reasonably accommodate his disability, as described herein.

76.     Because of Mr. Woodley's disability, the IDOC is and has been excluding him from or has denied him access to each program, service, or benefit described herein. Thus Mr. Woodley has been subjected to discrimination in each program, service, or benefit as a result of his disability.

77.     Mr. Woodley has been injured and continues to be injured as a result of this discrimination, as described elsewhere in this complaint.

## Count Two
### Rehabilitation Act (29 U.S.C. § 701 *et seq.*)
(Defendants Baldwin and the IDOC)

78.     Each paragraph of this complaint is incorporated as if fully restated here.

79.     Mr. Woodley has a disability within the meaning of the Rehabilitation Act.

80.     Mr. Woodley is otherwise qualified to participate the following programs, services, or benefits:

      a.     college-level education courses offered at Dixon Correctional Center;

      b.     the vocational program offered through Dixon Correctional Industries;

      c.     the opportunity to advocate for his health and correspond with attorneys, friends, and family through confidential communications;

      d.     the ability to travel around the prison and access prison services as otherwise permitted, without unreasonable risk to safety;

      e.     the ability to read documents and perform other near-vision tasks while incarcerated; and

      f.     the ability to live in a safe, reasonably hygienic cell.

81.     Under the Rehabilitation Act the IDOC is responsible for ensuring that individuals in its custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability and are not, on the basis of disability, excluded from participation in or denied the benefits of its services, programs, or activities because of their disability.

82.     The IDOC receives federal funding.

83.     Despite Mr. Woodley's known and obvious disability the IDOC failed to reasonably accommodate his disability, as described herein.

84.     Because of Mr. Woodley's disability, the IDOC is and has been excluding him from or have denied him access to each program, service, or benefit described herein. Thus, Mr. Woodley has been subjected to discrimination in each program, service, or benefit as a result of his disability.

85.     Mr. Woodley has been injured and continues to be injured as a result of this discrimination, as described elsewhere in this complaint.

**Count Three**
**Eighth Amendment to the United States Constitution**
(Defendants Baldwin, Keane, Varga, Wexford, and Does 1-5)

86.     Each paragraph of this complaint is incorporated as if fully restated here.

87.     Mr. Woodley has a serious medical need in that, because he suffers from STGD, he requires visual aids in order to avoid strain to his eyes that damages his retinas and causes severe pain.

88.     Mr. Woodley has a serious medical need in that, because he suffers from STGD, he requires visual aids to prevent him from injuring himself as he attempts to navigate the prison and being able to live in hygienic conditions in his cell.

89.     Defendants are and have been aware of facts from which the inference could be drawn, and they drew the inference, that a substantial risk of serious harm existed if Mr. Woodley did not receive the visual aids he required.

90.     Notwithstanding the facts of which they were aware, defendants failed or refused to provide Mr. Woodley with the visual aids he required, exhibiting deliberate indifference to a serious medical need.

91.     Mr. Woodley has been injured and continues to be injured as a result of this failure or refusal to provide him with visual aids, as described elsewhere in this complaint.

**WHEREFORE**, Plaintiff Stephon Woodley respectfully requests that he be granted the following relief:

1.     Declare that the defendants' conduct as alleged herein violates Mr. Woodley's rights under the following laws:

      a.     the Americans with Disabilities Act;

      b.     the Rehabilitation Act; and

      c.     the Eighth Amendment prohibition against cruel and unusual punishment.

2.     Award equitable relief, including without limitation, an order that defendants IDOC, Baldwin, Varga, Keane, Wexford, and/or Does 1-5:

      a.     Provide plaintiff with a portable digital magnifier that is appropriate for Mr. Woodley's current visual impairment;

      b.     Acquire each of the Additional Visual Aids, conduct an expedited security review of these aids, and provide them to Mr. Woodley;

      c.     Hire Mr. Woodley at Dixon Correctional Industries;

      d.     Provide Mr. Woodley with back pay that he would have been awarded through employment at Dixon Correctional Industries had he been hired in the proper order on the Dixon Correctional Industries waitlist;

      e.     Award Mr. Woodley the credit against his incarceration that he would have been awarded if he had been hired in the proper order on the Dixon Correctional Industries waitlist.

3.     Award actual damages for injuries suffered by Mr. Woodley from damage to his retina as a result of being deprived the visual aids described herein.

4.      Award actual damages for the physical injuries suffered by Mr. Woodley as a result of hurting himself while attempting to navigate in the prison, for want of visual aids described herein.

5.      Award actual damages for income that Mr. Woodley would have earned at Dixon Correctional Industries if he had been hired in the proper order on the Dixon Correctional Industries waitlist.

6.      Award actual damages for income that Mr. Woodley will lose as a result of his loss of education resulting from the failure to provide Mr. Woodley with the visual aids described herein.

7.      Award actual damages for income that Mr. Woodley would have earned in civilian employment if he had been released earlier, pursuant to the credit that Mr. Woodley would have earned if he had been hired in the correct order on the Dixon Correctional Industries waitlist.

8.      Award actual damages for income that Mr. Woodley will lose as a result of his loss of vocational experience as a result of the failure to hire him at Dixon Correctional Industries from the Dixon Correctional Industries waitlist.

9.      Award actual damages for the injuries Mr. Woodley has suffered as a result his extended confinement in prison, which has resulted from defendants' failure to award him credit against his incarceration, which has resulted from their failure to hire him at Dixon Correctional Industries in the proper order on the waitlist.

10.     Award punitive damages against each of the defendants except Defendants Baldwin and the IDOC.

11.     Award costs and attorney's fees.

12.     Award all other relief that is just and proper.

*     *     *

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial on all issues so triable.

February 9, 2018                                     /s/ Stephen H. Weil

                                        Stephen H. Weil – steve@weilchardon.com
                                        Alexis G. Chardon – ali@weilchardon.com
                                        Weil & Chardon LLC
                                        333 S. Wabash Avenue, Suite 2700
                                        Chicago, IL 60604
                                        (312) 585-7404

                                        *Attorneys for Plaintiff Stephon Woodley*