```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            WESTERN DIVISION

 3    STEPHON WOODLEY,                   )  Docket No. 18 CV 50050
                                         )
 4                   Plaintiff,          )  Rockford, Illinois
                                         )  Monday, April 23, 2018
 5       v.                              )  10:00 o'clock a.m.
                                         )
 6    JOHN R. BALDWIN, et al.,           )
                                         )
 7                   Defendants.         )

 8                      TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE IAIN D. JOHNSTON
 9
      APPEARANCES:
10
      For the Plaintiff:    WEIL & CHARDON, LLC
11                          (333 South Wabash Avenue
                             Suite 2700,
12                           Chicago, IL  60604) by
                            MS. ALEXIS G. CHARDON
13                          MR. STEPHEN H. WEIL

14    For the Defendants:   OFFICE OF THE ILLINOIS ATTORNEY GENERAL
                            (100 West Randolph Street,
15                           13th Floor,
                             Chicago, IL  60601) by
16                          MR. EDWARD M. BRENER

17                          BOLLINGER CONNOLLY KRAUSE LLC
                            (500 West Madison Street,
18                           Suite 2430,
                             Chicago, IL  60661) by
19                          MR. FRANCISCO J. ESPINOSA

20    Court Reporter:       Heather M. Perkins-Reiva
                            327 South Church Street
21                          Rockford, Illinois  61101
                            (779)772-8309
22

23

24

25
```

```
 1              THE CLERK:  Calling 18 CV 50050, Woodley v. Baldwin,
 2  et al.
 3              MR. BRENER:  Good morning, your Honor.  Edward
 4  Brener, B-r-e-n-e-r, on behalf of the State of Illinois
 5  Defendants.
 6              THE COURT:  Good morning, Mr. Brener.
 7              MR. WEIL:  Good morning, Judge.  Steve Weil on behalf
 8  of the Plaintiff.
 9              THE COURT:  Good morning, Mr. Weil.
10              MS. CHARDON:  Good morning, your Honor.  Ally
11  Chardon, Alexis Chardon, on behalf of the Plaintiff.
12              THE COURT:  Good morning, Ms. Chardon.
13              MR. ESPINOZA:  Good morning, your Honor.  Francisco
14  Espinoza on behalf of Wexford Health Sources.
15              THE COURT:  Good morning, Mr. Espinoza.
16              All right.  And we have Mr. Woodley appearing through
17  the videoconferencing.
18              Mr. Woodley, can you hear us?
19              MR. WOODLEY:  Yes, sir.
20              THE COURT:  Okay.  If there is a microphone nearby,
21  get it closer to Mr. Woodley so that we can hear him when he
22  speaks, okay?
23              MR. WEIL:  Judge, we went over this a little before
24  you came on the bench.  He is kind of stuck where he is at.
25  It might maybe just make sense -- he is a bit soft
```

1   spoken -- to have him speak up a little, and that might be our

2   solution.

3          THE COURT:  Okay.  All right.  So before we get

4   started, this is the first thing we can do.  There is a -- and

5   I see Mr. Woodley, obviously.  Does IDOC have any -- I'm using

6   "IDOC" as a generic.

7          Does the Defendant have any witnesses that you plan

8   on presenting?

9          MR. BRENER:  We have one witness who is sitting

10  outside the courtroom.  Her name is Amber Allen.  She's the

11  health care administrator at Dixon.

12         THE COURT:  I didn't know she was back.  I thought

13  she left and then came back.

14         Wasn't she at East Moline for a little bit?

15         MR. BRENER:  You have information that I'm not privy

16  to, Judge.

17         THE COURT:  Maybe she was there short term.  Okay.

18         All right.  Wexford has filed a motion to dismiss,

19  and then the IDOC Defendants have filed a partial motion to

20  dismiss.  Let's just get a briefing schedule on those two.

21  Those will go to Judge Reinhard for a ruling.

22         How much time would you need to respond to the

23  motions to dismiss?

24         MR. WEIL:  Four weeks, if we could, Judge.

25         THE COURT:  Let's make it May 25th.

```
 1              Mr. Brener, how much time to reply?

 2              MR. BRENER:  Fourteen days, Judge.

 3              THE COURT:  Make it June 11th.  That will be for both

 4    sets of briefs.  I have that.  So that takes care of that

 5    issue.

 6              MR. ESPINOZA:  I'm sorry, your Honor.  Do we both get

 7    14 days?  Is that what you are saying?

 8              THE COURT:  Wexford and --

 9              MR. ESPINOZA:  Yes, okay, thank you.

10              THE COURT:  -- and IDOC get 14 days, okay?

11              I have the parties' joint written status report on

12    the administrative exhaustion issue.  That was a helpful

13    document.  So there is -- well, obviously, there were exhibits

14    attached.  Mr. Woodley appears to have exhausted his

15    administrative remedies under the PLRA.

16              Any issue as to -- did Mr. Woodley file anything with

17    the EEOC?

18              MR. WEIL:  I haven't spoken with my client about

19    that, Judge, since we received the brief.

20              THE COURT:  Okay.  Maybe we will get to it today -- I

21    assume he is going to testify today, right?

22              MR. WEIL:  Judge, our position, there is a piece of

23    the IDOC's brief about that, but the preliminary injunction

24    motion doesn't have anything to do with Dixon Correctional

25    Industries.  So it has to do with the visual aids that he was
```

1  prescribed.  So I don't understand why that was briefed at all
2  at this point, but in all events --
3          THE COURT:  Well, maybe I was confused, too.  I
4  thought it was briefed because part of the Plaintiff's issue
5  was he needed these four devices so that he could work in the
6  Industries.
7          MR. BRENER:  That was my understanding, and the
8  reason that I included that in my brief, your Honor, I don't
9  think it was at all clear in the motion under which theory or
10 theories Plaintiff was proceeding.
11         THE COURT:  Okay.  Well, I think he is just knocking
12 one out for you.
13         MR. WEIL:  We want the four devices.  It
14 doesn't -- it is not necessary -- it would help for Dixon
15 Correctional Industries, but it is necessary for all the rest.
16         THE COURT:  Okay.
17         MR. BRENER:  So can we maybe clarify, then, which
18 statutes Mr. Woodley is asserting that he is entitled to this
19 preliminary injunction under?  Because I think that would be
20 helpful.
21         THE COURT:  Okay.  Are we moving under the
22 Rehabilitation Act, Section 1983, or both?
23         MR. WEIL:  Both, Judge, and the ADA section, too.
24         THE COURT:  Okay.  All right.  Just let me put those
25 over there.

1          All right.  I have read the briefs and the filings.

2    The parties can litigate however they want to litigate.

3    That's fine.  I don't get paid to litigate anymore.  I call

4    balls and strikes.

5          Having said that, I have got some questions for both

6    of you.  You can either tell me now after I'm done asking you

7    the questions or you can incorporate it into whatever you are

8    going to present today.

9          In no particular order, let's start an easy one

10   because it is the first Post-it on here.

11         Let's make sure I got the facts correct:  Mr. Woodley

12   had a device that you are seeking now, correct?

13         MR. WEIL:  He had a portable digital magnifier in the

14   past, yes.

15         THE COURT:  And it is the same device?

16         MR. WEIL:  It is a portable digital magnifier.  At

17   one point he was prescribed, essentially, a better one.

18         THE COURT:  Okay.  I know there is a six times versus

19   eight times.

20         MR. WEIL:  It is not that, Judge.

21         THE COURT:  Okay.

22         MR. WEIL:  So the six versus eight versus even ten

23   power magnification, those are all essentially the magnifying

24   glass you would get at a store, at a Walgreens, or a

25   magnifying sheet that you probably saw in junior high.  Those

 1    are entirely separate from the portable digital magnifiers.

 2            Mr. Woodley, and we will bring all this out, he was

 3    issued those basic magnifying glasses beginning in 2002 when

 4    he entered IDOC up to 2012.  In 2012, a request is

 5    made -- yes, it's 2012, a request is made.  He can't read with

 6    these things.  Let him get a portable digital magnifier.  He

 7    is allowed to buy one in 2012.  He buys it with his own money.

 8            THE COURT:  Okay.  Let me pause you right there.  Let

 9    me pause you right there.

10            MR. WEIL:  Sure.

11            THE COURT:  So he has had a portable digital

12    magnifier in the past.  I assume before Mr. Woodley was

13    physically handed that portable visual magnifier, the Illinois

14    Department of Corrections looked at the device and said it is

15    not a security issue.  I'm assuming that's correct.

16            MR. BRENER:  I'm sure that they did, Judge.  I

17    don't --

18            THE COURT:  Okay.

19            MR. BRENER:  I have no doubt that that happened.

20            THE COURT:  You and I are on the same wavelength.

21            So the obvious question becomes, and it is not

22    addressed in any of the filings, but the painfully obvious

23    question becomes is if DOC inspected that device in the past,

24    and it sounds like it is the same device, why do they need to

25    inspect it again?

1       MR. BRENER:  I will clarify.  I think it is a similar

2  device.  I don't think it is the same device.  But that

3  doesn't really directly answer your question.  I will do my

4  best to do that.

5       My understanding with the security risk, No. 1, they

6  have not had the opportunity to review it, and so that

7  presents a security risk because they are fairly risk averse,

8  and it is a question of the unknown.  It was specifically

9  brought to my attention that the cord would be a concern

10  because that same cord that charges the specific device that

11  he is asking for could also be used to charge, for instance, a

12  cell phone, which is a very specific security risk in a

13  prison.

14       THE COURT:  And that's fine.  Let me pause you there.

15       Did the previous device have a cord?

16       MR. BRENER:  Yes.  It was also electronic, and I

17  don't know the answer to what I think your next question is

18  going to be, which is could it have also done that.

19       THE COURT:  I mean, look, these aren't -- I'm not

20  going to -- I'm not the smartest person in this room right

21  now.  I guarantee you that.  So these questions should have

22  been kind of hashed out a long time ago, maybe even years ago.

23       If he used a cord on a device previously, and that's

24  a concern now, why was it okay before, but not okay now?  Why

25  do -- if it is a cord, what inspection process would you need?

1    It is a cord.  I mean, does it have -- has it got razor blades

2    on the sides?  Does it got some thermonuclear device we are

3    concerned about?

4         MR. BRENER:  No and no.

5         THE COURT:  Okay.  So that's an obvious question that

6    comes to mind that I'm a little confused about.  Maybe we will

7    get it hashed out in the process.

8         MR. WEIL:  Judge, I think one quick thing here.  I

9    think the security has never laid eyes on the device because

10   it was never acquired for inspection.

11        THE COURT:  I understand the circular problem that

12   your client finds himself in, which is Wexford won't get the

13   device until IDOC approves it.  IDOC won't approve it until

14   Wexford gets the device, and then we just keep going in

15   circles.

16        Kind of where we are at, right?

17        MR. BRENER:  I think so, yes.

18        THE COURT:  We've probably all read Catch-22 at some

19   point in high school, and if not high school, college.

20        Okay.  So that's one issue that, at some point, will

21   be helpful.

22        In the years when I was an assistant attorney

23   general, I saw lots of -- not lots, I saw several people who

24   were blind at IDOC who had canes.  I don't know if that's

25   still an issue.  I think I have seen them at Dixon since I

1    went out and visited.

2            Are there sight-impaired people in IDOC facilities

3    who are given canes?

4            MR. BRENER:  Yes, and I'm going to follow up on that.

5    Mr. Woodley is getting an extendible cane.  That is something

6    that I have addressed since we were last in front of you,

7    Judge.

8            THE COURT:  Okay.

9            MR. BRENER:  I explained that to counsel.  He is

10   getting the cane.  It has either been ordered or it will be

11   ordered today.  He should be getting it this week.

12           THE COURT:  Fantastic.  All right.

13           And these will be in no particular order.  I'm just

14   going off of my notes from the briefs as I read them.

15           This is an issue that Wexford raised.  It is an issue

16   that I raised in my head.  We talked about it in chambers.  We

17   are not -- the Plaintiff is not seeking to maintain the status

18   quo.  In fact, the Plaintiff is seeking to change the status

19   quo.  So is it a mandatory -- you don't have to answer this

20   now.  It certainly seems like a mandatory injunction, and if,

21   in fact, it will last during the duration of Mr. Woodley's

22   incarceration, it seems like a mandatory permanent injunction.

23           I don't know what cost we are at here dollar-wise and

24   ranges, but in the -- let's say -- let's just say $450, which

25   happens to be the filing fee cost.  I don't know who paid the

1    filing fee.  I don't know if Mr. Woodley paid it out of his

2    account.  But if it was paid elsewhere, it seems like a

3    solution would have been to get the devices, put them in on

4    the damages component, and proceed with that, and then

5    Mr. Woodley would have the devices.  That just, you know,

6    seemed like it might be a solution to the current situation we

7    find ourselves in.

8         At some point, I need to know why the devices -- I

9    don't know if the issue is IDOC needs to see the devices.  We

10   talked about the circular issue.  But there is an issue of

11   were they not purchased solely because of cost or was there

12   another reason, and if it is solely because of cost, before I

13   even read the next paragraph of the Plaintiff's brief, I went,

14   "I assume there is a return policy."  That seems like a

15   commonsense solution.  So I don't know if they were denied

16   solely before because of cost, but I would like to know that

17   at some point before we are finished today.

18        IDOC Defendants make what seems to be a good point,

19   but I don't know all the facts, so it might not turn out to be

20   a good point.  There is a gap between when he -- Mr. Woodley

21   still has the device that helps him read and he was using it

22   to take classes, and then he doesn't take classes for

23   approximately a year and had the device.

24        Why wasn't he taking classes if that's the goal?

25   Maybe there is a good answer to that; maybe there isn't.  I

1    don't know.

2            How about the lamp?  It sounds like just a really

3    bright light.

4            MR. BRENER:  It is the same problem, Judge.  It is

5    not -- certainly, that one is not about money, even if there

6    is an insinuation that the others are.

7            THE COURT:  Okay.

8            MR. BRENER:  A lamp wouldn't be an expensive

9    purchase.  It is about it hasn't been approved.

10           THE COURT:  Okay.  Are there lamps in any IDOC

11   facility?

12           MR. BRENER:  The inmates are not issued lamps in

13   their cells.

14           THE COURT:  Okay.

15           MR. WEIL:  My understanding, Judge, is that

16   commissary does allow you to buy a lamp.  This one is just

17   more powerful, and Mr. Woodley can clear that up on his

18   testimony.

19           THE COURT:  Okay.  Return policy, raised that.

20           As far as -- I think we got one on the video screen,

21   the ambulatory aides.  I assume they are called "ambulatory

22   aides" for a reason, meaning they help Mr. Woodley ambulate

23   around the prison.  Their function is not to help him read or

24   help him with schoolwork, right?

25           MR. BRENER:  That's my understanding.

1          THE COURT:  They are not tutors, right?  That's why

2     they are called "ambulatory aides," not tutors.

3          MR. BRENER:  That's correct.

4          THE COURT:  Mr. Woodley has an out date the end of

5     September now; is that right?

6          MR. WEIL:  That's correct, Judge.

7          THE COURT:  Okay.  While it is in front of me, I will

8     raise Exhibit 16.  Wexford's point is they are not

9     prescriptions; they are recommendations.  I will freely admit

10    that things were written in a form where it says

11    recommendations, but I'm looking at Exhibit 16, I

12    believe -- yes, 16 -- from the University of Illinois

13    Hospitals.  There is a date on here somewhere.  Well, there is

14    the date it's printed.

15         Okay.  There it is.  Result date, 2/25/2015;

16    performed information, signed information, 3/4/2015; history

17    and functioning.  Okay.

18         MR. WEIL:  Judge, I think I understand -- I might

19    anticipate your confusion.

20         THE COURT:  Well, it says they are prescriptions.  It

21    says script in there, right?

22         MR. WEIL:  Yes.

23         THE COURT:  Let me find -- all right.  It is there.

24         So I get the point that it is a form where it says

25    "recommendations."  Certainly Exhibit 19, as well as maybe

 1    others, seem to strongly indicate it is more than just a

 2    recommendation; it is a doctor ordering a prescription.

 3            MR. ESPINOZA:  Sure.  I understand, your Honor.  I

 4    think in one of the medical records, the Medical Specialist

 5    Services and Referral Report, you have a notation of the

 6    actual doctor from UIC, John Stelmack.

 7            THE COURT:  Can you give me the document number?

 8            MR. BRENER:  This is IDOC 120, Judge.

 9            THE COURT:  From my exhibits, what is it?

10            MR. BRENER:  I pulled that out of my binder.  This is

11    Page 35 of the Plaintiff's filing, Page 35 of 95.

12            THE COURT:  Okay.  I will tell you what I have.

13            MR. WEIL:  I'm sorry.  Exhibit 15, Judge.

14            THE COURT:  Okay.  Exhibit 15.  There we go.  Hold

15    on.  Let me get there.

16            Okay.  Sure, it says "recommendations."

17            Go ahead.

18            MR. ESPINOZA:  Sure.  I mean, I think that anyone

19    seeing that would look at that and see she could have wrote

20    please -- these are prescribed to the Plaintiff.

21            MR. BRENER:  And I would add, Judge, that, yes, a

22    copy of that -- these ophthalmology notes was placed in the

23    Plaintiff's file, but what was actually faxed to the health

24    care unit was a document that said "recommendations."  It

25    said:  "These are my recommended vision aids."  And then on

 1   the next page, there is a recommendation of what it is that --

 2          THE COURT:  Which document is that?

 3          MR. BRENER:  This is Page 36.

 4          MR. WEIL:  This is Exhibit 15 again, Judge.

 5          MR. BRENER:  Still Exhibit 15, on the very next page,

 6   it is just there is four things listed that on the very

 7   previous page Dr. Stelmack says "See attached

 8   recommendations," and that is a document that was faxed to the

 9   health care unit.

10          THE COURT:  Doesn't 19 certainly look like a script?

11   And that's in Wexford's documents, Dr. Tim Chamberlain.

12          MR. WEIL:  Judge, I think I might be able to help

13   out.

14          THE COURT:  Why don't you help out.

15          MR. WEIL:  So if you go to our Exhibit 17 --

16          THE COURT:  Okay.  I'm there.

17          MR. WEIL:  -- it is an IDOC Medical Services Referral

18   and Report.

19          THE COURT:  Yes.

20          MR. WEIL:  This is an IDOC document that they send

21   out to the specialist, to whatever specialist it is,

22   cardiologist, whatever, and it has these fields.  This is Joan

23   Stelmack, Dr. Stelmack, when she sees Stephon Woodley on

24   February 24th.

25          "Recommendations, plans," that's the IDOC -- that's

1    what they want to know from the specialist.

2         THE COURT:  That's the form.

3         MR. WEIL:  And she says essentially on 17 "I will let

4    you know what my recommendation" -- "I will give you my

5    prescription or recommendation," and the semantic difference

6    is a little lost on us, on 17.

7         And then if you go to 15 -- this is my fault for

8    flipping these exhibits around -- this is March 3rd, and this

9    is where she and her staff have looked into what specific aids

10   he needs.  They sent this on March 3rd.  Again,

11   recommendations, plans on an IDOC form which is what they give

12   to specialists to tell them what to do, and that's where she

13   makes the recommendations, and you are looking at Exhibit 15,

14   Pages 1 and 2, and then she prescribes the specific devices.

15        MR. BRENER:  And, Judge, respectively --

16        THE COURT:  Hold on.

17        Go ahead.

18        MR. WEIL:  And then, again, this is the form you give

19   the specialists at IDOC.  This is how patients get sent out

20   from IDOC to go see a specialist and see what they need.

21        Down below, you see both on Exhibit 17 and on

22   Exhibit 16 at the bottom the medical director of the facility

23   says "I approve or disapprove."  In both cases, it says "I

24   approve of these plans."

25        THE COURT:  Exhibit 15, just for the record?

```
1              MR. WEIL:  15 and 17.

2              THE COURT:  Right.  You said 16.

3              MR. WEIL:  I apologize, Judge.

4              THE COURT:  That's okay.

5              MR. WEIL:  And so the semantic difference is a little

6     lost on us, and I'm happy to enter into argument about that.

7     Those are what we are going to discuss, but we can talk about

8     it here later.

9              THE COURT:  Okay.  Go ahead.

10             MR. BRENER:  And respectfully, Judge, this isn't a

11    semantics argument.  There is a serious and real difference

12    between a recommendation and a prescription.  You will hear

13    testimony from Ms. Allen this morning about the difference

14    between the two and how the doctors at Stateville and how the

15    health care unit will treat them differently.  I don't think

16    this is at all a semantic argument.  It absolutely matters.

17             THE COURT:  You said, "Stateville."

18             MR. BRENER:  I'm sorry.  Excuse me.  Dixon is what I

19    meant.

20             THE COURT:  Just making sure.  Okay.

21             MR. WEIL:  So, Judge, from our perspective, the IDOC

22    hires Wexford to provide health care.  A Wexford doctor

23    looking at Mr. Woodley says he needs to go out and see someone

24    about his eyes and get visual aids.  They go to -- and we can

25    march through all these different ophthalmologists that they
```

1  sent him to, march through the exhibits, and each one they

2  send out to say "What does this man need?"  They have the same

3  form.  It says "Recommendations and Plan."  You can see it in

4  Exhibit 2 -- or Exhibit 12.  I'm sorry.  You can see it again.

5          Every specialist they send him to, they send this

6  form out to say "What do we need to do?"  Wexford -- a medical

7  doctor decided they need to figure out what he needs.  You

8  know, this is the doctor at Wexford.  They sent him to a bunch

9  of specialists.  The top of that pyramid is Dr. Joan Stelmack,

10 who is the specialist that these other specialists say

11 Mr. Woodley needs to go to to figure out what he needs based

12 on the IDOC doctor's conclusion that he needs something.  And

13 so the peak of the pyramid here is Dr. Stelmack.  There is no

14 other competent medical opinion about what he needs.

15          I would like to see any referral form that IDOC can

16 point to where they send him out to a specialist that isn't

17 this form, where it says recommendations or plans.

18          THE COURT:  Okay.

19          MR. WEIL:  And all of those recommendations are

20 approved --

21          THE COURT:  Time out, please.  Time out.

22          I'm going to keep going through my questions.  You

23 can argue all you want when we get to it.  I'm throwing these

24 out here:  What I would like to hear about when we get to the

25 evidence.

 1          And Mr. Woodley has worked and continues to work at

 2    the dietary division; is that right?

 3          MR. WEIL:  That's correct, Judge.

 4          THE COURT:  Okay.  And here is -- here is their

 5    points.  It is on Page 5 of my notes:  "Plaintiff needs to

 6    explain 14-month delay there."

 7          MR. WEIL:  I'm sorry, Judge.  Where --

 8          THE COURT:  Page 5 of the IDOC's response brief.

 9          MR. WEIL:  Okay.

10          THE COURT:  Basically, "Plaintiff last enrolled in a

11    college-level course on March 16, 2015, which he completed on

12    May 11, 2015."  So their point is, okay, you had the digital

13    magnifier, but then didn't do anything until -- didn't take

14    any classes in that 14-month period.

15          MR. WEIL:  Judge, Mr. Woodley will explain that

16    Illinois entered a budget impasse.

17          THE COURT:  At some point, someone is going to tell

18    me that.  That's all.

19          MR. WEIL:  Okay.

20          THE COURT:  What is going on with the talking watch?

21    Does he have a talking watch?  And what does it do?

22          MR. ESPINOZA:  I believe it tells him the time, your

23    Honor.

24          MR. WEIL:  It doesn't help him read.  It doesn't help

25    him get around.

 1          THE COURT:  Okay.  I think I already addressed the

 2   Wexford issue.

 3          The main issues that Wexford has raised is

 4   recommendation versus prescription, and then it is not a

 5   preliminary injunction.  It is -- well, if it is a preliminary

 6   injunction, it is a mandatory preliminary injunction, which is

 7   a different standard, and it kind of seems a more accurate

 8   label to be a mandatory permanent injunction.

 9          Okay.  That's all I got.  Let's put on witnesses and

10   let's get this hearing going.

11          MR. WEIL:  Judge -- go ahead.

12          MR. BRENER:  Why don't I jump in.  We do have a

13   couple of stipulations and then also an evidentiary dispute

14   that I think we ought to raise.

15          First of all, with respect to the stipulations, we

16   are not contesting, as you noted, that Mr. Woodley complied

17   with the grievance procedure under the PLRA, so I don't think

18   we need testimony on that.

19          To the extent that any of the records that are being

20   introduced are from his medical chart or his optometric chart

21   or anything that IDOC maintains, again, we will stipulate to

22   it.

23          THE COURT:  Okay.

24          MR. BRENER:  But we do have an objection to the

25   declaration that the Plaintiff has filed.  This is the

1    declaration of Joan Stelmack.

2          THE COURT:  Okay.  And what's the basis of the

3    objection?

4          MR. BRENER:  Fairness, Judge.  It is true that --

5          THE COURT:  Give me a rule of evidence.

6          MR. BRENER:  Well, it is going to be Rule 403,

7    really.

8          THE COURT:  Okay.

9          MR. BRENER:  It is true that when we are here for

10   preliminary injunction hearings, declarations may be admitted

11   in lieu of live testimony, but you just heard from them that

12   this is essentially their star witness.  She is not here to

13   testify.  This is a preliminary injunction hearing.  I have

14   not had the opportunity to conduct any discovery on her.  I

15   haven't had the opportunity to depose her.  And I think it is

16   important that the language that she uses in this declaration,

17   that this was a prescription, directly contradicts the

18   language she used in the document that she faxed to the

19   department in which she said that "I am recommending certain

20   visual aids be provided to Mr. Woodley."

21          That's important testimony.  I can't elicit it.  I

22   have never been offered the opportunity to elicit it.  And I

23   think we should stick with what's in the medical records.

24          THE COURT:  Well, it is a preliminary injunction

25   hearing, and I don't think it was a big surprise.  I set this

1    thing out 30 days.  Now, I know you are busy, and I set it out

2    30 days in large part because you were busy, but her name was

3    all over the documents, and the Plaintiff made a big deal

4    about her multiple times.  I set it out 30 days for a couple

5    of things:  One, to get the cane.  That seemed like an easy

6    thing.  And, two, I don't know --

7                MR. BRENER:  I would note that this declaration was

8    filed one week ago.

9                THE COURT:  Right.  But she is not a surprise is my

10   point.

11               MR. BRENER:  But her testimony that this is a

12   prescription, again, it directly contradicts what's in the

13   medical records.

14               THE COURT:  I don't think it does, and we will hear

15   from Ms. Allen.  I would like to hear from her testimony.

16               Okay.  I will take it under advisement.  There is no

17   jury here.

18               Okay.  So you got the stip as to PLRA issue, as to

19   the authenticity of the medical records.  You got an issue

20   over the declaration.

21               Any other evidentiary issues I should know about

22   before we get started?

23               MR. WEIL:  None here, Judge.

24               THE COURT:  Okay.  All right.

25               MR. WEIL:  Judge, in terms of housekeeping, I thought

1  what we would do, and this may be what you said, and I'm

2  repeating you, but essentially in terms of our case-in-chief,

3  we take Mr. Woodley's testimony, do any redirect after cross,

4  and then just move all the exhibits into evidence.  I think

5  the defense wants to do essentially the same thing.  And then

6  we have argument after that.

7          THE COURT:  Okay.

8          MR. BRENER:  No objection.

9          MR. ESPINOZA:  No objection.

10          THE COURT:  All right.  Go ahead.

11          MR. WEIL:  In terms of the literal physical, we have

12  a deck of our exhibits for the court, if that's how we are

13  going to admit them.  They have obviously been submitted to

14  you electronically.

15          THE COURT:  Out of curiosity, is Mr. Woodley going to

16  be talking about the exhibits?  And, if so, how?

17          MR. WEIL:  He can't read them.

18          THE COURT:  That was my question.

19          MR. WEIL:  Yes, there may be -- I do have a couple of

20  documents that might refresh his recollection, Judge, and that

21  creates a bit of a situation.  I thought that I would just

22  read off from the document what it was.  I mean, we don't have

23  a jury here, so I'm a little less concerned about prejudice,

24  and just see if that refreshes his recollection if this comes

25  up at all.

1          THE COURT:  You can put your evidence in however you

2     want to put it in.

3          MR. WEIL:  Okay.

4          THE COURT:  How do you want to put it in?

5          MR. WEIL:  If we have -- I want Mr. Woodley to

6     testify.  Again, the documents, if they are entered into

7     evidence, I can make argument off of those later.  If I need

8     to refresh his recollection with something, I will try to do

9     that and see if we have any trouble.

10          I don't anticipate showing Mr. Woodley documents,

11     however you might do that.  I think we will just have him walk

12     through the experience.

13          THE COURT:  Okay.  If you want the exhibits in, you

14     can make a motion, and they can object, and I will rule on it.

15          MR. WEIL:  Well, we will move to tender all the

16     exhibits into evidence, then.

17          THE COURT:  Okay.  All the exhibits that are attached

18     to the filing?  I have got -- I have Plaintiff's brief with

19     Exhibits 1 through 33.

20          Is that what you are looking to get admitted?

21          MR. WEIL:  Yes, Judge.

22          THE COURT:  Okay.  Any objection?

23          MR. BRENER:  I will renew my objection to Exhibit 33.

24     No objection to the remaining records.

25          THE COURT:  Okay.  And that will be taken under

Woodley - Direct

25

1   advisement.

2         MR. BRENER:  And, Judge, I would make a similar

3  motion with respect to the exhibits attached to my brief.

4         MR. ESPINOZA:  And my brief as well, your Honor.

5         MR. WEIL:  No objection here, Judge.

6         THE COURT:  Okay.  There you go.  Problem solved.

7  And I will rule on the declaration at some point.  Okay.

8         MR. WEIL:  Are we going to swear the witness in?

9         THE COURT:  You tell me when you are ready to go.

10        MR. WEIL:  I'm ready, Judge.

11        THE COURT:  Okay.  Mr. Brener, are you ready?

12        MR. BRENER:  Yes, Judge.

13        THE COURT:  Mr. Woodley, can you stand and raise your

14  right hand?

15        (Witness duly sworn.)

16       STEPHON WOODLEY, PLAINTIFF'S WITNESS, SWORN

17               DIRECT EXAMINATION

18  BY MR. WEIL:

19  Q.  Good morning, Mr. Woodley.  Steve Weil here.  Can you hear

20  me okay?

21  A.  Yes.  Can you hear me?

22  Q.  Yes, I can.  Thank you.

23         I want to go through your experience at Wexford and

24  specifically your experience with your visual impairment over

25  time.

Woodley - Direct

26

1    A.   Yes.

2    Q.   What is your visual impairment?

3    A.   It is a condition called Stargardt's macular dystrophy,

4    which is a form of macular degeneration that affects the

5    central vision, and it is not corrected with glasses, and

6    there is no surgery to correct the retina loss, and my central

7    vision is distorted.

8    Q.   When were you diagnosed with this condition, Mr. Woodley?

9    A.   I would say between the age of 10 or 11, but the vision

10   was actually good at the time.  I noticed the difference in

11   the classroom.  Like I sat in the back because my name begins

12   with a W, and I couldn't see the blackboard, like I was, at

13   that age.  And I went to the Illinois School of Optometry in

14   Chicago, and then I found out at Northwestern when they

15   explained to me that it is Stargardt's, which is a juvenile

16   version of macular degeneration, and they said then on down

17   the line this is how it would affect me.

18   Q.   And what did they tell you?

19   A.   They told me at some point in my 20s and 30s that the

20   vision would drastically decrease.  So they explained to me

21   that now for this period of time that the vision may not

22   change that much, and it is no surgery or anything like that

23   that would come along, and in my 20s or 30s this is what would

24   happen.  I would become blind or legally blind.  I would

25   become visually impaired.

Woodley - Direct

27

1   Q.   Okay.  Mr. Woodley, do you recall when you entered IDOC,

2   what year?

3   A.   2002, IDOC.

4   Q.   Okay.  And were you diagnosed with this again there?  Did

5   the people -- did the doctors recognize it at that time?

6   A.   Yes.  I have -- every facility has an eye doctor do an

7   examination, and when you look into the eye, every eye doctor

8   can see the spotting there, and I was diagnosed with it there

9   as well.

10  Q.   And when you were diagnosed -- so you are -- just to make

11  sure we are clear, you were diagnosed again or it was

12  recognized again when you came in in 2002, right?

13  A.   At that time.  I was previously diagnosed.

14  Q.   Understood, Mr. Woodley.

15          At that time in 2002 when the eye doctor recognized

16  your condition, were you given any sort of magnifying glass or

17  any other visual aid?

18  A.   Yes.  Initially, I was given like a pocket magnifier

19  because I didn't need as much strength and power at that time

20  to read documents, mail, legal things like at that time.

21  Q.   And did your vision worsen over time when you were at

22  IDOC?

23  A.   Yes, sir.  In my mid to late 20s, it gradually decreased,

24  and when it decreased, they provided more powerful

25  magnification.  Then it actually came to a point where it

Woodley - Direct

28

 1    rapidly decreased and the vision acuity became 20/400, which

 2    is considered legally blind.

 3    Q.   Okay.  Mr. Woodley, as I recall, you were born in 1980, so

 4    that makes the math kind of easy here.  Your mid-20s is 2005,

 5    from there on out?

 6    A.   Yes.  I would say from mid-2005, I had to get another

 7    magnifier at that particular time frame.  And from that point

 8    on, from maybe 28 to 32, that's when it really progressively

 9    happened, then.  It changed rapidly, surprisingly.  It changed

10    dramatically, in fact.

11    Q.   Has it changed much since 2012?

12    A.   The central vision has been decreasing to this point, and

13    I would say that it has started to affect the curriculum a

14    little bit more, but it is to the point now it is hard with

15    mobility and other things.  I never had challenges with it in

16    the past.

17    Q.   Okay.  Notwithstanding your visual impairment, did you get

18    a GED in prison?

19    A.   Yes, sir.

20    Q.   Do you remember when you got that degree?

21    A.   Yes.  Initially, when I came to IDOC, I began my -- my

22    vision was bad, and I began working, and I had different jobs

23    and things of that nature, and I helped people that worked for

24    the health care department, things like that.

25         My vision started to decrease, and I realized what

Woodley - Direct

29

 1   the specialist at Northwestern was telling me about as a

 2   child: how I need employment to be looking to pay for things

 3   when I get older.  I realized that as my vision decreased, I

 4   need to get my education started, and I enrolled in the

 5   diploma program.  I took the test on tape.  They brought in a

 6   tape and person to administer the test.  They brought a real

 7   big -- big, big, foot-like, huge, and the instructor was

 8   trying to help me through it, and I was the valedictorian of

 9   my class when I got my diploma.

10   Q.  Let me back you up, Mr. Woodley.

11        Do you remember the year you got your GED?

12   A.  2011, I believe.

13   Q.  Okay.  Would somewhere around April 6th be about right?

14   A.  What did you say, sir?

15   Q.  April 2011?

16   A.  Yes, that's -- that's what I'm saying.  That's accurate.

17   Q.  And if I understood you correctly, your vision was pretty

18   bad at this point --

19   A.  Yes.

20   Q.  -- by the time you got your GED?

21   A.  Yes.

22   Q.  How did you study for it?

23   A.  At that particular time, I had a hand-held magnifier that

24   wasn't powerful enough, and we used books on tape.  And the

25   teacher tried to help me as much as possible and explained, at

Woodley - Direct

30

1  the same facility, that the things that he was teaching me, he

2  explained the subjects that I will be taking the test on, and

3  they gave you what they called a "pretest."  So doing a

4  pretest, you know what you specifically have to study, and the

5  teacher, at that particular time, was real resourceful on what

6  to study.

7  Q.  Okay.  Mr. Woodley, you said you used books on tape.  How

8  would you do that?  I mean, how would you read a book on tape?

9  What would you do?

10 A.  The books on tape, you inject it, and play it, and it

11 explains the question to you, and you can constantly repeat it

12 over and over again.  It takes a long time to try to study

13 like that because you bring it to your ear, because of your

14 vision, and you have got to just keep playing it over and over

15 again trying to understand, and you have somebody physically

16 there to try to show you the diagrams, and it is a long

17 process.

18 Q.  Okay.  Thanks, Mr. Woodley.

19      Do you remember how you scored on the math at that

20 time?

21 A.  I'm exceptional at math and science.  I had the highest

22 grade possible that you can get in math.

23 Q.  Okay.  And how did you study for math with books on tape?

24 What were you doing?

25 A.  Well, before with the books on tape, the teacher tried to

Woodley - Direct

31

1    explain.  He had tried to make -- he had tried to make things
2    on paper large, huge, to go through like the equations and
3    things like that, and he specifically knows these are the
4    subjects that we have to study for.  So when they administer
5    the test -- and the tape was actually playing back.  I was
6    listening to the teacher explain it to me when I was listening
7    to it on tape and to be able to compute the math problems onto
8    paper now.
9    Q.  So there was books on tape for that as well?  Is that --
10   A.  The test was books on tape, but the pretest was audio of
11   the teacher for the other -- there was two teachers, a male
12   and a female, that administered the pretest.
13   Q.  Okay.  Thank you, Mr. Woodley.
14           After you got your degree in, I guess it was, April
15   of 2011, did you register for college after that?
16   A.  Immediately, sir.
17   Q.  Do you remember when you started taking classes?
18   A.  I would say it was the time period '11 or '12.
19   Q.  Okay.
20   A.  I can't remember, but not too far from that particular
21   time to get my diploma.
22   Q.  Mr. Woodley, the audio cut out here for a second.  Did you
23   say you started taking classes in 2012?
24           THE COURT:  I thought he said '11 or --
25           THE WITNESS:  Right.  It was '11 or '12.  I can't

Woodley - Direct

32

1   pinpoint the exact time frame, but it was after that because I

2   immediately registered once I got the diploma.  You had to get

3   that to register.  That was in '11, sure, because you had to

4   take your GED showing that you were eligible to take college

5   courses, and I registered for college 8/11.

6   BY MR. WEIL:

7   Q.  Okay.  Were there books on tape available in college for

8   the college courses you were taking?

9   A.  No, no, the college courses don't have books on tape, and

10  the books can't be ordered in large print.

11  Q.  Did that create a problem for you, the fact that there

12  were no books on tape for the college courses?

13  A.  Right, that was a problem, and the instructors couldn't

14  enlarge certain things off of computers or whatever.  Like the

15  font, they couldn't enlarge the font.  So I needed a more

16  powerful magnifier to try to get through the parts that I

17  couldn't visibly see.

18  Q.  Okay.  Do you remember receiving -- well, let's talk

19  about -- well, you heard us discuss earlier you got a digital

20  magnifier at some point, right?

21  A.  Yes, sir.

22  Q.  When did you get that?

23  A.  I believe it was 2012.

24  Q.  Okay.  Did that change your ability to take college

25  courses?

Woodley - Direct

33

 1   A.  Yes, sir.  It allowed me to study and read the text, and I

 2   was able to maintain a 4.0 GPA because I could study and read

 3   every time we had an assignment to do or any kind of test

 4   inside of the classroom and stuff.

 5   Q.  Okay.  Mr. Woodley, you said you got the digital magnifier

 6   in 2012.  Did it break at some point after that?

 7   A.  Yes.  In 2014, I believe, the charge -- the charge didn't

 8   charge, something to that nature, like in '14.

 9           THE COURT:  He broke up.  I didn't hear.

10   BY MR. WEIL:

11   Q.  Mr. Woodley, you cut out again.  Could you just say that

12   again?

13   A.  In 2014, the charger had failed.

14           THE COURT:  The charger failed, okay.

15   BY MR. WEIL:

16   Q.  Okay.  And could you use the digital magnifier when the

17   charger failed?

18   A.  No, sir, because even though it is rechargeable, once the

19   battery life dies, there is no way to regenerate power to make

20   it operate.

21   Q.  Mr. Woodley, I want to back up for a second to when you

22   acquired the first digital magnifier in 2012.

23           Was that purchased for you, or did you buy it with

24   your own money?

25   A.  I had to write an institutional check from my inmate trust

Woodley - Direct

34

1    fund and purchase it from -- I believe it was the Illinois

2    Lighthouse For the Blind is where we purchased it from.

3    Q.  Okay.  Thank you, Mr. Woodley.

4         And then going back again to 2014:  When your digital

5    magnifier broke, did you get a new one?

6    A.  Yes, sir.

7    Q.  Did you pay for that one?

8    A.  No.

9    Q.  Okay.  Who paid for it, do you know?  Or was it just

10   provided to you?  Or do you know who paid for it?

11   A.  At the time, the ADA coordinator explained to me that the

12   then governor, he had changed the policy with IDOC, with ADA,

13   they have to order everything from a particular company or you

14   can't really go through it.  So me actually knowing who it was

15   purchased from or where it was purchased from, they changed

16   the policy.  So I don't know what particular place they

17   ordered it from.

18   Q.  Okay.  Mr. Woodley, you know, I shouldn't have led you

19   down that path.

20        Did you have to pay for the magnifier in 2014 when it

21   was replaced?

22   A.  No.

23   Q.  Okay.  Thank you.

24        So you had this magnifier, and you get it in 2012.

25   You are using it to take college classes.

Woodley - Direct

35

1       Do you remember the years that you were taking

2 college classes?

3 A.  Yes.  I took classes, like I said, for three or four

4 years -- three to four years straight, all the way up to '15,

5 around that time.

6 Q.  Okay.  Do you remember what month -- what was the

7 last -- when did your last class end in 2015?

8 A.  I would say it was -- I believe it was the spring

9 semester.

10 Q.  Okay.

11 A.  So springtime.

12 Q.  So you had the digital magnifier.  Why didn't you take

13 classes in the fall of 2015 or the beginning of 2016?

14 A.  Well, I have several things to explain that.  First of

15 all, the thing they explained to us is they were bringing in

16 new business courses, because all the classes that I take is

17 to help me rehabilitate myself for employment down the line.

18 So Dan Stevenson explained to us they were bringing in other

19 type of business classes that remained on the list, and I also

20 took a correspondence class in that time frame through Bedco

21 (phonetic), a mail correspondence course, with the digital

22 magnifier.  Then after that --

23       THE COURT:  Can you have him repeat that?

24       MR. WEIL:  Hold on, Mr. Woodley.

25       I'm sorry, Judge?

Woodley - Direct

36

1          THE COURT:  I'm not following him.

2     BY MR. WEIL:

3     Q.  Okay.  Yes, Mr. Woodley, let me walk you --

4          THE COURT:  Have him go slowly and loudly.

5     BY MR. WEIL:

6     Q.  Let me walk you through.  I will ask the questions.  Just

7     try to answer the question.  I will ask you to elaborate if I

8     need you to.  And just nice and slow, and a little loud, okay?

9          So just to back up because you described this, were

10    you taking these college classes just as sort of general

11    enrichment or general education, or did you have a specific

12    career goal in mind?

13    A.  I had a specific career goal in mind.

14    Q.  And what was that career goal?

15    A.  Real estate and business.  Business, mainly business, and

16    everything that is associated with it.

17    Q.  Meaning do you -- when you say real estate, that's the

18    career goal that you have?

19    A.  Yes, sir, as far as --

20    Q.  Go ahead, Mr. Woodley.

21    A.  Yes.  As far as real estate, being a real estate broker.

22    And at the time, I took classes in accounting so I could

23    understand marketing and business management.  I took all

24    those types of classes, sir.

25    Q.  Okay.  So you weren't -- were you taking just random

Woodley - Direct

37

1  classes and showed up or were you picking classes to take?

2  A.  Every business class that they offered at Dixon

3  Correctional Center, I enrolled in and I got a 4.0 GPA.

4  Q.  Okay.  So you took classes through the spring semester of

5  2015 you just testified?

6  A.  Yes.

7  Q.  Why -- very briefly, what classes -- why didn't you take

8  classes later in 2015?

9  A.  They repeated in March for marketing -- the class that I

10  actually passed, they repeated that particular class for the

11  next March, and I was on the waitlist.

12  Q.  Okay.  Just so -- I'm sorry.  Just so the court

13  understands, so you had just taken a marketing class and they

14  were repeating that again?

15  A.  Yes.

16  Q.  And you didn't sign up for it?

17  A.  Well, you have to go and register.  I'm still on the

18  registered list, but I didn't sign up.  You can't repeat the

19  same class.

20  Q.  Right.  Because you had already taken it?

21  A.  Right.

22  Q.  Okay.  That was one reason.  Are there any others?

23  A.  Yes.  Shortly after that, a budget impasse came.  We ended

24  up changing governors or whatever, and we ended up with Bruce

25  Rauner, and there was a budget impasse between him and Mike

Woodley - Direct

38

1    Madigan, and it affected academic classes, and academic

2    classes shut down for a while, for a long period of time.

3    Q.   Okay.  How did you know that, Mr. Woodley?  How did you

4    learn it?

5    A.   I learned it three ways:  The first way is that they

6    informed us that they put out memos in the housing unit that

7    other inmates read it to me, and they had a thing called a

8    "Warden's Bulletin" that's on television, and people read it

9    on television as well.

10   Q.   And what did those -- what did those three pieces of

11   information tell you again?

12   A.   Due to a budget impasse, there wasn't going to be any

13   academic courses, and there was an unlimited time frame.  They

14   couldn't tell you when it was going to open up.

15   Q.   Okay.  This was 2015, right?

16   A.   Yes.  It was roughly -- you know, I can't tell you the

17   exact time, but it was in that time frame, sir.

18            MR. WEIL:  Okay.  Thank you.

19            Judge, I don't know if we would offer you authority

20   on this, but I would ask you to take judicial notice that the

21   Illinois budget impasse was July 1st, 2015 to August 31st,

22   2017.  We can provide some evidence for that, if you would

23   like.

24            THE COURT:  Since Mr. Brener lived through it and I

25   lived through it, I mean they were not --

Woodley - Direct

39

1      MR. BRENER:  I don't have any objection to that

2  judicial notice.

3      THE COURT:  -- they were not paying the AAGs'

4  reimbursements to travel up here, which is one of the reasons

5  why we hooked up the videoconferencing through Dirksen so that

6  they wouldn't have to essentially float the state a loan for

7  eight to twelve months.  It was pretty bad.

8  BY MR. WEIL:

9  Q.  So, Mr. Woodley, you had this budget impasse.  There was a

10  repeat class that you just discussed.  The budget

11  impasse -- and there were no college courses being offered at

12  Dixon; is that correct?

13  A.  It was no academic courses offered in that time frame at

14  all.

15  Q.  Okay.  You said that you were interested in pursuing -- or

16  you are interested in pursuing a career in real estate and

17  that --

18  A.  Yes.

19  Q.  -- you were taking college courses with that goal in mind.

20      When the budget impasse hit or there were just no

21  classes available for whatever reason, did you do anything to

22  push towards that goal of getting a career in real estate?

23  A.  Yes.  Previously, before the impasse, I earned my real

24  estate loan certification at Blackstone Career Institute

25  through a correspondence course.  After that budget impasse, I

Woodley - Direct

40

1  took a correspondence course through a place called Bedco, and

2  it teaches you about real estate and property preservation,

3  and I earned my certificate during the budget impasse from

4  Bedco.  Those are the things that are documented in my master

5  file.

6  Q.  So if I understand you correctly, you took correspondence

7  courses, would you say, as a substitute for college classes or

8  a supplement?

9  A.  Yes.

10 Q.  And when you said -- you just said they are reflected in

11 your master file.

12       What do you mean by that?

13 A.  Every inmate has a file that is considered a master file

14 with achievements, anything like that, and all the

15 certificates I earned through the correspondence courses are

16 in the master file, and that would be in the administrative

17 building.

18 Q.  Do you know why the IDOC would care about correspondence

19 courses at all?

20 A.  Yes.  It shows your rehabilitation and it shows that you

21 have been occupying your time successfully and constructively,

22 so upon your release, it affects how you reenter society.

23 Q.  How does it affect how you reenter society from the

24 perspective of the IDOC?

25       MR. BRENER:  Objection to foundation.

Woodley - Direct

41

```
 1              THE WITNESS:  Well --
 2              MR. WEIL:  I will back up, Judge.
 3              THE COURT:  Sustained.  Sustained.
 4        I need a lot of foundation as to why he believes what
 5   IDOC does.
 6              MR. WEIL:  Hold on, Mr. Woodley.
 7   BY MR. WEIL:
 8   Q.  Has anybody explained to you why these certificates are
 9   being placed in your master file?
10   A.  I had an explanation then, and I have one now.  I'm in a
11   program currently called Risk and Needs Assessment, which is a
12   program sponsored by the State of Illinois and federal
13   government, and it is a plan that shows you how that you
14   prepare for employment and rehabilitation as far as behavior,
15   and it affects your situation going on, and your master file
16   is reviewed by the staff here, the field services staff.
17   Q.  Okay.  So your master file is reviewed by parole officers
18   once you get out?  That's your understanding.
19   A.  Previously, and the field services as well.
20   Q.  Okay.  And so part of what is in your master file that the
21   parole officers are reviewing are any certificates you get
22   through correspondence courses?  That's what your
23   understanding is?
24   A.  Yes, correspondence, and like I took anger management and
25   things of that nature, just cognitive thinking, employment,
```

Woodley - Direct

42

1  and behavior.

2  Q.  Okay.  And correspondence courses are among those?

3  A.  Yes.

4  Q.  Okay.  So we have gone through these correspondence

5  courses you are taking.  Does your -- what happened to your

6  portable digital magnifier that you had been using to take

7  these correspondence courses?

8  A.  In 2016, we had an Orange Crush shakedown, a tac team

9  shakedown.  They came and they ransacked the cell.  They broke

10  the magnifier, and they broke the little --

11       THE COURT:  Hold on a second.  Hold on a second.  He

12  has got to slow down.  He has to slow down and speak louder

13  and slower.  I know about Orange Crush.  I heard about that

14  they broke the magnifier, but I didn't hear what other item he

15  said Orange Crush broke.

16  BY MR. WEIL:

17  Q.  Mr. Woodley, go ahead and just speak loudly and slowly, if

18  you could.

19  A.  Yes.

20  Q.  So, again, you were testifying just now that your digital

21  magnifier was broken in 2016.

22       Could you just describe what you just said again,

23  please?

24  A.  When we returned to the housing unit, the cell was

25  basically ransacked, and the magnifier was broke, and they

Woodley - Direct

43

1  broke the window to the cell, the window to the outside.  That

2  was broken out, too.

3          THE COURT:  The window to the cell?

4  BY MR. WEIL:

5  Q.  Sorry.  Does that have anything to do with the magnifier

6  when you say the window?

7  A.  Oh, the window to the cell, the actual -- they had

8  everything stacked up, and the magnifier was broken, and

9  everything was ransacked, and the actual window, the physical

10 window that's in the wall, that was broke, too.

11 Q.  Okay.  But point being here your magnifier was broken

12 after this tac team went through?

13 A.  Yes, yes.

14 Q.  Okay.  Did you request a new one, then?

15 A.  Yes, sir, immediately.

16 Q.  Okay.  Now, after the magnifier is broken -- so this

17 is what month in 2016?  Do you recall?

18 A.  It was sometime -- I believe it was around July.  I think

19 it was July, sir.

20 Q.  Okay.  And after the magnifier is broken, could you read?

21 A.  No, it was impossible.

22 Q.  Okay.  And so you said a minute ago that you requested

23 a -- what did you request when you reported it?  Did you

24 request a new one or what?

25 A.  I requested that -- I asked for three things: either get

Woodley - Direct

44

```
 1   this repaired, a new one, or replace it with a similar device.

 2   Q.  Okay.  And did that happen?

 3   A.  No.

 4   Q.  Okay.  Was something given to you as a substitute?  Were

 5   you ever told --

 6   A.  Yes.

 7   Q.  -- that something would be given to you as a substitute?

 8          And what was that?

 9   A.  It was a thin plastic sheet magnifier.  That's what they

10   gave.

11   Q.  Okay.

12   A.  That's what I was issued.

13   Q.  So just to help Judge Johnston here, it is a plastic sheet

14   magnifier.  Can you just sort of -- you can hold up your hands

15   to maybe describe how big it is and what it looks like.

16          Is it like the size of a page or --

17   A.  Yes, it is very thin.  It is very thin.  It is a piece of

18   plastic that is maybe like this long (indicating), and it is

19   not powerful at all.

20   Q.  Okay.

21   A.  It is like this (indicating), like this (indicating).

22   Q.  So when you got the --

23   A.  A page like this (indicating).

24   Q.  I'm sorry.  Thank you, Mr. Woodley.

25          When you got the plastic --
```

Woodley - Direct

45

 1          THE COURT:  And for the record, I can see his hand

 2    gestures.  If this ever goes to Judge Reinhard, he is not

 3    going to see the hand gestures.

 4          MR. WEIL:  Certainly.  For the record, Mr. Woodley

 5    made sort of the shape of something about the size of an 8 and

 6    a half by 11 page.

 7          THE COURT:  Mr. Woodley, is it the size of a piece of

 8    paper, essentially?

 9          THE WITNESS:  Yes, or a little bit smaller, you know,

10    a little bit smaller than an actual sheet of paper.

11          THE COURT:  Okay.  Thank you.

12    BY MR. WEIL:

13    Q.  Could you read with that plastic sheet magnifier,

14    Mr. Woodley?

15    A.  No.

16    Q.  Did you try?

17    A.  Yes, I attempted, and there is no way that it was powerful

18    enough.  I put it on there, and it didn't work.

19    Q.  Okay.  Did you file a grievance about that?

20    A.  Yes.

21    Q.  Were you ever -- after the plastic sheet magnifier, was

22    that ever replaced with anything else up to today?

23    A.  Yes, at the end of '17, I believe, they ended up giving me

24    a 6X, and that's not powerful either.

25    Q.  I'm sorry.  Mr. Woodley, when you say a "6X," what do you

Woodley - Direct

46

 1  mean?

 2  A.  It is a glass magnifier.  This is the only thing that they

 3  replaced it with, and it is not even powerful.  I don't know

 4  if you can see it (indicating).

 5  Q.  Okay.  Thank you, Mr. Woodley.

 6           So for the record, you are holding up a magnifier

 7  with a lens that's about, I would say, 2 inches across?  Would

 8  you say that's accurate?

 9  A.  Yes.

10  Q.  Okay.  And it has a light on it?

11  A.  Yes.

12  Q.  Can you -- is there batteries?  Can you hold it up to the

13  light?

14  A.  These are batteries I just bought this morning

15  (indicating).  I bought it from the inmate commissary, and I

16  have the receipt to show I bought these.  This is a powerful

17  battery.

18  Q.  So these are brand-new batteries in there right now?

19  A.  Yes.

20  Q.  And it has, it looks like, a single light.  I don't know

21  what you call it.  An LED, it looks like; is that right?

22  A.  Yes.

23  Q.  Okay.  Is that the only device that has -- so you had the

24  sheet magnifier.  You have had that.  Between the two, have

25  you been given anything else between the end of the -- when

Woodley - Direct

47

```
 1   the digital magnifier broke in 2016 and through today, or is
 2   it these two devices?
 3   A.  No.
 4   Q.  It is these two devices?
 5   A.  Yes.
 6   Q.  Have you tried to read with the magnifier you currently
 7   have, the one you just held up?
 8   A.  Yes, sir.
 9   Q.  Okay.  And were you able to read with it?
10   A.  It is extremely difficult.  It doesn't even pick up -- it
11   doesn't make it big enough.  It don't even pick up the whole
12   word.  It only picks up maybe a letter or two at a time, and
13   it is so faint that I can hardly see it.
14   Q.  Okay.  Why don't we talk about -- so have you been able to
15   take correspondence courses since the digital magnifier broke?
16   A.  No.
17   Q.  Okay.  Have you been able to take therapeutic classes
18   since the digital magnifier broke?
19   A.  Yes, I took therapeutic and clinical services classes.
20   Q.  Okay.  I want you to talk about those.
21        What classes did you take?
22   A.  Under clinical services, the class is called Lifestyle
23   Redirection.
24   Q.  Okay.
25   A.  And it is done by individual counselors here that work
```

Woodley - Direct

48

1  within the institution.  It is a group setting, and basically

2  the counselors explain to you about different subjects, and

3  there is not a lot of reading.  It is more of a group session,

4  and they explain things to you about different choices that

5  you make in life as far as anger, behavior, employment, things

6  of that nature.

7  Q.  Okay.  So it sounds like a lot of talking, not a lot of

8  reading; is that accurate?

9  A.  Yes, that's accurate.

10         THE COURT:  Did you say a lot of talking --

11         MR. WEIL:  A lot of talking and not a lot of reading.

12         THE COURT:  Not a lot of reading.

13  BY MR. WEIL:

14  Q.  Okay.  But it sounds like there is some reading; is that

15  right, Mr. Woodley?

16  A.  Yes.  They have pamphlets and all types of information

17  that they have that they pass out about different

18  employment -- you know, a lot of information that's vital, and

19  it is not enlarged, or there is no way to read it.

20  Q.  Okay.  And how do you intake that information?  You know,

21  you can't read, so how do you understand what's on those

22  pages?

23  A.  At the time when I tried to get my ambulatory aide and try

24  to take down things that they are shown on the board, he tried

25  to write it down and tried to repeat it to me, or things that

 1   are very small, he was trying to read it to me here, read it

 2   back to me.

 3   Q.  Okay.  Is that an easy process?

 4   A.  No, it is very difficult.

 5   Q.  Okay.  How is it difficult?

 6   A.  Like in the classroom setting, if they show the television

 7   monitor or they read it like a real-time reading, if there is

 8   instructors reading it, he is in my ear trying to read.  It is

 9   like a group reader.  So he is reading out loud to me while

10   the instructor or the counselor is reading the same thing.  So

11   he tries to repeat because I ask him what is this word, how do

12   you spell it, because he may pronounce something one way or he

13   slows down, and I'm just trying to understand what's going on.

14   Q.  And if I understood you correctly, when you say it is not

15   a lot, I mean, how much reading are we talking about here?

16   A.  I would say that it is mostly like brochures.  Brochures

17   and it was like printouts of different types.  I would say

18   pages, it would be like maybe two to six pages a section.

19   Q.  How does that volume of reading material compare with the

20   college classes you took before your digital magnifier broke?

21   A.  It is no comparison.  The college courses, it is a thick

22   textbook, and it has a lot of reading, a lot of questions.  It

23   is sections and sections and chapters of reading.

24   Q.  Just to back up for a second, Mr. Woodley, the ambulatory

25   aide, was it assigned to you -- well, let me back up.

1        Were you told that the ambulatory aide was assigned

2   to you to help you read or to get around?

3   A.  It was -- it was -- it was medical documents and things,

4   and the medical director, I met with the medical director, and

5   the aide, the visual --

6   Q.  Mr. Woodley, hold on a second.  You are cutting in and

7   out.  So maybe try that again nice and slow.

8        THE COURT:  We heard he met with the medical

9   director, and then we lost him.

10       MR. WEIL:  We heard that you met with the medical

11  director and nothing else.

12  BY MR. WEIL:

13  Q.  Let me ask you this, Mr. Woodley:  Was it your idea to

14  have the ambulatory aide read to you?

15  A.  Yes, because they told me there is no other way they can

16  find someone to read for me, nothing else they can do.

17  Q.  Okay.  Have you tried to read longer texts with the

18  ambulatory aide?

19  A.  I'm currently studying the text to try to take the real

20  estate broker's license, and we tried very hard to get through

21  it, and he has to stand over my shoulder to try to point out

22  things and tried to read things so I can get my real estate

23  broker's license.

24  Q.  Is that reading -- so just to be clear for the court, this

25  is a longer book?  Can you explain what you are talking about,

Woodley - Direct

51

1   this book for the broker's exam?

2   A.   This is the Illinois Real Broker's Exam Guide

3   (indicating).

4   Q.   So you are holding up a book there?

5   A.   Yes, it is a textbook, like he can only explain to me what

6   the diagram shows.  He can't actually enlarge or read the

7   diagram, showing different parts of the house, or when we take

8   a pretest, he is -- I'll stand up and show them.

9   Q.   Okay.

10  A.   This is how I study.  So he has to stand right here

11  (indicating).  This is the magnifier (indicating).  The only

12  thing I can make out with the magnifier is the actual diagram.

13          And let's demonstrate how.  So read it to me.

14          So I can see this line.  What does that say?

15          UNIDENTIFIED SPEAKER:  "Waste."

16          THE WITNESS:  That's how I try to study.  This is how

17  I try to get my real estate broker's license and try to study.

18  This only picks up one or two letters at a time, so it is very

19  hard to try to go through that process.

20  BY MR. WEIL:

21  Q.   Okay.  So what you demonstrated to me is your ambulatory

22  aide standing over your shoulder trying to point out letters.

23          Have you been able to successfully read this book

24  with that technique?

25  A.   We tried that technique.  No.  The answer to the question

Woodley - Direct

1  is no.  Sometimes I sit on the floor and he will sit in a

2  stool to try to make it comfortable so he can sit, like --

3  Q.  Mr. Woodley, you don't have to demonstrate.  You can just

4  explain it for the record.

5  A.  Yes.  Okay.  Well, here the ambulatory aide is sitting in

6  the seat, so he is there, and I sit on the floor next to him,

7  next to his leg, and he will try to point out the different

8  chapters.  So sometimes he wears down because I'm driven.  I'm

9  ready to achieve goals.  He gets tired every time, so I have

10  to sit there, and there is no way we can go through all these

11  questions on the preexam.  It is an unbelievable process as to

12  how much time in trying to gain information and education.

13  Q.  Do you think you would be able to take a college class

14  with the technique you just described?

15  A.  No.  I mean, I enrolled -- I talked to the dean about it.

16  You know, I talked to the dean April 13th of this month.  So

17  the dean said that whatever we can try to do, he said that he

18  will read the test to me if he has to read the test to me.

19  Q.  Okay.  Just one moment, Mr. Woodley.  I'm looking over

20  things here.

21       Do you have any particular classes that you want to

22  take?

23       Just to back up.  College courses have resumed now,

24  is that right, at Dixon?

25  A.  January of this year.

Woodley - Direct

53

 1   Q.  Okay.  Have you placed yourself on the waitlist for those?

 2   A.  Yes, I'm on the waitlist.

 3   Q.  Okay.  And do you have any reason to believe you will be

 4   able to take a class?  Setting aside the visual aid for a

 5   second, do you have any reason to believe that you will be

 6   able to take a class before your out date in September?

 7   A.  I have an opportunity to take two, and I'm on the waitlist

 8   for the third.

 9   Q.  Okay.  And how do you know you have an opportunity to take

10   two?

11   A.  April 13th of this month, I met with the dean of Lakeland;

12   that's the college here.  And he showed me -- he explained to

13   me that I'm on the list for career tech, and the next month it

14   starts in June for the college academic courses.

15   Q.  Career tech?

16   A.  Yes.

17   Q.  And what's the other one?  That was one class.  You said

18   there were two.

19   A.  He doesn't know the exact courses they are going to offer

20   in June, but he said the month it will be starting is June,

21   and he doesn't know if they are going to -- I wanted to take

22   Vo-Tech math, and he doesn't know if it is Vo-Tech math or

23   whatever it is going to be in that particular month.  They

24   haven't come up with a schedule as far as what classes are

25   going to be for that semester, but I'm on the list to attend

1    the class.

2    Q.  Is it your understanding that those classes require a lot

3    of reading?

4    A.  Yes.

5    Q.  Okay.  Do you think you would be able to take those

6    classes if you didn't have the digital magnifier?

7    A.  It is going to be extremely difficult to try to get

8    through the text.  There is no way to read a full word, not

9    even a full sentence.

10   Q.  Okay.  Thank you, Mr. Woodley.

11          I want to step away from the education you have been

12   trying to get and just talk about a few other issues,

13   materials you read in prison.  What about your health records?

14   Do you try to collect those or do you tend to try to read

15   those?

16   A.  Yes, all the medical records, my ambulatory aide has to

17   read them to me.

18   Q.  So do you check out -- I believe there is a process where

19   an inmate can gather their medical records; is that right?

20   A.  Yes.

21   Q.  And do you do that?  Do you do that from time to time to

22   check on your status?

23   A.  Yes, I request medical records often.

24   Q.  Why is that?

25   A.  I took HIV tests, I took several other health exams, and

Woodley - Direct

55

 1  like I went out to take tests for my eyes to see the condition

 2  of the retina, and I take other tests dealing with like this

 3  physical overall health.

 4  Q.  When you had the digital magnifier, were you doing that as

 5  well?

 6  A.  Yes.

 7  Q.  Okay.  And when you had the digital magnifier, were you

 8  trying to read those yourself or were you also giving them to

 9  other inmates to read?

10  A.  When I had the digital magnifier, I was able to read my

11  own HIV test results and things like that and other medical

12  documents on my own.

13  Q.  Okay.  And now that you don't have a digital magnifier,

14  what do you do?

15  A.  I have to rely on my aide or anybody that's there at the

16  time to help me.

17  Q.  Okay.  If you had a digital magnifier again, would you be

18  showing those medical records to your aide again or would you

19  try to read them yourself?

20  A.  No, I will not show them to the aide, and, yes, I would

21  read them myself.

22  Q.  Okay.  What about just personal correspondence and that

23  type of thing with family, do you receive that?

24  A.  Yes, I receive mail occasionally, but I have to share

25  intimate letters with him.  But my family, like my dad, that's

Woodley - Direct

56

 1   the only parent I have left, and he understands the condition

 2   more than anybody, so he spends a lot of money on the phone.

 3   So we can communicate over the telephone because he knows it

 4   is hard for me to read and I don't have nothing to read with.

 5   Q.  Okay.  Was he writing you letters before the digital

 6   magnifier broke?

 7   A.  Yes.

 8   Q.  Okay.  Do you have -- not to get too personal, but do you

 9   have a love interest outside of prison?

10   A.  Yes.

11   Q.  Okay.  And how do you correspond with her?

12   A.  Through the telephone and certain things that you have to

13   send in the mail because we can't afford the calls all the

14   time, and my ambulatory aide has to read her letters to me.

15   Q.  Is that an ideal situation for you, or would you rather

16   keep those private?

17   A.  I would definitely like to keep those private.

18   Q.  All right.

19   A.  And, excuse me, sir?

20   Q.  Go ahead, Mr. Woodley.

21   A.  Another thing, they --

22   Q.  Go ahead.

23   A.  Speaking of private correspondence, he also has to read my

24   Social Security number and things like that because I had mail

25   coming back like a Social Security card, birth certificate.

Woodley - Direct

1    He is the one that has to read.  So I'm not just giving up

2    intimate information, I'm giving him my personal information

3    and things of that nature as well.

4    Q.  Okay.  Thank you, Mr. Woodley.

5         I want to turn away from the digital magnifier now

6    and talk about how you get around the prison, and, you know --

7    A.  Yes.

8    Q.  -- we have described how Stargardt's affects your ability

9    to read in quite a bit of detail.

10        Does it affect distance vision and your ability to

11   walk around as well?

12   A.  Yes, it affects the central vision and it affects depth

13   perception, so I can barely navigate with the peripheral

14   vision, which is the outside of the eye.  The central

15   vision -- if we are walking somewhere, he will try to tell me,

16   "Okay.  There is a curb," and I can step.  Sometimes I can't

17   judge distance like a regular person would, so he explains.  I

18   can see the object that's in front of me, but as far as the

19   distance or how high to step or how low to step, I bump into

20   things and I stumble a lot.

21   Q.  Well, let me back you up there, Mr. Woodley.  So you had

22   this visual impairment.  It limits -- you just testified it

23   limits your ability to sort of see things at a distance.

24   A.  Yes.

25   Q.  You were prescribed -- were you -- do you remember when

Woodley - Direct

58

1   you received an ambulatory aide?  Ballpark is fine.

2   A.  I would say '16.  It was either '16 to '17.

3   Q.  Okay.  And before you were assigned an ambulatory aide,

4   were you banging into things a lot as you walked around?

5   A.  Yes.

6   Q.  Okay.

7   A.  Yes.

8   Q.  And you get this ambulatory aide.  Did that solve that

9   problem?

10  A.  No.  I'm able to navigate --

11  Q.  Explain.  Just go ahead and explain.

12  A.  As far as the inside of the cell, like judging

13  distance -- like we have a thing called a "property box," and

14  that's where you have to keep all your property in there, and

15  there's a toilet in there.  So trying to see the box, I end up

16  banging into the box all the time, and he is not there with

17  me.  So I end up bruising my legs, bumping into objects in the

18  cell and the toilet (indicating).

19  Q.  Okay.

20  A.  So he can tell me where certain things are at, but the box

21  and the toilet are things that are stationary in the cell, and

22  I try to maintain, because anything that is high, I can stick

23  my hand and tell how far it is, but things lower to the ground

24  or like even walking outside, like potholes, even though I can

25  walk the same path here -- I can navigate the facility because

Woodley - Direct

59

1  I have been walking the path a lot.  When he is with me, he

2  will tell me, "Okay, there is a pothole."  I will try not to

3  step into it.  Like recently, I stepped into the mud because a

4  tractor was coming up the walk.  He said, "Stephon, here comes

5  a tractor."  I ended up stepping into the mud because I

6  couldn't judge the distance between the sidewalk and the mud.

7  Q.  Mr. Woodley, for the record, you showed us your shins just

8  now.  You pulled up your pants and showed us your shins.

9  There are dark marks on there.

10         Are those bruises?

11  A.  Yes.

12  Q.  Okay.  And how recently would you say that you got those

13  bruises?

14  A.  I bump into something every day.  I bump into lower items

15  on a regular basis.

16  Q.  Okay.  And you heard testimony -- or you heard us talking

17  before you started testifying.  It sounds like you will be

18  getting a walking cane coming up.

19         What about the monocular?  What do you know about the

20  monocular?

21  A.  Well, from my understanding, what I was explained, glasses

22  don't enhance like the distance vision.  It doesn't work.  The

23  monocular would give me enough strength to see things at a

24  distance like maybe how glasses would be.  So sometimes I drop

25  things on the floor, and I can't -- if I'm standing, I can't

Woodley - Direct

60

1   see.  I have to get down on all fours.  I have to

2   literally -- if I drop something on the floor, I can't see it,

3   so I have to literally get down on the floor and search the

4   ground like this (indicating).

5   Q.  Mr. Woodley, it is okay.  You can sit in your chair.  We

6   understand.

7   A.  At times I'm on the ground to try to find it because he is

8   not with me all the time, the person I'm dealing with.  The

9   monocular would give me the opportunity, if something is at a

10  distance, for example, I can see the water in the pot, like

11  the water heating things up there.  It would be essentially

12  glasses, similar to a thick pair of glasses.

13  Q.  So, basically, a very thick pair of glasses?  Is that what

14  the analogy would be?

15  A.  I would say probably more than thick.  I would say it is

16  probably maybe this long (indicating) because -- it is like

17  that.

18  Q.  Okay.  So that is letting you see objects, it sounds like,

19  maybe across the room or 20 feet away or so?  Is

20  that -- that's what I'm taking for what you are describing; is

21  that right?

22  A.  Yes.

23          MR. BRENER:  Objection --

24          THE WITNESS:  I would say -- I would see things on

25  the floor.

Woodley - Direct

61

```
 1              THE COURT:  Hold on a second.  There is an objection.
 2              What's the objection?
 3              MR. BRENER:  I'm just going to object to foundation.
 4    Not having this implement, how can he testify what would be --
 5              THE COURT:  How does he know?
 6    BY MR. WEIL:
 7    Q.  Mr. Woodley, how do you know anything about the monocular?
 8    You haven't had one, so what's the basis of you saying all
 9    this?
10    A.  The monocular, I have seen them before like when I went
11    to -- when I was out, I went to the Illinois School of
12    Optometry, and they had those types of devices there.  And
13    while I was in custody in 2014, I went to the UIC specialist
14    in Chicago, the low-vision specialist.  And the low-vision
15    specialist showed me the digital magnifier, explained to me
16    this is how this works and explained to me how each of the
17    items -- explained how it affects a different portion of my
18    vision and what the aid and the tool is actually used for.
19    Q.  So the specialist explained it to you.
20              Did they have a demonstration unit there for you, a
21    demonstration magnifier for you to use?
22    A.  They had the demonstration for the portable magnifier
23    there, and they had -- they explained to me what the monocular
24    was, but the portable magnifier was physically there, and they
25    explained it to me and showed me how it works, the digital
```

Woodley - Direct

62

```
 1   magnifier.

 2   Q.  Okay.  Understood.

 3        Okay.  I want to turn, finally, to the task lamp,

 4   Mr. Woodley.

 5   A.  Yes.

 6   Q.  Can you explain -- well, to back up, is there enough

 7   lighting in your cell for you to see things -- or to back up

 8   even farther, and I'm sorry, what's the interaction between

 9   Stargardt's and, say, dim light or bright light?  How is

10   Stargardt's affected by the amount of lighting that you have?

11   A.  Well, the brighter -- I would say the brighter, the

12   better, and the more light that you have, it is easier to try

13   to see things through the distorted central vision.  And when

14   I left from the commissary, and it is small, it is not that

15   bright, additional light --

16   Q.  Hold on, Mr. Woodley.  I will get you there.  Just hold on

17   a second.

18        So for Stargardt's, if I understand you correctly,

19   bright lights matter.  Has that been your experience with your

20   condition?

21   A.  Yes.

22   Q.  Okay.  And they matter why?

23   A.  Because -- not to be too technical, but it is the portion

24   of the eye that the light passes through that gives the brain

25   and the optic nerve the signal that you are looking at.  So
```

Woodley - Direct

63

1   anything that is bright, it allows the retina to see through

2   the narrowest part, to bring the signal to exactly what I'm

3   looking at.

4   Q.  So a brighter light helps you to see, essentially?

5   A.  Yes.

6   Q.  Okay.  And talk about the lighting in your cell, and

7   just -- you don't have to go into its effect, but how bright

8   is the lighting in your cell?  What is the source of light?

9   A.  Well, it is a central ceiling light, and I have additional

10  light that I have that's like close to that light.  Like the

11  ceiling is really high.  Then I have additional light that is

12  closer down to where I am at to try to brighten up the areas

13  lower to where I'm at.

14  Q.  Okay.  What is the lighting on the ceiling?

15  A.  A fluorescent light.

16  Q.  Okay.  Like a tube light?

17  A.  Yes, sir.

18  Q.  Okay.  And how about -- how much -- is that very bright in

19  the room or very dim?  We are not worried about the other

20  lights you might have.

21  A.  I would say that it is in between.  It is not very bright.

22  Q.  Okay.

23  A.  It is like scant.  It casts shadows.  So like in the cell,

24  if you are sitting or standing on the bunk, the bunk casts a

25  shadow.  So when the light is over here (indicating), and I'm

Woodley - Direct

64

1   down here (indicating), it is blocked.  So there is no light
2   coming down over me like that.
3   Q.  All right.  Mr. Woodley, you said, when you started
4   describing this, you have other lights in the cell, too,
5   right?  What are those?
6   A.  It is a small LED light, and it is a light that I can move
7   around, and I try to carry it around like by the sink area or
8   if I'm in the bunk because the property box and things like
9   that we have to have stuff stored away.  So I try to bring
10  additional light in there because people are not in there with
11  me all the time.  He doesn't live in the cell with me.  So I
12  bring additional light down to shine on products that I need
13  and food that I'm trying to eat.
14  Q.  Okay.  And where did you get that light, Mr. Woodley, that
15  additional light you just described?
16  A.  The inmate commissary.
17  Q.  Okay.  Is it bright?  Does it help you see very much?  I
18  mean, it sounds like it helps a little, but describe -- does
19  it solve your problem, essentially?
20  A.  No, it is very weak, and I tried to -- I explained that to
21  the ADA coordinator and people like that about I need
22  additional lighting.  It is very weak.  I brought that to the
23  facility, but I can't bring that type of item to the cell.
24  Q.  Mr. Woodley, you cut out again on the audio feed here.
25  You said it is very weak, and you explained it to the ADA

Woodley - Direct

65

1    coordinator, and you cut out for a second.

2         Can you just say what you said again?

3    A.  I said that it is not bright, and I tried to explain it to

4    the ADA coordinator, and I said I wish there was a way I can

5    actually show to you so you can see how dim and how weak that

6    lighting is.

7    Q.  Okay.  Have you -- you haven't received another light from

8    the ADA coordinator besides that one?  I will back up.

9         This light is a light you purchased in commissary; is

10   that right?

11   A.  The only one I received is the one I purchased on my own.

12   Q.  Okay.  I want to turn for a second to some of the items

13   that are available in prison for inmates in general.

14        Are inmates at Dixon allowed to have MP3 players?

15   A.  Yes.

16   Q.  Okay.  Do those have charging cords?

17   A.  Yes.

18   Q.  Okay.  Are inmates allowed to have tablets?

19   A.  Yes.

20   Q.  Okay.  Do those have charging cords?

21   A.  The tablet -- when they showed us the tablet, I didn't see

22   the cord attached, but I would say it has to have one because

23   it is not battery operated.

24   Q.  Okay.  And so does the prison commissary sell lamps?  It

25   sounds like you bought one.

Woodley - Cross

66

1   A.  Yes.

2   Q.  Okay.  You received a talking watch; is that right?

3   A.  Yes.

4   Q.  Okay.  Does that talking watch help you read?

5   A.  No, sir.

6   Q.  Does it help you get around the building without bumping

7   into things?

8   A.  No, sir.

9            MR. WEIL:  Thank you, Mr. Woodley.

10           That's my direct, Judge.

11           THE COURT:  Okay.  Mr. Brener?

12                         CROSS-EXAMINATION

13  BY MR. BRENER:

14  Q.  Good morning, Mr. Woodley.  My name is Edward Brener.

15           Are you able to hear me?

16  A.  Yes.  I can hear you, but -- yes.

17  Q.  I'm standing at the other podium from where your attorney

18  was standing.  So if you are able to hear me, then you will be

19  able to answer my questions.

20           First, just a preliminary question:  You mentioned

21  that the tac team damaged your previous magnifier.

22           Were you present when the tac team shook down the

23  cell?

24  A.  No, they escorted us to -- they took us out.

25  Q.  Where were you taken?

Woodley - Cross

1  A.  We were taken to the chow hall.

2  Q.  When you got back, can you describe the physical condition

3  of your digital magnifier?

4  A.  I noticed that --

5        THE REPORTER:  He is breaking up.  I can't hear him.

6        THE COURT:  Yes.

7        MR. BRENER:  Mr. Woodley, hold on for one second

8  because you are breaking up.

9        THE WITNESS:  Yes.

10  BY MR. BRENER:

11  Q.  Okay.  Try again.  Can you describe the physical condition

12  of the magnifier when you were returned to your cell after

13  that shakedown?

14  A.  Yes.  It was sitting out with the digital books on tape.

15  I have a book on tape there.  That was sitting to the side in

16  its chair.  When I grabbed the magnifier, it seemed fine at

17  first, but after you grabbed it, you noticed that the

18  light -- the handler was aggressive with it, and the button

19  that comes on, it doesn't work, you know.  And I notified the

20  staff of that immediately.  You can tell somebody grabbed it

21  that doesn't know what they were doing, and they handled it

22  aggressively.

23  Q.  Okay.  You discussed having taken a number of trainings in

24  prison: your GED course, which you took in the past, the

25  number of college courses you have taken, some real estate

Woodley - Cross

68

1  courses, the college business courses, and then also those

2  correspondence courses in real estate.

3        Have you taken any courses in medicine?

4  A.  No, sir.

5  Q.  Do you have any medical training whatsoever?

6  A.  No, sir, except for the only medical training I have is

7  the emergency part of the CPR.  I registered at CHS Hospital.

8  Q.  You have been trained in CPR?

9  A.  Yes.  That was a program to save lives.  I trained in CPR.

10 It was actually the first responder, sir.

11 Q.  When did you take your first responder course?

12 A.  Around the same time that I enrolled in college.  It is a

13 program I enrolled in Lakeland College.

14 Q.  You took that at Dixon?

15 A.  Yes, sir.

16 Q.  You have been treated by a number of providers for your

17 Stargardt's disorder, correct?

18        MR. WEIL:  Objection, vague in terms of treatment.

19        THE COURT:  It is an opening general question.  It is

20 foundational in nature, so it will be overruled.

21        Can you answer that question, Mr. Woodley?  You have

22 been treated by a number of doctors for your Stargardt's?

23        THE WITNESS:  Well, I have been seen -- it is not

24 treatment like surgery.  There is no specific treatment that

25 corrects it.  So as far as like a surgery, an operation, no in

 1   that aspect.

 2           THE COURT:  Okay.  The question is you have been seen

 3   by a number of doctors relating to your vision problems,

 4   right?

 5   BY MR. BRENER:

 6   Q.  Is that a yes, sir?

 7   A.  Yes, I have been seen by specialists with regard to

 8   Stargardt's.

 9           THE COURT:  Okay.

10           MR. BRENER:  Okay.  Thank you.

11   BY MR. BRENER:

12   Q.  Do you recall seeing a doctor at Dixon by the name of

13   Dr. Chamberlain?

14   A.  Yes, he is the medical doctor -- or he was.

15   Q.  He was the medical director at Dixon?

16   A.  Yes.

17   Q.  How many times would you say you saw Dr. Chamberlain?

18   A.  More than four.  Maybe, I would say, four to six.

19   Q.  Do you remember what the reason was that you were seen by

20   Dr. Chamberlain maybe between four and six times?

21   A.  It was pertaining to the Stargardt's, the low-vision aids,

22   and any time that you go out on a writ, when you return, you

23   have to see the medical director when you return to the

24   facility from going out to the writ.

25   Q.  So when you were taken to UIC Hospital to see a

 1  specialist, you then subsequently had an appointment with

 2  Dr. Chamberlain?

 3  A.  Yes, previously, before that, because he makes a

 4  recommendation as well, too.  It is a before, and then you go

 5  out, and then when you return, you have to.

 6  Q.  Do you remember any specific appointments that you had

 7  with Dr. Chamberlain, anything that the two of you talked

 8  about or anything that he told you he was going to write in

 9  your chart?

10  A.  Well, Dr. Chamberlain --

11           THE REPORTER:  He is breaking up.  I can't hear him.

12           THE COURT:  Yes, we can't hear at all.

13  BY MR. BRENER:

14  Q.  Mr. Woodley, hold on for one second, please.  Again, the

15  feed broke up.

16           It is the same question.  I'm just asking if you

17  remember any of your communications with Dr. Chamberlain on

18  any of the dates that you saw him.

19  A.  Yes, he noted that the bruises and scarring and scabs on

20  my legs, he talked to me about contacting the ADA person about

21  visual impairment and as far as like actual notations like

22  what he is going to write, the doctor don't really tell you

23  exactly what he is going to write in the chart.

24  Q.  Was that your January 26, 2017, appointment?

25  A.  Yes, I saw him in January.

Woodley - Cross

1   Q.  Do you remember if that conversation took place in

2   January?

3   A.  Yes.

4   Q.  What, specifically, did he tell you about his

5   communications or his intended communications with the ADA

6   coordinator?

7   A.  To find a solution to provide me the visual aids and

8   explain to him -- he saw the sheet magnifier and explained to

9   them that that's no help, and also explained about the need

10  for an ambulatory aide and the interest I have in those.

11  Q.  Did he say to you that he was specifically ordering you a

12  replacement for the plastic sheet magnifier?

13  A.  He said that it is needed and that the specialist

14  recommended it, and he said he is going to through -- I don't

15  know if it is a procedure.  He used a fancy word.  It was like

16  a word.  "Collegial," that's what he called it.  So it is

17  called a collegial, which is a meeting, and he explained a

18  collegial is a meeting between him and Wexford and I guess

19  whoever else, but I know it was a collegial with him and

20  Wexford.  He said the items that I need to be provided, this

21  is where this would be brought up, at the collegial.

22  Q.  Did he mention the monocular scope specifically?

23  A.  He mentioned all of the UIC recommendations, and as far as

24  specifics, he just said that the recommendations, he is going

25  to try to go forward to get them approved or whatever.

Woodley - Cross

1  Q.  Okay.  Do you remember any other communications with

2  Dr. Chamberlain?

3  A.  Yes.  We tried to figure out a solution as far as like the

4  previous ADA coordinator and the previous warden had approved

5  the items to come into the institution.  So he was saying

6  that, okay, if it is a problem, we will try to figure out how

7  about a return policy, an insurance policy, things of that

8  nature.

9  Q.  Who were the previous ADA coordinator and the warden that

10  you were referring to just now?

11  A.  Chris Barnhart was the ADA coordinator, and Donald Enloe

12  was the warden.

13  Q.  Do you recall who the warden was in January of '17?

14  A.  No, I can't remember the warden.  We had several wardens

15  since then.  I can't actually remember who the warden was in

16  '17.

17  Q.  Do you recall who the ADA coordinator was in 2017?

18  A.  Yes, at that time, Max Blackburn replaced Chris Barnhart.

19  Q.  That was the facility ADA coordinator?

20  A.  Yes.

21  Q.  Okay.  Did you get that ambulatory aide?

22  A.  Yes.

23  Q.  And just because I don't think we heard it on your direct

24  examination, can you explain exactly what the job of an

25  ambulatory aide is to the best of your understanding?

Woodley - Cross

73

```
 1   A.  I don't have the knowledge specifically of what the
 2   ambulatory aides have been, but I have been asking questions
 3   about it and saying like what can he help me with, and can he
 4   go to different classes, and can he help me in the cell and
 5   like the limitations of what we could do.  So as far as asking
 6   if they ever gave us a job description of what his job is, no.
 7   Q.  What is the -- I'm sorry, please continue.
 8   A.  That's all I asked.  I said I know several counselors.  We
 9   asked the health care about the ambulatory aide, and basically
10   how can he help me, and what's the job description.
11   Q.  What does he do for you?
12   A.  As far as -- you got to be specific because he -- as far
13   as with reading, he tries to point out like things.  As far as
14   like looking at things at a distance, when we are walking, he
15   will try to explain to me, "Here is a pothole right here.
16   This is a curb right here."  He will read, like, my documents
17   for me.  He will read my documents.  He will come in the cell,
18   and if I drop something on the floor, he will try to help me
19   pick it up, things of that nature.
20   Q.  When you are walking with your ambulatory aide, is he
21   allowed to put a hand on your back or your arm to help steer
22   you?
23   A.  Well, the thing is I would say yes, but he will
24   say -- okay, even if he doesn't touch me, and I see the
25   pothole, he will try to explain to me move right or move left.
```

Woodley - Cross

74

1  It is still a problem with the actual object that I'm looking

2  at.

3  Q.  But the answer is, yes, he can physically help steer you

4  around objects that you're walking towards?

5  A.  Right.  But when -- he can step up on the steps, like on a

6  curb.  So he will say -- okay, if he pushed me in the back,

7  I'm going to trip over the curb.

8  Q.  Do you remember seeing an optometrist at Dixon by the name

9  of Dr. Fahey?

10  A.  Yes.

11  Q.  When did you see Dr. Fahey?

12  A.  In '17, after I saw Chamberlain.  It was around the same

13  time period, sir.

14  Q.  Was that the one and only time you saw Dr. Fahey?

15  A.  Yes, I believe so.

16  Q.  And what did Dr. Fahey do for you at that appointment?

17  A.  Well, he did, I want to say -- I don't know what you mean

18  do for me.  You have got to explain that question.

19  Q.  Well, did Dr. Fahey physically examine your eyes?  Let's

20  start there.

21  A.  Yes, yes.

22  Q.  Okay.  Did Dr. Fahey talk to you about your condition?

23  A.  Yes.

24  Q.  Did Dr. Fahey tell you that he was going to prepare a

25  medical record for you?

Woodley - Cross

75

1    A.  I don't know what you mean by that.  He didn't say prepare

2    a medical record.

3    Q.  What did the two of you discuss?

4    A.  Well, he told me that, after the exam, he knows that the

5    retina has some scarring, and he said that he would provide me

6    something to read with, and he noted that the glasses -- that

7    the glasses won't correct the vision or enhance my vision.

8    Prescription glasses won't do it.

9    Q.  Anything else?

10   A.  He made a note about a job performance, a job that I

11   basically explained to him that I do, like with my hands and

12   things like that, that I will be able to do a job that's up

13   close, and I believe that he made -- I don't know the exact

14   words, but I'm saying that I could perform a certain job task

15   without being visually impaired.

16   Q.  That's the job that you have in the commissary?

17   A.  I don't work in the commissary, sir.

18   Q.  That's the job that you have rolling plastic silverware

19   into napkins?

20   A.  Yes, that's I take the napkins and salt and pepper and I

21   twist it together.

22        THE COURT:  I think it is dietary.

23        MR. BRENER:  I'm sorry.  Dietary, excuse me, not

24   commissary.  Forgive me.

25

Woodley - Cross

76

1   BY MR. BRENER:

2   Q.  How do you know that he prepared that note?  Did he tell

3   you he was writing it down?

4   A.  We discussed it because I don't know who the person is

5   without being privy to that type of information, but somebody

6   mentioned that I had an assignment, and he had asked about it,

7   and we ended up discussing the fact of what the assignment is.

8   He said that it should be -- my vision, I should be able to

9   perform the task, that I don't have to physically look at

10  something to perform that task.

11  Q.  Do you know if he recorded anything else regarding your

12  visit or regarding his impression of your condition?

13  A.  He is supposed to have made recommendations for low-vision

14  aids.  He said that I definitely need low-vision aids.

15  Q.  Did he specify exactly what low-vision aids he thought you

16  needed?

17  A.  He said -- I don't know, like I said.  I can't verbatim

18  repeat what he said, but I know there is an agreement with the

19  UIC specialist because he had asked me about that, and he

20  knows that Stargardt's is macular degeneration.

21  Q.  Have you ever seen a doctor -- an optometrist at Dixon by

22  the name of Dr. Lundford?

23  A.  Yes.

24  Q.  How many times would you say you have seen Dr. Lundford?

25  A.  I would say maybe three.

1   Q.  Do you remember when your first appointment with him was?

2   A.  It was after Mr. Fahey because I thought there was an

3   appointment to pick up the visual aids, but Dr. Lundford said

4   that the new doctor at Wexford had wanted him to examine my

5   eyes, and he already -- he did a physical examination, and

6   then he put me on a digital machine, a machine that digitally

7   scans my eye at the facility here.

8   Q.  Okay.  Did you discuss your condition with Dr. Lundford at

9   all at that appointment?

10  A.  Yes.

11  Q.  And what did the two of you discuss?

12  A.  He said basically the same situation, the problem has been

13  with security, and he is going to try to get me some type of

14  low-vision aid.

15  Q.  Did he ever offer you a low-vision aid?

16  A.  Yes -- well, I didn't know -- I picked it up.  That's the

17  magnifier.  I didn't know -- this here, this is the magnifier,

18  and he told me he tried to order something more powerful, but

19  this is the only thing that security would so-called

20  "include."  He said he would try to get something more

21  powerful, but this is all I got.

22  Q.  Was that April of 2017 when he offered you that magnifier?

23  A.  The magnifier -- the magnifier in '17, he said he didn't

24  have it there.  Blackburn, the ADA coordinator, had the sheet

25  magnifier, and I explained to him and it is documented that

Woodley - Cross

78

```
 1    the sheet magnifier that Mr. Fahey and Mr. Chamberlain, that
 2    magnifier is --
 3              THE REPORTER:  He's breaking up.  I can't hear him.
 4              THE COURT:  He broke up at a very critical moment.
 5              MR. BRENER:  Mr. Woodley, can you repeat everything
 6    you just said?  I'm sorry.  We missed it again.
 7              THE WITNESS:  At that particular time, Dr. Lundford
 8    explained that he didn't have any visual aids, but the ADA
 9    coordinator, Max Blackburn, had a plastic sheet magnifier.  So
10    I explained to Dr. Lundford at that appointment that previous
11    to him, Dr. Fahey and Dr. Chamberlain both said the sheet
12    magnifier -- they said it was insufficient to aid my
13    condition, and the magnifier was returned to Max Blackburn
14    through Counselor Gardner.  So the same magnifier Mr. Lundford
15    was talking about, he didn't even know that I had already -- I
16    already previously had it from the year before.
17    BY MR. BRENER:
18    Q.  So you refused to take that, correct?
19    A.  No, sir, because I already had it in my possession, and I
20    explained that to -- I didn't refuse it.  I signed it, and I
21    had it for eight months, and I grieved it, and Dr. Chamberlain
22    and Dr. Fahey said it was insufficient.  And after those
23    appointments, it was returned through Counselor Gardner, and I
24    never refused the magnifier from Dr. Lundford.
25    Q.  And Dr. Lundford discussed visual aids that he thought you
```

Woodley - Cross

 1    needed?

 2    A.  Yes.

 3    Q.  And did he say what specifically he thought you needed?

 4    A.  Well, he said he knows I need low-vision aids, and his

 5    thing was he kept saying that the problem was security, and he

 6    kept listening to a nurse that was in the room guiding him

 7    through the exam, and Dr. Lundford said, "I'm going to try and

 8    get you some kind of help aid to try to make it through," and

 9    he specifically said he would try to get me something that I

10    could read with, and he knows that the sheet magnifier wasn't

11    strong enough because they informed the doctor of the

12    sheet -- this was a brand-new doctor at the time.

13    Q.  So I don't think you quite answered my question, so I'm

14    going to ask it again.

15          Did he make any specific prescriptions of specific

16    visual aids that he felt you needed?

17          MR. WEIL:  Objection, foundation.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes, well --

20    BY MR. BRENER:

21    Q.  You can answer the question, Mr. Woodley.

22    A.  I know that this year, 2018, he specifically said that he

23    tried to get me a powerful magnifier, and I ended up with a

24    6X -- no, that was '17.  He knew it wasn't powerful enough.

25    He ended up writing a referral for me to go back out to the

Woodley - Cross

1    low-vision specialist in December of 2017 because he said he

2    don't have the power or the equipment to give me what I need.

3    So he wrote a letter of referral in '17 to see a low-vision

4    specialist again.

5    Q.  Did Dr. Lundford ever tell you that you needed the digital

6    magnifier that you are asking for?

7    A.  Dr. Lundford, this is -- I can't verbatim repeat what he

8    said, but he said he never seen a patient with Stargardt's

9    disease, and he never treated one.  He said he heard about it

10   when he was in college and school.  He said he is not even

11   trained in this area; it is not his area of expertise.  He

12   said the low-vision aids I need, I need to see a specialist,

13   and he wrote a referral for them twice.  He said he wrote the

14   first specialist, and he said, "Did they ever send you out?"

15   And I said, "No, sir."  He said he was going to do it again,

16   another referral to a low-vision specialist in December 2017.

17   Q.  Is that a no, he never said you need that digital

18   magnifier?

19   A.  He said the education and the type of training that he

20   need, he is not trained in that field, so he specifically said

21   he doesn't know about low vision.  He said that he knows I

22   need powerful magnification, and what he specifically tried to

23   get me, they didn't even approve that.  He said he didn't want

24   this 6X.  He said he tried to order one that is double this,

25   and he said security wouldn't even approve that.  That's his

1    words.

2            THE COURT:  Mr. Woodley, the question is did

3    Dr. Lundford ever tell you that you need the digital

4    magnifier?

5            THE WITNESS:  He said -- to that particular question,

6    no.  He said I need a low-vision aid, and he didn't have

7    training in that particular area.  He didn't say what I do

8    need or don't need.  He had no training in that area.

9            THE COURT:  Okay.  So he just used the phrase

10   "low-vision aid."  He did not specifically say the "digital

11   magnifier"?

12           THE WITNESS:  He said I need to see a specialist

13   because he don't know what to do.

14   BY MR. BRENER:

15   Q.  So then, briefly, with respect to the lamp that you are

16   asking for, and also with respect to the scope that you are

17   asking for, did Dr. Lundford ever specifically tell you that

18   you needed those items?

19   A.  Dr. Lundford never even went over the low-vision items

20   like that because he said that he has never even treated

21   nobody with this condition.  He didn't even really -- he just

22   kept saying, "You will have to see a specialist.  You will

23   have to see a specialist."  He didn't have an idea -- he

24   didn't even know about Stargardt's.  He said, "You got that

25   damn Stargardt's."  So he didn't even completely understand.

Woodley - Cross

82

 1    He said he is not trained as a specialist in this field at

 2    all.  So he said he wanted me to see a specialist.  The only

 3    thing that he said is he is looking at my eyes because Wexford

 4    asked him to examine the eyes.

 5    Q.  So I would like to move on.  So I am just asking you a

 6    yes-or-no question, Mr. Woodley:  Did Dr. Lundford tell you

 7    you needed that monocular scope or that lamp?

 8    A.  He never told me what I needed.

 9    Q.  Okay.  Has any doctor ever told you that because you do

10    not have these visual aids your condition has deteriorated?

11    A.  Well --

12            MR. WEIL:  Objection, vague.

13            THE COURT:  He is answering it, so overruled.

14            THE WITNESS:  Okay.  As far as the condition

15    changing, when I went out on the writ recently and I saw a

16    retina specialist, the retina specialist was looking -- was

17    saying that it is a change in vision, and he made

18    recommendations, and I don't know -- he noticed the difference

19    in the retina, and he said -- he asked me was I getting any

20    type of help at the facility with any aids or anything like

21    that.  I told him, "No, I have no visual aids."

22    BY MR. BRENER:

23    Q.  When did that conversation take place?

24    A.  It was twice.  It was once -- it was once in '14, before I

25    saw the UIC low-vision specialist.  They took me to UIC to see

Woodley - Cross

83

1   a retina specialist, and they explained to me about how the

2   the field of vision is affected without a visual aid.  So I

3   saw two specialists who tried to explain about how I'm not

4   able to see through the distorted vision part.

5   Q.  So was your vision already deteriorating in 2014 when you

6   saw those specialists?

7   A.  Well, they said that the condition should be leveled out,

8   and I need visual aids to enhance the vision, and they started

9   to explain to me about the physical symptoms that I was

10   having, the headaches and the eye pain and strain, that

11   nature, trying to see without the visual aids.

12   Q.  This is while you had that digital magnifier, correct?

13   A.  No, at that time -- at that time, the retina was --

14   Q.  Mr. Woodley, just pause for one second because, again, we

15   lost the audio.  Just give it a second to reset.

16         All right.  Do you want to try it again?

17   A.  Okay.

18   Q.  All right.  Do you want to try it again?

19   A.  At that time, the doctor said -- the specialist said that

20   the vision should have reached like the lowest point at that

21   time.

22   Q.  And that conversation took place in 2014, correct?

23   A.  I had two conversations about the same thing --

24         THE REPORTER:  I can't hear him.

25         MR. BRENER:  One second, Mr. Woodley.

Woodley - Cross

84

1          THE COURT:  Mr. Woodley, you said you had two

2  conversations.  One was in 2014.  Was the other also in 2014?

3          THE WITNESS:  No, the other one was in '18, this

4  year.

5          THE COURT:  2018.  Okay.

6  BY MR. BRENER:

7  Q.  Okay.  So let me back up a little bit.

8          Your first meeting with those specialists in 2014,

9  did you or did you not have your digital magnifier at that

10  point?

11  A.  Yes, the first time, yes.

12  Q.  And at that meeting, did those specialists tell you that

13  your condition was deteriorating or had deteriorated?

14  A.  They told me --

15          THE REPORTER:  I can't hear him.

16          MR. BRENER:  Hold for one second, please,

17  Mr. Woodley.  Again, we are losing the audio, and I'm sorry.

18  BY MR. BRENER:

19  Q.  All right.  Please try again.

20  A.  The specialist explained to me that the central vision, at

21  particular times, that it gets distorted, that it should be at

22  the bottom, and it takes time, and it makes the cloudiness be

23  more difficult without the visual aids.  The digital magnifier

24  is supposed to be like to read letters and mail and things

25  like that, but I still have to strain to see objects and

Woodley - Cross

1    things of that nature.

2    Q.  And that was prior to the optometrist at UIC Hospital

3    telling you you needed the monocular scope and the lamp,

4    correct?

5    A.  That was the retina specialist.

6    Q.  Is that a yes, that was prior to the optometrist telling

7    you you needed the lamp and the scope?

8    A.  Well, I don't know if the low-vision specialist called the

9    optometrist, but the retina specialist explained to me that

10   the vision is affected by distance and reading.  So I saw the

11   retina specialist, and that's when I seen the low-vision

12   specialist.  So as far as ophthalmologists or optometrists,

13   the question you are asking is not really -- you have to ask

14   me about specific type.

15   Q.  You know what?  That's fair, Mr. Woodley.  Let me be more

16   specific.

17          You saw a doctor at UIC Hospital in February of 2015;

18   do you remember that?

19   A.  It was more previous.  That was a low-vision specialist.

20   I saw one previous to that in 2014.

21   Q.  Do you remember seeing someone in February of 2015 at UIC

22   Hospital?

23   A.  Yes.

24   Q.  Okay.  Do you recall whether that person was the first

25   person to tell you you needed the monocular scope and you

Woodley - Cross

1   needed the lamp in your cell?

2   A.  Yes, this was the clinic, the low-vision clinic.

3   Q.  Was that the first person to tell you those things?

4   A.  That's the only time this was discussed with the

5   specialist.  The doctor -- this is what I was looking at, sir.

6   The doctor I saw previously was the retina specialist.  He

7   makes a referral to the low-vision specialist that deals with

8   visual impairment and visual rehabilitation.

9   Q.  So is that a yes, you got your referral, you saw the

10  doctor in February of 2015, and that specialist told you you

11  needed that scope and that lamp?

12  A.  Yes.  From my understanding, this is the professional in

13  that particular field of low vision.

14          THE COURT:  Okay.  Just so I'm clear, Mr. Woodley, in

15  2015, did you see a specialist at UIC who told you that you

16  needed the powerful lamp and the monocular scope?

17          THE WITNESS:  And the digital magnifier and the

18  folding walking cane.

19          THE COURT:  And the digital magnifier and the cane.

20  That's when you were --

21          THE WITNESS:  Yes.

22          THE COURT:  -- told that was in February of 2015?

23          THE WITNESS:  Yes.

24  BY MR. BRENER:

25  Q.  Mr. Woodley, at that time, you had a digital magnifier,

Woodley - Cross

1  didn't you?

2  A.  Yes, it was the power was limited, and the one that they

3  explained to me, showed me, was more powerful and able to pick

4  up more words because the one I had was smaller, and this is

5  more powerful to enhance the remaining vision I have.

6  Q.  So fair to say this was not the same piece of equipment?

7  A.  It is very similar.

8  Q.  Okay.

9  A.  But it is just -- it is very similar.

10 Q.  So after that meeting with the specialist at UIC Hospital

11 in 2015, has any doctor told you that because you didn't have

12 those visual aids your condition got worse?

13 A.  Repeat the question.

14 Q.  After you had that specialist meeting in 2015 where you

15 were told that you needed the lamp, the scope, and the new

16 digital magnifier, has any doctor or specialist or anyone who

17 has seen you or provided any kind of treatment for your vision

18 told you that the lack of those implements caused your

19 condition to get worse?

20 A.  Well, the specialist I saw after having the aide, he knows

21 that I should have visual aids, and he said it was something

22 with the retina, the Stargardt's is getting worse, and the

23 retina was swollen from straining to see.

24 Q.  I will ask my question again because I don't think you

25 answered it.

Woodley - Cross

 1          Did that person this year tell you that that caused

 2   your Stargardt's disorder to get worse?

 3   A.  He was simply telling me about the retina --

 4          THE REPORTER:  He is breaking up.

 5          THE COURT:  He broke up.

 6   BY MR. BRENER:

 7   Q.  Is that a no, he did not tell you this caused your

 8   Stargardt's to get worse?

 9   A.  He said that the retina is swollen, and I'm straining to

10   see because I don't have nothing to see with.

11   Q.  I'm asking you a very specific yes-or-no question,

12   Mr. Woodley.  Did that provider tell you that because you

13   didn't have those visual aids your Stargardt's disorder got

14   worse?

15   A.  He didn't call it "Stargardt's."  He said the retina.  It

16   was the retina, sir.  The retina, that's what.

17   Q.  I'm going to move on, Mr. Woodley.

18          Your impairment has not prevented you from working

19   while at Dixon, correct?

20   A.  No, not the job -- certain job tasks I have now, no, it

21   has not affected.

22   Q.  You are paid for doing that job?

23   A.  What did you say, sir?

24   Q.  Are you paid for doing that job?

25   A.  Yes, I earn like a dollar a day.

Woodley - Cross

89

```
 1   Q.  Do you also have people outside of prison sending you
 2   money from time to time?
 3            MR. WEIL:  Judge, object, outside the scope.
 4            THE COURT:  It is cross-examination.  I don't know
 5   what we are going -- or where we are going or for what it's
 6   worth.  So I will overrule the objection and see where it is
 7   and go from there.
 8            MR. BRENER:  I will ask the question again.
 9   BY MR. BRENER:
10   Q.  Do you also have people sending you money from time to
11   time?
12   A.  Occasionally, my father and my aunt send me money.  It is
13   not a lot.
14   Q.  Okay.  Those funds, are they deposited in your trust fund
15   account?
16   A.  Yes.
17   Q.  Is that where the money you earn from your job is
18   deposited?
19   A.  I don't know if it is going in the trust fund account, but
20   I know I earn like a dollar.  I can't specifically say.  I
21   don't know what your question really is.
22   Q.  Okay.  The money that you receive from working or from the
23   people outside of prison that are sending you money, is that
24   deposited in the same account that you used to purchase your
25   lamp?
```

Woodley - Cross

90

1    A.  Yes.

2    Q.  Is that also the same account that you used to purchase

3    the initial digital magnifier?

4    A.  Yes, yes.

5    Q.  Okay.  I have to ask you a very specific question:  Prior

6    to filing this lawsuit, did you have any communications with a

7    federal government agency?  You may know it either as the EEOC

8    or the Equal Employment Opportunity Commission.

9    A.  I'm not --

10             MR. WEIL:  Objection.  Again, outside the scope.

11             MR. BRENER:  Wait.  We lost you, Mr. Woodley.

12             THE COURT:  Overruled.

13             Let's get this wrapped up.

14             Mr. Woodley, did you hear the question?

15             THE WITNESS:  It is breaking up on my end, too.

16   Something about the federal government.

17             MR. BRENER:  Yes, I will repeat my question,

18   Mr. Woodley, and please give me a hand wave or something if it

19   breaks up, and I will break off and finish my question when

20   you can hear me again.

21   BY MR. BRENER:

22   Q.  Did you communicate with an agency called the EEOC or the

23   Equal Employment Opportunity Commission?

24   A.  I know the group in Washington is under the Civil Rights

25   Division about employment.  Now, as far as specifically the

Woodley - Cross

91

 1   EEOC, I know that it is the U.S. Department of Justice, the

 2   Civil Rights Division, and the part about employment and

 3   hiring, I filled out a section under that.  I know that.  So

 4   far as technically it goes, I don't know that.  But the U.S.

 5   Department of Justice, I have filed a complaint about

 6   employment.

 7   Q.  When did you file that complaint?

 8   A.  Maybe '13, 2013.

 9   Q.  Did you ever get a response from them?

10   A.  Yes.

11   Q.  Do you have that response?

12   A.  I sent the response to -- I don't have it.  I sent it to

13   the advocacy group because they said they could -- I forwarded

14   it to an advocacy group.

15           THE COURT:  What year did you get the response?

16           THE WITNESS:  It took a while.  Maybe '13 or '14.

17           THE COURT:  Okay.

18           THE WITNESS:  It was a long -- it was a long -- it

19   was a long period for that response.

20   BY MR. BRENER:

21   Q.  Do you remember if they sent you a document called a

22   letter -- a letter granting you the right to file a lawsuit

23   about your employment complaint?

24   A.  As far as the content of the letter, I know they was

25   saying, after the complaint, I still had an opportunity to

Woodley - Cross

92

1  move forward, but as far as like the actual detail of what you

2  said, those particular -- that particular document that you

3  are talking about, words like that, I know I could continue on

4  from this point, and the complaint was received, and you can

5  continue on in the process.

6  Q.  What's the name of the advocacy group that you sent that

7  to?

8  A.  The first one was called the Great Lakes Americans with

9  Disabilities.  It was based in Chicago, Illinois.  Then I sent

10 the next one -- I sent the same one to Equip for Equality.

11 Q.  Okay.  Other than that letter, have you had any

12 communications with the EEOC?

13       THE COURT:  I think he said he didn't recognize that

14 acronym.

15       Hold on a second, Mr. Woodley.

16       Mr. Woodley, do you know what the acronym "EEOC"

17 means?

18       THE WITNESS:  No.

19 BY MR. BRENER:

20 Q.  Okay.  Other than that letter, have you had any

21 communications with that agency under the Department of

22 Justice or any other government agency about the job that you

23 want?

24 A.  The U.S. Department of Justice --

25       THE COURT:  All right.  Mr. Woodley, we can't hear

Woodley - Cross

93

 1  you at all.

 2          THE WITNESS:  I know I contacted the U.S. Department

 3  of Justice about the employment, I know that for sure, the

 4  Civil Rights Division.

 5  BY MR. BRENER:

 6  Q.  Is that just the one time?

 7  A.  And the advocacy group, I contacted Lisa Madigan, the

 8  state's attorney general's office later on.  Those were the

 9  two people I reached out to.

10  Q.  Okay.  Let's talk about your --

11          THE COURT:  Mr. Brener, how much more time do you

12  have?

13          MR. BRENER:  I want to go through the education.

14          THE COURT:  Okay.  How much more time do you have?

15          MR. BRENER:  Ten minutes if I get direct answers,

16  maybe 15 if I don't.

17  BY MR. BRENER:

18  Q.  Mr. Woodley, you have testified that you have taken a

19  number of courses while at Dixon, right?

20  A.  Yes, sir.

21  Q.  Okay.  You testified that college courses resumed being

22  offered at Dixon in the very first of -- I'm sorry,

23  January 1st, 2018, correct?

24  A.  Yes.

25  Q.  When did you attempt to register for college courses after

Woodley - Cross

 1   they, once again, became available at Dixon?

 2   A.  I went to -- that particular registering that you are

 3   talking about, the day after I asked them to replace the

 4   magnifier, and he said, no, and he kept me on the waitlist,

 5   and I told him I was trying to obtain -- get a way to read the

 6   material, and he kept me on the list.

 7   Q.  Is that when the dean told you that he would read the text

 8   to you?

 9   A.  He told me this April 13th of -- he didn't say text,

10   t-e-x-t.  He said he will try to read the test, the t-e-s-t.

11          THE COURT:  Test, test.

12          MR. BRENER:  I understand.

13          THE COURT:  I was thinking "text" as well, not

14   "test."

15          MR. BRENER:  Thank you for clarifying, Mr. Woodley.

16   BY MR. BRENER:

17   Q.  Now, the classes that you referenced, there was one called

18   career tech, and there was another one that you weren't sure

19   was going to be offered.  Are these classes that will further

20   your aspirations towards being a real estate agent?

21   A.  Yes, sir.

22   Q.  What is being taught in the career tech class?  Do you

23   know?

24   A.  The career tech is a -- from my understanding, the

25   knowledge that I have, it gives you like a resume, and it

Woodley - Cross

 1  prepares you as far as like dealing with employment and career

 2  opportunities as far as like -- I don't know the exact, the

 3  exact regimen, but I know it is about employment

 4  opportunities, and they teach you about resumes and interviews

 5  and things of that nature.

 6  Q.  How do you register for the correspondence courses that

 7  you were taking?

 8  A.  Through --

 9       THE REPORTER:  I'm sorry.  "Through"?

10       MR. BRENER:  I'm sorry.  Say that again.  We lost you

11  again.

12       THE WITNESS:  Through the United States Postal

13  Service.

14  BY MR. BRENER:

15  Q.  So this is something that you do directly with the company

16  that's offering them?

17  A.  Yes.

18  Q.  Is this a program that's offered by IDOC?

19       MR. WEIL:  Objection, vague, foundation.

20       THE COURT:  Overruled.

21       THE WITNESS:  I --

22       MR. BRENER:  Mr. Woodley, we can't hear you again.

23  I'm sorry.  Try again.  I will ask my question again.

24  BY MR. BRENER:

25  Q.  The correspondence courses that you have taken, that you

Woodley - Cross

96

1   registered through the post office, is this a program that is

2   offered by the Illinois Department of Corrections?

3   A.  No, it is not offered by IDOC.

4   Q.  Okay.  How about the real estate broker class that you say

5   you are taking, the book you showed us on camera earlier, is

6   that a program that is offered through the Illinois Department

7   of Corrections?

8   A.  It is very close.  I am in a program called "Risk and

9   Needs Assessment."  The Risk and Needs Assessment

10  Program -- part of the program deals with employment

11  opportunity, and the employment opportunity to get the real

12  estate broker license, I have to study the real estate guide.

13  Q.  But the real estate broker program itself, the one -- the

14  guide that you showed us, is that offered through IDOC?

15  A.  Well, the information is obtained and offered through the

16  IDOC.

17  Q.  That wasn't the question I asked, so I will ask again.

18        The program itself, is that offered through IDOC, or

19  is that something that you do directly with the company that's

20  offering that course?

21  A.  This is direct.  This is a preparation guide.  You have

22  to -- it is a preparation guide that you deal with directly.

23  Q.  So the class that you just referenced, is that another

24  vocational class that you are taking at Dixon right now?

25  A.  Well, it is -- it is dealing with social work.

Woodley - Cross

97

```
1              THE REPORTER:  I can't hear him.

2              THE COURT:  Hold on a second.  Mr. Woodley, hold on a

3    second.

4              MR. BRENER:  Is that a --

5              THE COURT:  Hold on.

6              Mr. Woodley, the Risk and Needs Assessment course, is

7    that directly through IDOC at Dixon?

8              THE WITNESS:  Yes.  I don't know if you can see it,

9    but you see right here (indicating).  You can see it is an

10   IDOC program.  It is through the IDOC.

11             MR. BRENER:  And the record will reflect Mr. Woodley

12   just held up two sheets of paper showing us documents,

13   presumably, from that course that he is taking.

14             THE WITNESS:  It is not a document.  It is actually

15   the service plan.  It is not a document.

16             MR. BRENER:  Thank you, Mr. Woodley.

17   BY MR. BRENER:

18   Q.  When did the summer session college courses begin at

19   Dixon?

20   A.  June.

21             MR. BRENER:  I have nothing further, your Honor.

22             THE COURT:  Okay.

23             Do you have any redirect?

24             MR. WEIL:  I do, Judge.

25             THE COURT:  How long do you anticipate it lasting?
```

Woodley - Redirect

1          MR. WEIL:  I think we can keep it pretty short,

2     Judge, five to ten.

3          THE COURT:  You need a break?

4          THE REPORTER:  Yes.

5          THE COURT:  Let's take a break.

6      (Recess taken.)

7          MR. WEIL:  Judge, I believe counsel for Wexford

8     doesn't have any questions to ask Mr. Woodley, so I'm ready to

9     redirect when you are ready, Judge.

10         THE COURT:  Okay.  Well, hold on one minute.

11     (Brief pause.)

12         THE COURT:  Okay.  Recall the case please.

13         THE CLERK:  Recalling 18 CV 50050, Woodley vs.

14     Baldwin, et al.

15                    REDIRECT EXAMINATION

16     BY MR. WEIL:

17     Q.  Good afternoon, Mr. Woodley.  Just a few questions for

18     you.

19         Counsel for the Defendants asked you if you have a

20     job right now.  Do you remember that?

21     A.  Yes.

22     Q.  How much do you get paid at that job?

23     A.  28 --

24         THE REPORTER:  "28" what?

25

```
 1   BY MR. WEIL:
 2   Q.  Mr. Woodley, say that again.  You cut out.
 3   A.  $28 a month, 2-8, 28.
 4   Q.  $28 a month?
 5   A.  Yes.
 6   Q.  How many days a week do you work at the job?
 7   A.  Monday through Friday, so 22 days -- mostly, the whole
 8   month.
 9   Q.  It sounds like that comes out to a little better than a
10   buck a day; is that right?
11   A.  Yes.
12   Q.  Okay.  How much does Dixon Correctional Industries pay, if
13   you know?
14           MR. BRENER:  Objection, relevance.
15           THE COURT:  Go ahead.  Overruled.
16           THE WITNESS:  It --
17           THE COURT:  Look, I know you are going to get up and
18   say he is not entitled to a job at Dixon Industries in the eye
19   care place, which I get it, and he is not.  So you can go
20   ahead and make your record.  Go ahead.
21           Go ahead and answer that question, Mr. Woodley:  Do
22   you know how much Dixon Correctional Industries pays?
23           THE WITNESS:  It pays $3 an hour, roughly like 500
24   bucks a month, like $500 a month.
25
```

Woodley - Redirect

1  BY MR. WEIL:

2  Q.  Do you know whether Dixon Correctional Industries, whether

3  working there entitles an inmate to an earlier release or

4  credits against his sentence?

5          MR. BRENER:  Your Honor, for purposes of the

6  record --

7          THE COURT:  Wait.  Mr. Woodley, hold on.

8          MR. BRENER:  For the purposes of the record, the same

9  objection.

10          THE COURT:  Okay.  All right.  Go ahead.

11          MR. WEIL:  Go ahead, Mr. Woodley, you can answer the

12  question.

13          THE WITNESS:  You can earn early release.

14          MR. WEIL:  You can or you cannot?

15          THE COURT:  "You can earn early release."

16          THE WITNESS:  Yes, can, c a-n.

17  BY MR. WEIL:

18  Q.  And does your current job allow you to earn credits

19  towards an early release?

20  A.  No.

21  Q.  Counsel asked you about money that was deposited into your

22  commissary account.  Do you remember that?

23  A.  The trust fund account.

24  Q.  Yes, sir.

25          What do you use that money for?

Woodley - Redirect

1   A.  Hygiene products, certain clothing items, and if there is

2   enough left over, food to eat.

3   Q.  If you had enough money in that account to purchase a

4   digital magnifier, would you have tried to do that?

5   A.  Yes, I have -- I haven't had that amount of money in

6   years, since my mother died.

7   Q.  I want to ask you -- talk about the correspondence courses

8   now, but I want to ask first about the Risk and Needs

9   Assessment that you and I talked about and you talked about

10  with Mr. Brener, too.

11         Can you explain what the Risk and Needs Assessment is

12  and what it is for?

13  A.  Yes.  It is a sponsored program by Bruce Rauner, the

14  governor of Illinois, and the federal government to reduce

15  recidivism, meaning people returning to prison, and part of

16  the program is here at the Dixon facility.  It is held by a

17  social worker, and they do a thing called a SPIN analysis.  It

18  means service plan instrument.  And on an individual basis

19  with the social worker, they pick a program plan for you to

20  try to reduce your chance of recidivism, and my particular

21  plan deals with employment and deals with visual impairment

22  opportunities and work office space entities.

23  Q.  Do correspondence courses matter for the Risk and Needs

24  Assessment in the SPIN that you were just talking about?

25  A.  Yes.

Woodley - Redirect

1  Q.  How do they matter?

2  A.  Because with the employment opportunity field that I am

3  in, the particular prison doesn't offer training in that

4  particular field.  They provide you information, like they

5  told me I'm eligible to become a real estate broker, but as

6  far as obtaining the information to get licensed, they are

7  telling me that I have to do -- you know, have my own time on

8  my own opportunity.

9  Q.  Does the Risk and Needs Assessment then encourage you to

10 take programs -- to take correspondence courses?

11 A.  It encourages me to take programs for correspondence

12 courses, education.  It is an array of things to help

13 rehabilitate you, sir.

14 Q.  And setting aside the benefit you get from the

15 correspondence course itself, does the Risk and Needs

16 Assessment provide you benefits if you take correspondence

17 courses?

18 A.  Yes.

19 Q.  What are those?

20 A.  Well, any type of questions that you have through the

21 correspondence course, like the eligibility, for example, in

22 my particular case, through the Risk and Needs Assessment,

23 they went to the Illinois Department of Professional and

24 Financial Regulation.  So I know I'm eligible to earn the

25 broker's license.  So any other questions that you have

Woodley - Redirect

1  pertaining to any correspondence information and tied to it,

2  they give you the research to provide you as much information

3  as possible.

4  Q.  Just one minute.  Excuse me, Judge.

5       Does the Risk and Needs Assessment affect your

6  eligibility for parole or your status on parole?

7  A.  Yes.

8  Q.  Okay.  How so?

9  A.  It affects it several ways.  The social worker deals

10  directly with field services, and the aide has read to me that

11  in the Illinois law, if you are part of the risk assessment,

12  it helps you with --

13       THE REPORTER:  You have to have him repeat.

14       MR. WEIL:  Mr. Woodley, just that last bit, you cut

15  out.  Could you say that again?

16       THE WITNESS:  Risk assessment --

17  BY MR. WEIL:

18  Q.  Hold on, Mr. Woodley, sorry.  Pause for a second.  Let's

19  just pause for a second.

20  A.  Yes.

21  Q.  Go ahead.

22  A.  The Risk and Needs Assessment, the social worker deals

23  directly with parole and the field services department, and

24  the aide has read to me that in the Illinois law, if you are

25  part of the risk assessment, it helps you with early release,

Woodley - Recross

1    and it shows that you have completed the program during your

2    incarceration.

3    Q.  And so setting aside early release, does that -- it

4    affects your parole as well, is what you are saying, your

5    status on parole --

6    A.  Yes.

7    Q.  -- or your conditions?

8    A.  Right, the status, the conditions, and it is like

9    stipulations, more stipulations.

10   Q.  Okay.  And so the courses that you are able to take or

11   your ability to take courses affects your conditions of parole

12   later on?

13   A.  Yes.

14          MR. WEIL:  Okay.  Thank you, Mr. Woodley.

15          Nothing further, Judge.

16          MR. BRENER:  Just one follow-up, your Honor.

17          THE COURT:  Go ahead.

18                         RECROSS EXAMINATION

19   BY MR. BRENER:

20   Q.  Mr. Woodley, is your testimony that because you were

21   denied access to correspondence courses the terms of your

22   parole will be materially impacted?

23   A.  I can't -- what did you say, sir?  It is hard to hear.

24   Q.  Can you hear me?

25   A.  Okay, yes.  Could you repeat the question again?

Woodley - Recross

1  Q.  Is your testimony that because you didn't take

2  correspondence courses after your digital magnifier broke,

3  your eventual parole beginning at the end of this year will

4  come with a worse set of stipulations or circumstances

5  attached to it?

6  A.  Yes, we deal directly -- I recently went to parole school

7  this month, and parole says employment is a big part of

8  getting parole.  So, one, it is mandatory as far as a better

9  relationship, not just rehabilitative, but with the parole

10  agent himself.  That's what the parole agent told me.

11  Q.  Sure.  But I'm asking about the courses that you say you

12  otherwise would have taken.

13  A.  Yes.

14  Q.  Had you been able to take those courses, would that have

15  caused you to be released prior to late September of 2018?

16  A.  No, the courses don't earn them.  You asked about parole,

17  does it affect parole.  You are asking a totally different

18  question now.

19  Q.  Well, are you going on parole in September of 2018?

20  A.  Yes, I am.

21  Q.  Okay.  So do you believe your parole period would have

22  begun sooner if you had taken additional correspondence

23  courses?

24  A.  No, not sooner.

25  Q.  Will there be additional restrictions placed on where you

Woodley - Recross

106

1   can live that would not have been imposed if you had taken

2   additional correspondence courses?

3           MR. WEIL:  Objection, calls for speculation.

4           THE COURT:  Overruled.

5           THE WITNESS:  What did you say, sir?

6           MR. BRENER:  Did you hear my question, Mr. Woodley?

7           THE WITNESS:  You said something about live.

8           MR. BRENER:  I will repeat my question.

9   BY MR. BRENER:

10  Q.  Are there going to be additional restrictions on where you

11  can live while you are on parole that you would not have faced

12  if you had taken additional correspondence courses?

13          MR. WEIL:  Same objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  No, it doesn't affect living.  It

16  affects stipulations for your parole.

17  BY MR. BRENER:

18  Q.  Why don't you explain what you mean by "stipulations" for

19  your parole.

20  A.  Okay.  The parole, they encourage employment.  So if I'm

21  trained now, and I get education before I get there, a career

22  goal once I get on parole, the agent will allow me to travel

23  to work to be in the program, and I can complete tasks, saying

24  I'm earning income, I am a productive member of society, and

25  less chance of re-offending or recidivism.  That's what the

Woodley - Recross

1  parole agents say coming to the institution.  Like I see

2  counselors and field services.  The parole agents have always

3  encouraged me to get a job and learn what you can before you

4  are released so you can have these important opportunities.

5  BY MR. BRENER:

6  Q.  Did the parole agent that you spoke to tell you that you

7  had to get a specific job or would any job do?

8  A.  In my particular case, I talked to him about disabilities,

9  and I'm not the same as the next person because I can't just

10  go get a construction job or a CDL license.  So my career

11  opportunity is limited compared to the person that is not

12  visually impaired or disabled.

13  Q.  I understand that, Mr. Woodley, but I'm asking if you were

14  to get a job that wasn't working in the real estate industry,

15  would that satisfy your parole agent that you are working and

16  would that improve the conditions of your parole?

17  A.  Yes, it would be a form of employment.

18            MR. BRENER:  Nothing further.

19            THE COURT:  Mr. Woodley, I have a couple of questions

20  regarding Dixon Industries.

21            THE WITNESS:  Yes.

22            THE COURT:  We all know it pays better than any other

23  job, not only at Dixon, but anywhere in the IDOC, right?

24            THE WITNESS:  Yes, to my knowledge.

25            THE COURT:  Okay.  Do you know what the specific

1  restrictions or requirements are to be employed in Industries?

2  Do you know?

3          THE WITNESS:  I --

4          THE REPORTER:  I can't hear him.

5          THE COURT:  I'm sorry.  We didn't hear you.

6          THE WITNESS:  I was placed on the waitlist to get

7  hired.  So whatever the stipulations, whatever the

8  requirements were, I had to meet the requirements because I

9  was on the waiting list for years and years and years to be

10  hired.

11          THE COURT:  Okay.  When were you placed on the

12  waitlist to work in Industries?

13          THE WITNESS:  2010.

14          THE COURT:  Okay.  Do you know whether inmates who

15  have an out date within a certain period of time cannot get a

16  job at Dixon Industries?  Do you understand that question?

17          THE WITNESS:  Yes.  So to answer the question

18  thoroughly, it used to be like a protocol, but they started

19  hiring inmates outside of those, that protocol.

20          THE COURT:  Okay.  So, for example, to your

21  understanding, could an inmate with less than six months be

22  hired at Dixon Industries?

23          THE WITNESS:  It used to be like that, sir, but the

24  person in charge of that, he hires all types of people in all

25  different time frames.

```
 1              THE COURT:  Okay.  Do you know anybody who has been
 2   hired by Dixon Industries who has an out date within, let's
 3   say, the last -- within the next three years?
 4              THE WITNESS:  Yes, above -- yes.
 5              THE COURT:  Okay.  When were they hired?
 6              THE WITNESS:  I would say between '13 and up to
 7   recently.  I would say between '13 and -- that I personally
 8   know of, between '13 and '17, they hired people in all types
 9   of times.
10              THE COURT:  Okay.  And those people have worked for
11   Dixon Industries and have been released already?
12              THE WITNESS:  Yes.
13              THE COURT:  Okay.  All right.
14              From Plaintiff, any follow-up on my questioning?  And
15   only my questioning.
16              MR. WEIL:  No, Judge.
17              THE COURT:  All right.  Any follow-up?
18              MR. BRENER:  No.
19              THE COURT:  I'm sorry?
20              MR. BRENER:  No, Judge.
21              THE COURT:  All right.  Okay.  Does that conclude
22   Mr. Woodley's testimony?
23              MR. WEIL:  It does, your Honor.
24              THE COURT:  All right.  Thank you, Mr. Woodley.
25         (Witness excused.)
```

Allen - Direct

110

1          THE COURT:  All right.  It is 1:00 o'clock.  You have

2     Amber Allen?

3          MR. BRENER:  Correct.

4          THE COURT:  Does the Plaintiff have any other

5     witnesses?

6          MS. CHARDON:  No, your Honor.

7          THE COURT:  Okay.  We have all the documents, right?

8     We have already stipulated to those documents.  So we will

9     take a break.  Come back at 2:15.  It is 1:00 o'clock now.

10    2:15.  All right.  Thank you.

11     (Recess taken.)

12         THE COURT:  Let's recall the case, please.

13         THE CLERK:  Recalling 18 CV 50050, Woodley vs.

14    Baldwin, et al.

15         THE COURT:  All right.  Defendant, any evidence?

16         MR. BRENER:  Yes, I would like to call Amber Allen as

17    a witness.

18         THE COURT:  Okay.

19     (Witness duly sworn.)

20          AMBER ALLEN, DEFENDANTS' WITNESS, SWORN

21                    DIRECT EXAMINATION

22    BY MR. BRENER:

23    Q.  Would you state and then spell your full name for the

24    record?

25    A.  Amber Allen, A-m-b-e-r, A-l-l-e-n.

Allen - Direct

```
 1    Q.  Ms. Allen, are you employed?

 2    A.  Yes.

 3    Q.  And where are you employed?

 4    A.  At Dixon Correctional Center.

 5    Q.  Do you work for the Illinois Department of Corrections?

 6    A.  I do.

 7    Q.  And what is your job at the Dixon Correctional Center?

 8    A.  I'm the health care unit administrator.

 9    Q.  What is your role as the health care unit administrator?

10    A.  As the administrator, it is ultimately my job to ensure

11    that our patient offenders have access to health care.

12    Q.  And what nuts and bolts does that lead to?

13    A.  Okay.  It is about policy and procedure, ensuring that we

14    meet the directives that are established by the Department of

15    Corrections, both statewide and also specifically for Dixon

16    Correctional Center.  We also are under the guidelines that we

17    follow, the NCCHC, which is the National Commission of

18    Correctional Health Care Guidelines, which is like our

19    standards of care that we operate under within the Department

20    of Corrections in Illinois.

21    Q.  Are you a medical professional?

22    A.  I am an RN.

23    Q.  That's a registered nurse?

24    A.  Yes.

25    Q.  Okay.  Are you familiar with the phrase "SOAP note"?
```

Allen - Direct

1    A.   Yes.

2    Q.   Can you explain for the court what a SOAP note is and also

3    describe what it might look like?

4    A.   Sure.   SOAP is an acronym for "S" for subjective, "O" for

5    objective, "A" for assessment, and "P" for plan, and the

6    expectation of that is that's how we get our information.

7    When you talk to the patients, you are getting what they

8    subjectively are saying what their issue is, and then you're

9    objectively documenting things that you observe as well as you

10   can find things in the chart that you can be referencing under

11   your objective.   Your assessment is what you, as the medical

12   professional, feels is the issue, what they are coming forth

13   for.   And then your plan is what your plan of care is designed

14   to do for the patient, and part of that now also includes

15   educating the patient and for them to document "patient

16   verbalizes understanding" if they do.

17   Q.   Are SOAP notes recorded anywhere?

18   A.   They are in the medical progress note.

19   Q.   And what is a medical progress note?

20   A.   Every patient offender in the State of Illinois Department

21   of Corrections is issued an offender's medical record.   It is

22   a green chart that basically has all documentation in it that

23   includes medical, mental health, optometry, dental, anything

24   that would fall under our health care services by directive.

25   Q.   Are you familiar with the Plaintiff in this case, Stephon

Allen - Direct

113

1   Woodley?

2   A.  Yes.

3   Q.  And how are you familiar with him?

4   A.  I am familiar with him specifically by chart review and

5   documentation that has come to me via grievances, requests

6   from wardens, letters from Mr. Woodley, or just in-general

7   chart reviews that we do routinely on different situations.

8   Q.  What was the purpose of the various chart reviews that you

9   just described?

10  A.  My first introduction to him was in 2015 when I returned

11  to Dixon in June of 2015 as a health care administrator, and

12  it was brought to my attention referencing his -- when he went

13  out for a low-vision specialist that saw him in the summer of

14  2015, as far as their recommendations for visual aids that

15  they had prescribed for him.

16  Q.  And then did you do anything else with his chart

17  subsequently?

18  A.  Since then, it would be like a part of like the chart

19  review, or, again, if I received grievances or any requests, I

20  would do a review of his chart.

21  Q.  Would you say you are familiar with Mr. Woodley's chart?

22  A.  Yes.

23  Q.  Are you familiar with any of the medical conditions that

24  Mr. Woodley has?

25  A.  I am most aware of his visual condition he has been

Allen - Direct

1   diagnosed with because that's been the primary reason that I

2   have done like chart reviews or reviewed his chart.

3   Q.  Do you know what that condition is?

4   A.  He has been diagnosed with Stargardt's dystrophy, and

5   recently, at his most recent appointment, was also retina

6   pigmentosa -- retinitis pigmentosa is his most recent

7   diagnosis that was made when he went out to Rush Eye Center

8   within the last month.

9   Q.  In your review of Mr. Woodley's chart, did you come across

10  any medical records that were not generated at Dixon?

11  A.  Yes.

12  Q.  Where were those -- based on your reading of the

13  documents, where were those records generated?

14  A.  UIC had had some of them when he had gone out and then

15  again recently what I saw was Rush Eye Center.

16  Q.  Do you remember when those records were dated?

17  A.  The ones initially that I have reviewed were from 2015.

18  Q.  Do you know what types of medical providers he saw at UIC?

19  A.  I am aware of the low-vision specialist I do believe was

20  an optometrist, but that was the person that he went to as a

21  referral from Dixon.

22  Q.  Do you know what kinds of medical providers he has seen at

23  Dixon Correctional Center?

24  A.  At Dixon he has seen our medical director.  I don't

25  believe he has seen our current medical director at all, but

Allen - Direct

1    he had previously seen Dr. Timothy Chamberlain, who is our

2    medical director.  I can't recall specifically what specific

3    nurse practitioners he has seen, but he has also seen

4    Dr. Hicks, who was our optometrist, who retired in 2016, and

5    then he saw Dr. Fahey, who was our optometrist, who was like a

6    fill-in at Dixon for a couple of days, and then recently, most

7    recently, Dr. David Lundford, who is our site optometrist

8    right now.

9    Q.  What do you know about Stargardt's disease, anything?

10   A.  The only thing I can tell you specifically about

11   Stargardt's is that it is a degenerative eye condition that is

12   not precipitated by anything.  I'm not sure if it is

13   congenital or if it is -- meaning he is born with it or if it

14   is something that he just developed, but Stargardt's dystrophy

15   is a visual acuity loss that goes over time, gets worse.

16   Q.  Is that something that you, as a medical professional,

17   would expect to see that his condition would worsen over time?

18   A.  Yes.

19   Q.  Are you familiar with what is known as "sick call"?

20   A.  Yes.

21   Q.  What is sick call?

22   A.  Sick call is how we -- how our offender patient population

23   can access health care.  We have education that is given to

24   our offenders as they come in, both at orientation and also at

25   their intake, and we also provide information on the

Allen - Direct

1   television and in bulletins that have gone out to our

2   population in which the offenders can sign up for sick call by

3   submitting a slip.  The nursing staff goes around and picks

4   those up every morning.  They review them, and then they put

5   them on to be seen either urgently if their issue is urgent or

6   otherwise on the next available day for sick call.

7   Q.  That procedure that you just described, was that procedure

8   in place in 2015?

9   A.  Back in 2015, instead of having slips in all the housing

10   units, they would just simply sign up with their housing unit

11   officer, and at approximately 3:30 every day, we would call

12   around to every housing unit to find out who is on sick call,

13   and then we would put them on the next day's sick call.

14   Q.  When did that procedure change?

15   A.  That procedure changed in March of 2016.

16   Q.  Are you familiar with Mr. Woodley's medical chart?

17   A.  Yes.

18   Q.  Are you familiar with his visits to sick call?

19   A.  Yes.

20   Q.  As you sit there today, do you recall when you -- when he

21   last visited sick call based on your reading of his chart?

22   A.  It was prior to January of 2017.

23        MR. BRENER:  Judge, may I use a document that's been

24   admitted on the Elmo?

25        THE COURT:  Sure.

Allen - Direct

117

1        MR. BRENER:  Thank you.

2        THE COURT:  What's the document number?

3        MR. BRENER:  This is Bates-numbered IDOC 172.  It was

4   from my Exhibit 11, which was a group exhibit, and the date on

5   the exhibit is January 26, 2017.

6        THE COURT:  What's the IDOC number?

7        MR. BRENER:  11 -- oh, I'm sorry.  The Bates number

8   is 172.

9        THE COURT:  Did the Bates numbers get moved on the

10  documents?

11       MR. BRENER:  Yes, it is on the face of the document.

12  It is in the upper left-hand corner, upside down,

13  unfortunately.

14       THE COURT:  Upper left-hand corner.  I have got some

15  in the bottom right-hand corner.

16       So it is right there under the binder clip, upside

17  down.

18       Hold on.

19   (Brief pause.)

20       THE COURT:  Okay.

21  BY MR. BRENER:

22  Q.  Ms. Allen, do you see a screen in front of you?

23  A.  I do.

24  Q.  And on that screen, do you see a medical record?

25  A.  Yes.

Allen - Direct

1  Q.  Have you seen this record before?

2  A.  Yes.

3  Q.  Can you tell us what record it is, who it belongs to?

4  A.  This is Mr. Woodley's appointment when he saw

5  Dr. Chamberlain, our then medical director, on January 26,

6  2017, at 10:00 o'clock in the morning.  It was a referral from

7  sick call that was a request for visual aid.

8  Q.  How do you know that he saw Dr. Chamberlain?

9  A.  By the signature at the bottom where it says "Tim

10  Chamberlain," and that's his signature.

11  Q.  Are you familiar with his signature?

12  A.  Yes.

13  Q.  Subsequent to this record, did you see any other records

14  in Mr. Woodley's medical chart that suggested to you that he

15  was seen at sick call?

16  A.  It would have been prior to this that the nurses would

17  have made the referral to Dr. Chamberlain's line.

18  Q.  Looking at this record, do you see the

19  subjective/objective, the analysis and plan, the SOAP that you

20  discussed?

21  A.  Yes.

22          THE COURT:  Assessment.

23          MR. BRENER:  I'm sorry.  Assessment.  Excuse me,

24  Judge.

25

Allen - Direct

1    BY MR. BRENER:

2    Q.  Yes, you do?

3    A.  Yes.

4    Q.  The S, the O, and the P are in the left column, correct?

5    A.  Correct, the S, the O, and the A.

6    Q.  The S, the O, and the A are in the left column.  Excuse

7    me.

8    A.  Yes.

9    Q.  On the right, do you see the plan?

10   A.  Yes.

11   Q.  Starting on the top right, can you read what

12   Dr. Chamberlain wrote?

13   A.  "Told patient would request ambulatory aide and sent

14   e-mail to ADA to see if they will allow him to purchase

15   magnifier again.  Patient verbalized understanding.  Sent

16   e-mail to ADA coordinator," and it says "and ADA coordinator."

17   Q.  Do you see anywhere on that note where Dr. Chamberlain

18   suggested that the facility should be providing a new

19   magnifier to Mr. Woodley for free?

20   A.  No.

21   Q.  Did Dr. Chamberlain indicate in his written plan that

22   Mr. Woodley should be provided with any other visual aids?

23   A.  No.

24   Q.  You mentioned a Dr. Timothy Fahey.

25       What do you know about Dr. Fahey?

Allen - Direct

```
 1    A.  I never met Dr. Fahey in person.  He was an optometrist

 2    that was hired by Wexford.  He came in to assist us because

 3    our previous optometrist had retired in 2016, about eight,

 4    nine months before that.  So he was only out there one time on

 5    the weekend.

 6              THE COURT:  Can I pause you right there?

 7              THE WITNESS:  Sure.

 8              THE COURT:  Did you just say Dr. Fahey was an

 9    optometrist employed by Wexford?

10              THE WITNESS:  Yes.

11              THE COURT:  Okay.  So we have been lied to in the

12    past.

13              Go ahead.

14              Not by you, but go ahead.

15              THE WITNESS:  Yes, he was.

16              THE COURT:  We have been told repeatedly that Wexford

17    has no optometrist.  It can't be true now.

18              Go ahead.

19              THE WITNESS:  Okay.  Dr. Fahey came into our

20    facility -- I don't know if it was on one or two dates, but I

21    know it was during a weekend, I believe -- to fill in for us

22    because he was just helping us out until our

23    new -- Dr. Lundford came onboard, and I do believe that's when

24    he saw Mr. Woodley, so.

25
```

1    BY MR. BRENER:

2    Q.  So you are aware of a record that was in Mr. Woodley's

3    chart that was prepared by Dr. Fahey?

4    A.  Yes.

5    Q.  Okay.  I'm putting up the next record on the Elmo.

6              MR. BRENER:  This is zoomed out as far as I can make

7    it, Judge.

8              This has the "IDOC 139" in the top left-hand corner.

9              THE COURT:  Which exhibit is it?

10             MR. BRENER:  This will be Exhibit No. 11, Judge.

11             THE COURT:  139?

12             MR. BRENER:  I'm sorry.  This is Exhibit No. 9.

13   Excuse me.  This is from the Plaintiff's optical chart.

14             THE COURT:  Okay.  I'm there.  I'm there.

15   BY MR. BRENER:

16   Q.  Ms. Allen, do you see this record on this screen in front

17   of you?

18   A.  Yes.

19   Q.  Do you recognize this as a medical record from

20   Mr. Woodley's optometric chart?

21   A.  Yes.

22   Q.  Do you know who prepared it?

23   A.  Dr. Fahey.

24   Q.  And how do you know that?

25   A.  By his printed name and signature at the bottom of the

Allen - Direct

1   page.

2   Q.  Unlike the last record that I showed you, this record

3   doesn't really follow the traditional SOAP format.

4          Do you see an S or an O anywhere on here?

5   A.  No.

6   Q.  Okay.  Do you see either an assessment or a plan section?

7   A.  Yes.

8   Q.  Where do you see that?

9   A.  At the bottom -- at the bottom of the page, where it is

10  numbered 1 through 5.

11  Q.  And there is writing on those lines, correct?

12  A.  Yes.

13  Q.  Looking to line No. 3, can you read what Dr. Fahey wrote?

14  A.  "Low-vision aids highly recommended."

15  Q.  Did Dr. Fahey indicate any particular aids that should be

16  provided?

17  A.  No.

18  Q.  Are you familiar with Dr. Lundford?

19  A.  Yes.

20  Q.  What can you tell me about Dr. Lundford?

21  A.  Dr. Lundford started working at Dixon in February of 2017.

22  He is our optometrist.  He averages eight hours a week.  When

23  he first came in, he was working way more than that, just to

24  get us caught up since we were over eight months behind.

25  Q.  Do you know if Dr. Lundford has ever examined Mr. Woodley?

Allen - Direct

1  A.  Yes.

2  Q.  Do you know how many times?

3  A.  Off the top of my head, I would -- I think at least three

4  times that I have seen as far as based on the chart reviews I

5  have done.

6        MR. BRENER:  The next document is IDOC 141.  This is,

7  again, from Exhibit No. 9, Judge.

8  BY MR. BRENER:

9  Q.  Ms. Allen, do you recognize this document?

10  A.  Yes.

11  Q.  Have you seen it in Mr. Woodley's chart?

12  A.  Yes.

13  Q.  What is it?

14  A.  It is an optometry note written by Dr. Lundford on

15  April 20th, 2017.

16  Q.  And how do you know it was prepared by Dr. Lundford?

17  A.  Because I know his signature and his name at the bottom

18  that's written at the bottom of the page.

19  Q.  Do you see his signature at the bottom of the page?

20  A.  Yes.

21  Q.  Okay.  Back at the top, do you see a line that says "chief

22  complaint"?

23  A.  Yes.

24  Q.  Okay.  Did Dr. Lundford put anything in that line?

25  A.  Yes.

Allen - Direct

124

1   Q.  What did he say?

2   A.  "In to check on if patient wants the 3X magnifier that got

3   approved."

4   Q.  And then below in the section marked "Assessment/Plan,"

5   did Dr. Lundford indicate whether Mr. Woodley took that 3X

6   magnifier?

7   A.  It says:  "Patient refused magnifier and would like to

8   wait."

9   Q.  Earlier during your testimony, you said that there were

10  certain visual aids that were recommended by a doctor at UIC

11  Hospital.

12          Do you remember that?

13  A.  Yes.

14  Q.  Is there a difference between a medical recommendation and

15  a medical prescription?

16          MR. WEIL:  Objection, foundation.

17          THE COURT:  It is a foundational question.

18  Overruled.

19          THE WITNESS:  A recommendation --

20          THE COURT:  Just say yes or no.

21          THE WITNESS:  Yes.

22          THE COURT:  How do you know?

23  BY MR. BRENER:

24  Q.  And how do you know the difference between a medical

25  recommendation and a medical prescription?

Allen - Direct

1   A.  A prescription is going to be defined by the doctor, is

2   going to be specific to specify that an item is prescribed.

3   Q.  And when you say an item is "prescribed," what does that

4   mean?

5   A.  They will put on there specifically what they are

6   prescribing, and they won't use the word "recommendation."

7   Q.  How about with respect to a medical recommendation?

8   A.  A medical recommendation in everything I have ever

9   reviewed, it will say "recommended."

10  Q.  And what is the difference between a recommendation and a

11  prescription?

12  A.  A recommendation is like it would be beneficial, but it is

13  not something that the doctor feels is medically necessary or

14  they would prescribe it.

15  Q.  Hypothetically, if you were shown a medical recommendation

16  for a patient that's being treated at Dixon, would you assume

17  that the recommended course of treatment are the only possible

18  available treatments?

19  A.  No.

20  Q.  Depending on the patient, might there be other available

21  treatments that are not recommended?

22  A.  Yes.

23  Q.  Are you familiar with any of the accommodations that

24  Mr. Woodley has received at Dixon in order to help him manage

25  his vision?

Allen - Direct

1   A.  Yes.

2   Q.  How did you become familiar with those accommodations?

3   A.  Chart review.  A chart review is how I was made aware that

4   he was -- and also an e-mail communication from our optometry

5   coordinator who works with Dr. Lundford.

6   Q.  And through your chart review and through those e-mail

7   communications, what accommodations did you become aware that

8   Mr. Woodley has received?

9   A.  He has received -- he was assigned an ambulatory aide, and

10  then he was also given in September of last year, 2017, a 6X

11  scope.

12  Q.  And prior to that 6X scope, do you know if he had anything

13  else to help him see or read?

14  A.  I know in the past, he did have a digital magnifier and

15  also I believe some type of visual aid that he had for his

16  eyesight, but that was prior to me coming to Dixon, so I'm not

17  really familiar with what he had for like a scope.  I do know

18  that he did have a digital magnifier before.

19  Q.  Are you familiar with the digital magnifier that

20  Mr. Woodley has been recommended to receive?

21  A.  Yes.

22  Q.  What do you know about it?

23  A.  The one that they wrote down was called an HD digital

24  desktop magnifier at a cost of around $1,295, I believe, is

25  what they made as a recommendation.  That's beyond what he had

Allen - Direct

127

1  had previously, and it was also something at that time, when

2  it was made as a recommendation, that was going to require

3  security to --

4          THE COURT:  Can we back up?  What's this

5  recommendation that Ms. Allen is referring to?  I don't -- I

6  don't have any -- either I didn't write it down fast enough or

7  I wasn't listening carefully enough, but I don't recall her

8  testifying as to she saw a recommendation.

9  BY MR. BRENER:

10  Q.  Ms. Allen, did you ever see recommendations for

11  Mr. Woodley's treatment from a provider at UIC Hospital?

12  A.  Yes.

13  Q.  Do you recall what, if anything, was recommended for

14  treatment of Mr. Woodley's visual condition?

15  A.  Yes, there was several things that they made as

16  recommendations.  The one I was referring to was the HD

17  digital desktop magnifier.  There was a recommendation for a

18  scope.  There was recommendation for a walking cane and a

19  recommendation also for, I think, a lamp, for a light source.

20  Q.  So are you familiar --

21          THE COURT:  And when did she see this, and how did

22  she see it?

23  BY MR. BRENER:

24  Q.  How did you become familiar with these recommendations?

25  A.  They were brought to my attention in the summer of 2015

Allen - Direct

128

1    when the chart was brought to me referencing the fact that he

2    was requesting these visual aids.

3    Q.  Who brought that to you?

4    A.  A member of the medical team.  I can't recall.

5    Q.  And what did you do when you found out about these

6    recommendations?

7    A.  I approached -- we did not have a set medical director at

8    that time.  Dr. Funk, who was our regional medical director

9    for Wexford, was filling in, and these items would have been

10   pushed to whoever was covering collegial at our facility.

11   "Collegial" is the process that we go through in order to get

12   approval for either outside specialty appointments or when we

13   need any kind of durable medical equipment like what this

14   recommendation was.

15   Q.  Did you communicate those recommendations to Dr. Funk?

16   A.  I communicated it to the person who schedules the

17   writ -- or the collegial process that this needed to be

18   reviewed and put on for if they were going to see about

19   approving it.

20   Q.  Are you familiar with the digital magnifier that

21   Mr. Woodley previously had in his possession?

22   A.  I just am aware that he had a digital magnifier that was a

23   digital magnifier with a light source, was what I was told by

24   people that have talked to Mr. Woodley, and it was prior to me

25   coming to Dixon.

Allen - Direct

1   Q.  Do you know anything about the dimensions of that digital

2   magnifier?

3   A.  I do not.

4   Q.  Do you know anything about the power source of that

5   digital magnifier?

6   A.  No.

7   Q.  Okay.  Are you familiar with the dimensions of the

8   enhanced vision Amigo portable desktop magnifier?

9   A.  I don't know the exact dimensions.  I just know it was

10  large.  It was a larger device than what you would -- it was a

11  desktop style and a larger device than what he had had

12  previously.

13  Q.  How about the power source?

14  A.  It is -- all I was told, it was an HD, high-definition,

15  power source, and they were concerned over the issue from a

16  security standpoint because of the cord.

17  Q.  Let me back you up a little bit there.  Who was concerned

18  about the cord?

19  A.  Security.

20  Q.  Did you have any communications personally with security

21  about that issue?

22  A.  Yes.  Actually, when it went to collegial, they questioned

23  before purchasing the items if it would be cleared by security

24  because of the type of aids that they had made as a

25  recommendation.  So it went to security, and security at that

Allen - Direct

130

 1    time had stated that they would actually need to see the

 2    devices before they could actually make an assessment at that

 3    time.  So therefore because they were not purchased for them

 4    to review, they were denied.

 5            THE COURT:  Was the concern about the power source as

 6    far as security goes?

 7            THE WITNESS:  The following year when it was

 8    re-reviewed with the second -- the next assistant warden of

 9    operations that came in, he actually went online and actually

10    looked up the source, and he was concerned over the power

11    source with the cord, and he was also concerned over the

12    dimensions because it was a larger dimension, and the

13    potential of it being broken or mishandled or misused in

14    population.

15            THE COURT:  What's the security concern about it

16    being broken?

17            THE WITNESS:  The glass.

18            THE COURT:  Okay.  Does a cane have a power source?

19            THE WITNESS:  Does the what?

20            THE COURT:  Does the cane have a power source?

21            THE WITNESS:  It does not.

22            THE COURT:  Does a monocular scope have a power

23    source?

24            THE WITNESS:  It does not.

25            THE COURT:  Okay.  A lamp, obviously, has a power

Allen - Direct

 1  cord, right?

 2          THE WITNESS:  Yes.

 3          THE COURT:  But there are lamps at Dixon, right?

 4          THE WITNESS:  Yes.

 5          THE COURT:  You have got one at your desk?

 6          THE WITNESS:  Yes.

 7          THE COURT:  Okay.  That's all I have got.  Go ahead.

 8  BY MR. BRENER:

 9  Q.  Do you know whether Mr. Woodley has a cane?

10  A.  He does not.

11  Q.  Do you know whether he is going to get one?

12  A.  Yes.

13  Q.  How do you know that?

14  A.  Because I ordered one.

15  Q.  And when do you anticipate him receiving that cane?

16  A.  It should be this week.

17  Q.  Okay.

18  A.  I was not aware that he never had a cane until this was

19  brought to my attention the last week.

20          MR. BRENER:  I have nothing further, your Honor.

21          THE COURT:  Who brought it to your attention last

22  week?

23          THE WITNESS:  Actually, when we were reviewing the

24  case.

25          THE COURT:  Okay.

Allen - Cross

```
 1                 MR. BRENER:  That was me, your Honor.

 2                 THE WITNESS:  Uh-huh.

 3                 THE COURT:  Okay.  Go ahead.  Thank you.

 4                             CROSS-EXAMINATION

 5    BY MS. CHARDON:

 6    Q.  Good afternoon, Ms. Allen.

 7    A.  Hi.

 8    Q.  I apologize in advance if this is somewhat disorganized.

 9    This is an exciting proceeding where we don't have the

10    opportunity to do the same preparation in advance, but thank

11    you for being here.

12    A.  Thank you.

13    Q.  I'm Ally Chardon.  I represent the Plaintiff.  And I would

14    like to just walk through a few of the things that you

15    testified about.

16                 You are employed by IDOC in the health care unit,

17    correct?

18    A.  Yes.

19    Q.  As the administrator?

20    A.  Yes.

21    Q.  Do your job responsibilities include providing ADA

22    accommodations?

23    A.  No.

24    Q.  Do they include reviewing ADA claims or

25    accommodations -- excuse me, let me rephrase that.
```

Allen - Cross

1      Do you review ADA claims to determine appropriate

2  recommendations as part of your job?

3  A.  Yes.

4  Q.  And is that because -- when is that?  When do you review

5  ADA accommodations?

6  A.  Any time a request goes to our ADA coordinator and they

7  want to have verification that if a person meets the medical

8  criteria based on what the person is requesting, they contact

9  my office either directly or indirectly because my -- all my

10  visual issues are managed by my optometry coordinator, and

11  then I'm copied in on them, and then anything that has to do

12  with hearing is to my nursing supervisor, and, again, I'm

13  copied in on it, so from a need to know.

14  Q.  And you reviewed documents relating to Mr. Woodley's

15  situation in preparation for today, right?

16  A.  Yes.

17  Q.  And there were no documents stating -- that you saw

18  stating that he was denied -- it was determined that he didn't

19  meet medical criteria for any of his ADA accommodations?

20  A.  No.

21  Q.  So you didn't see anything -- any documents stating that

22  he wasn't -- he didn't meet medical criteria to obtain a

23  portable electronic magnifier?

24  A.  No.

25  Q.  And, in fact, if -- you sent -- excuse me, not you, but

Allen - Cross

1   the health care unit or Wexford sent him to a medical

2   professional to get the recommendations for the portable

3   electronic magnifier, right?

4         MR. BRENER:  Objection, foundation.

5         THE COURT:  Cross-examination.

6         THE WITNESS:  I would say that we sent --

7         THE COURT:  Overruled.

8         THE WITNESS:  -- the recommendation was to simply

9   send them out to a low-vision specialist.

10  BY MS. CHARDON:

11  Q.  And a low-vision specialist is an optometrist, right?

12  A.  Correct.

13  Q.  And that's a medical professional?

14  A.  Yes.

15  Q.  And it actually requires a medical referral to -- for a

16  patient at IDOC to see a low-vision specialist?

17  A.  Yes.

18  Q.  And that medical referral was approved by Wexford

19  collegial review in their medical opinion; is that correct?

20  A.  Yes.

21  Q.  And in this case in reviewing Mr. Woodley's medical

22  records, did you recognize that he was referred for a

23  low-vision specialist evaluation by Dr. Hicks in 2015?

24  A.  Yes.

25  Q.  And then he was referred again by Dr. Friedrichs in 2015

Allen - Cross

1    as well for a low-vision evaluation, correct?

2    A.  I don't recall that document, but --

3    Q.  Did you review all of his medical --

4    A.  I have reviewed quite a bit, yes.

5    Q.  I might be called to the table if I have the wrong

6    doctor's name.  He went to Illinois Eye Center in 2015,

7    correct?

8    A.  That was the doctor that must have seen him, then, at UIC.

9    Q.  And Illinois Eye Center is not -- is in Peoria, I believe,

10   but it is not -- let's put it -- Illinois Eye Center is an

11   outside --

12   A.  Outside provider.

13   Q.  -- an outside provider?

14   A.  Right.

15   Q.  And the Illinois Eye Center -- at the Illinois Eye Center,

16   he saw an ophthalmologist?

17   A.  I'm not sure who he would have seen unless I can review

18   the document.

19          MS. CHARDON:  Your Honor, may I approach?

20          THE COURT:  Sure.

21   BY MS. CHARDON:

22   Q.  I'm showing you what we have marked Plaintiff's Exhibit 9

23   on our brief.

24          Is that a medical record you reviewed?

25   A.  Yes.

Allen - Cross

136

1   Q.  And at the bottom, does it contain a suggestion for

2   low-vision evaluation?

3   A.  Yes.

4   Q.  At the top, does it say "Ophthalmological Report"?

5   A.  "Ophthalmology," yes, it does.

6   Q.  And you mentioned you were familiar with the fact that

7   Mr. Woodley also saw an ophthalmologist at University of

8   Illinois-Chicago, correct?

9   A.  I believe so.

10  Q.  And does Dr. Liederman -- does the name "Dr. Liederman"

11  ring a bell?

12  A.  Yes.

13  Q.  And Dr. Liederman also recommended that -- and that

14  referral was approved by Wexford --

15  A.  Yes.

16  Q.  -- correct?

17          And he was taken outside -- was he taken outside of

18  the prison to visit Dr. Liederman?

19  A.  Yes.

20  Q.  And Dr. Liederman recommended a low-vision

21  evaluation -- an evaluation with a low-vision specialist,

22  correct?

23  A.  Yes.

24  Q.  Because an ophthalmologist does not -- is not a specialist

25  in low-vision aids, correct?

Allen - Cross

1  A.  I don't know that.

2  Q.  In Mr. Woodley's case, none of his ophthalmologists that

3  he saw were specialists in low-vision aids, were they?

4  A.  That's correct.

5  Q.  They all referred him to a low-vision specialist --

6  A.  Yes.

7  Q.  -- correct?

8       And Dr. Liederman specifically referred Mr. Woodley

9  to see his colleague, Dr. Joan Stelmack, correct?

10  A.  I'm not recalling the names, but that's from the chart.  I

11  believe that to be true.

12  Q.  Are you aware that Mr. Woodley went to see an optometrist

13  at UIC --

14  A.  Yes.

15  Q.  -- following her appointment with Dr. Liederman?

16  A.  Yes.

17  Q.  And that optometrist was a low-vision aid specialist?

18  A.  Yes.

19  Q.  And she is the only low-vision aid specialist that

20  Mr. Woodley has seen?

21  A.  Since then, yes.

22  Q.  Since then or before then, he was not fitted for

23  low-vision aids with an outside specialist?

24  A.  Not while at Dixon.

25  Q.  Are you familiar with the fact that Dr. Fahey -- you said

Allen - Cross

1   he is the optometrist at -- he was the optometrist at Dixon,

2   correct?

3   A.  He was only there for one or two days.  He filled in, yes,

4   as an optometrist at Dixon.

5   Q.  And was that in 2017?

6   A.  Yes.

7   Q.  And in 2017, he wrote a referral -- he wrote on his

8   medical record that he recommended Stephon be seen for

9   low-vision aids, correct?

10  A.  Yes.

11  Q.  And Dr. Lundford is an ophthalmologist, correct?

12  A.  No, Dr. Lundford is an optometrist.

13  Q.  Is an optometrist.  Okay.

14          And he saw -- he saw Mr. Woodley in 2018, correct?

15  A.  Yes.

16  Q.  And he also recommended evaluation for low-vision aids,

17  correct?

18  A.  Yes.

19  Q.  By a specialist?

20  A.  Yes, low-vision specialist, just recently.

21  Q.  And Dr. Chamberlain, he is the medical director of Dixon?

22  A.  He was the medical director at Dixon.

23  Q.  Were you aware that Dr. Chamberlain, he didn't prescribe

24  any low-vision aids specifically?

25  A.  He did not.

Allen - Cross

1  Q.  And he didn't recommend any specific low-vision aids?

2  A.  He did not.

3  Q.  But he did appeal Wexford's denial of the low-vision aids,

4  didn't he?

5  A.  Yes.

6  Q.  You talked to us about a SOAP note?

7  A.  Yes.

8  Q.  And that's subjective, objective, assessment, plan?

9  A.  Yes.

10 Q.  And we looked at IDOC -- it was 172.  I'm not as

11 coordinated as my co-counsel here, but it was part of

12 Exhibit 11.  It was a medical record from Tim Chamberlain in

13 2017, and it had, after the O, it said, "Bruises and scrapes

14 on shins."

15 A.  Yes.

16 Q.  You remember that?

17 A.  Yes.

18 Q.  And --

19        MR. BRENER:  Objection, outside the scope of the

20 direct.

21        THE COURT:  I will allow it.  Overruled.

22 BY MS. CHARDON:

23 Q.  That was a document you talked about earlier today,

24 correct?

25 A.  Yes.

Allen - Cross

1   Q.  And the objective, the O, right before bruises and scrapes

2   on shins, that stands for objective, correct?

3   A.  Yes.

4   Q.  That's the doctor's observations?

5   A.  Yes.

6   Q.  That is not what the patient is reporting?

7   A.  Correct.

8   Q.  So you are involved with ADA accommodations for the

9   purpose of evaluating how they are prescribed when it comes to

10  prescribing -- getting them prescribed or purchasing them,

11  correct?

12  A.  My point is to have -- that I can validate that they have

13  a medical condition.

14  Q.  Okay.  And it is not your job to determine whether a

15  particular aid will accommodate a person's disability --

16  A.  It is not.

17  Q.  -- correct?

18        That's somebody else's job?

19  A.  Yes.

20  Q.  That's Max Blackburn's job?

21  A.  Max Blackburn is just the ADA coordinator.  It basically

22  is -- yes, I would say that he makes a recommendation based on

23  the ADA guidelines as far as what they will or will not be

24  able to provide for.

25  Q.  Are you aware that Mr. Woodley was provided an Aukey

Allen - Cross

1  portable electronic magnifier in 2012 as an ADA accommodation?

2  A.  I just saw a note on that today, actually, for the first

3  time.  I was not aware of that prior to today.

4  Q.  And then are you aware now that it was replaced in 2014,

5  when it was broken, as an ADA accommodation?

6  A.  Yes, I did see that.

7  Q.  Did you know that in May of 2017, Mr. Blackburn wrote in a

8  grievance response that he was reasonably satisfied that the

9  aids that Mr. Woodley was requesting would accommodate his

10  disability?

11  A.  I'm not aware of that.

12  Q.  Did you review grievance responses in preparation for

13  today?

14  A.  No, I don't get grievance responses as a part of my

15  preparation unless I'm directly involved in them, and I was

16  not.

17  Q.  Were you involved in Mr. Woodley's case in 2017?

18  A.  Yes.

19  Q.  And it is -- so Mr. -- I'm going to read you a portion of

20  this grievance response, which is IDOC No. 10.

21          THE COURT:  Why don't you show it to her --

22          MS. CHARDON:  Yes.

23          THE COURT:  -- or use the Elmo.

24          MS. CHARDON:  Can you give me one second?  I can put

25  one on the Elmo.  This is IDOC's Exhibit 7.

Allen - Cross

142

```
 1              THE COURT:  Do you want these, Ms. Allen?

 2              THE WITNESS:  No, but it is hard to read.

 3   BY MS. CHARDON:

 4   Q.  This is probably not effective for me putting this up

 5   because it is so small.

 6   A.  Okay.  I see it.  I have read it now.  We are good.

 7   Q.  At the bottom of this -- this Elmo is not going to work

 8   for me, but at the bottom of this, this is a grievance

 9   response dated May 3rd, 2017, right?

10   A.  Yes.

11   Q.  And it is from Max Blackburn?

12   A.  Yes.

13   Q.  And it says:  "Based on all available information, the

14   facility ADA coordinator is reasonably satisfied that the

15   equipment requested" --

16              THE COURT:  Slow down a little bit.

17              MS. CHARDON:  Sorry.

18   BY MS. CHARDON:

19   Q.  -- "that the equipment requested by the offender will

20   provide needed assistance but that it is beyond the scope of

21   what the ADA process is capable of obtaining."

22              Correct?

23   A.  Yes.

24   Q.  And that's not your determination, like you said, to

25   decide whether a particular piece of equipment will provide
```

Allen - Cross

1    the needed assistance under the ADA, correct?

2    A.  Correct.

3    Q.  That's up to Mr. Blackburn?

4    A.  It is up to the ADA accommodations.

5    Q.  Accommodations?

6    A.  Uh-huh.

7    Q.  And so Blackburn concludes because of this, the offender

8    was referred to the health care unit, which is capable of

9    prescribing more advanced equipment; is that correct?

10   A.  Yes, yes.

11   Q.  And that would be back into your territory, right?

12   A.  Right, that would go back to me.

13   Q.  And since then, we've just discussed, there have been more

14   referrals to low-vision aids evaluation?

15   A.  Yes, yes.

16   Q.  So you are not aware of anywhere in Mr. Woodley's records

17   where anyone concluded that the low-vision aids he is

18   requesting would not accommodate him, correct?

19   A.  No.

20   Q.  So we talked about that portable electronic magnifier that

21   Dr. Stelmack recommended was called the Amigo, right?

22   A.  Okay.

23   Q.  I think that you -- in your direct examination, you

24   testified that that cost upwards of $1,000?

25   A.  The one that they had prescribed as a recommendation back

Allen - Cross

1   in 2015 was an HD desktop digital magnifier --

2   Q.  Okay.

3   A.  -- at a cost of $1,295.  That was the one that was the

4   first one on the list.  That's how I remember it.

5   Q.  And prior -- but prior to Mr. Woodley -- Mr. Woodley

6   previously had a magnifier, correct?

7   A.  He did.

8   Q.  And that magnifier worked?

9   A.  Yes.

10  Q.  It was called an "Aukey."

11          Does that sound familiar?

12  A.  Yes.

13  Q.  Are you -- and it wasn't until that Aukey broke that he

14  requested a new one, correct?

15  A.  I don't know.

16  Q.  In reviewing materials for today, you didn't see him

17  beginning a grievance related to getting a new electronic

18  magnifier while he is still at the -- a newer and better one,

19  right?

20  A.  Prior to him going out to see the low-vision specialist

21  back in 2015, I was not at Dixon, so I did not review anything

22  prior to that probably from the time that his previous one had

23  broken until he went out to see this low-vision specialist and

24  then came back with the recommendations that they made.

25  Q.  Okay.  So I guess when we are talking about the four

Allen - Cross

1  vision aids that we just saw Max Blackburn concluded would

2  accommodate his disability in that May 2017 document, we don't

3  know for sure if he is talking about the earlier Aukey or the

4  later HD portable?

5  A.  Based on the information provided, I can't give an

6  assessment of exactly what he is referencing.

7  Q.  Okay.  And do you -- did you look into the cost of the

8  Aukey portable?

9  A.  No.

10  Q.  Are you aware that Max Blackburn did look into the cost

11  of --

12  A.  No.

13  Q.  So you are not aware, then, that in January of 2017,

14  he -- and I'm referring to Plaintiff's Exhibit 25 here -- he

15  wrote that Mr. Woodley's prior device was no longer eligible

16  for repair, unfortunately, because it was old, and that the

17  replacement cost would range from $300 to $700?

18  A.  Okay.

19  Q.  You weren't familiar with that?

20  A.  No.

21  Q.  So when it came -- in terms of ordering a replacement

22  device, were you talking about specific cost numbers?

23  A.  No.

24  Q.  So you were never presented with specific numbers?

25  A.  Ours was never an issue of the cost.

Allen - Cross

 1   Q.  It was an issue of security?

 2   A.  It is an issue of security.

 3   Q.  The portable --

 4        THE COURT:  Just the digital magnifier was an issue

 5   of security?

 6        THE WITNESS:  Unfortunately, they lumped them all in

 7   together.  That, I was not aware of because that was being

 8   handled by our medical director or our doctors that make that

 9   decision.  I don't make that decision.  They lumped them all

10   in together.  The only thing that I know that stood out that

11   they said that they were not likely to accommodate was that HD

12   desktop digital magnifier that they were talking about just

13   because of the power source and the size of it.  That was what

14   was given to me for information.

15        THE COURT:  Okay.  Thank you.

16        THE WITNESS:  Sure.

17   BY MS. CHARDON:

18   Q.  Were you aware that Mr. Woodley at one point proposed in a

19   grievance that the items could be ordered and then inspected

20   by security and returned if they weren't cleared?

21   A.  No.

22   Q.  And that was never a suggestion that you considered in

23   HCU?

24   A.  I did.

25   Q.  You did?

Allen - Cross

1  A.  I did, and I presented it to Wexford.

2  Q.  And it was denied?

3  A.  It was denied.

4  Q.  And you weren't the only person who did that, were you?

5  A.  Dr. Chamberlain, I believe, also was another person that

6  suggested that.

7  Q.  Yes.

8       And Dr. Chamberlain actually -- I'm -- you reviewed

9  medical records, correct?

10 A.  Yes.

11 Q.  So I'm referring to IDOC 155, which is part of Defense

12 Exhibit 11.

13      MS. CHARDON:  Do you have a second copy I could bring

14 her, Steve?

15      MR. WEIL:  Sure.

16 BY MS. CHARDON:

17 Q.  Well, I'm going to bring you a copy so it is easier for

18 you to see it.

19      THE COURT:  Wasn't Dr. Chamberlain -- I mean, he was

20 the medical director, right?

21      THE WITNESS:  Yes.

22      THE COURT:  And he was a Wexford employee, right?

23      THE WITNESS:  Yes.

24      THE COURT:  Okay.  So he is telling his employer "How

25 about we order them, you check them for security, and then

Allen - Cross

1   they are returned?"

2           THE WITNESS:  Yes.

3           THE COURT:  Okay.  Thank you.  I appreciate that.

4           And you did that as well?

5           THE WITNESS:  Yes.

6           THE COURT:  Okay.  Thank you, Ms. Allen.

7   BY MS. CHARDON:

8   Q.  In this document under A, I read "Stargardt's disease" --

9           THE COURT:  What page are we?

10          MS. CHARDON:  Oh, excuse me, your Honor.  We are at

11  IDOC 155.  It is part of the --

12          THE COURT:  Exhibit 11?

13          MS. CHARDON:  Defense Group Exhibit 11.

14          THE COURT:  1-5-5.  Okay.  Give me one second.

15          MS. CHARDON:  And it is top left, upsidedown marking.

16  We could -- I will give you some time.

17  BY MS. CHARDON:

18  Q.  I read this as saying -- well, "S-W," I don't know what

19  that means.  Do you know what that means?

20  A.  Which part?

21  Q.  SW -- I read "S-W staff."  I meant -- okay, under A --

22  A.  Okay.

23  Q.  -- why don't you read it?

24  A.  How about I read it?

25  Q.  Yes.

Allen - Cross

1   A.  It says:  "Stargardt's disease.  Security needs to see

2   equipment.  Equipment returnable per the companies that sell

3   them.  E-mail out to get them ordered and sent if possible.

4   Awaiting response to e-mail."

5   Q.  That indicates that Dr. Chamberlain was aware at that time

6   that -- Dr. Chamberlain learned that the visual aids were

7   returnable if they were not approved by security?

8   A.  According to his note.

9   Q.  And to your knowledge, as you already said, these have

10  never been ordered, other than the cane?

11  A.  The cane.

12  Q.  And the cane was ordered last week by you -- or today?

13  A.  Of the recommendations -- of the recommendations, I do

14  know that he did get a scope.  That was not the scope that

15  they recommended, but he did get a scope in September of 2017.

16  So that was to help with his visual acuity that he received

17  then.

18  Q.  Are you sure that was a scope, or was it a magnifier?

19  A.  According to the documentation in his chart, it is called

20  a "6X scope."

21  Q.  Okay.  But to your knowledge, none of these four items

22  have been -- excuse me.

23       Let's start -- this day -- was the scope, the

24  monocular scope, was that inspected by security eventually

25  then?

Allen - Cross

1    A.  I don't believe that was -- no, wait, I take that back.

2    Yes, it was.  Everything that comes in through central supply

3    goes to property, and if property does not -- if they feel

4    there is a problem, it goes to the security specialist, and

5    then they are the ones who actually inspect it.

6    Q.  Okay.

7    A.  So, yes, everything actually goes to security to be seen

8    as it comes in prior to giving it to an offender.

9    Q.  And that will happen with the cane when it comes in?

10   A.  The cane won't because the cane has already been issued to

11   other patients inside the facility that we use it for, so

12   that's something that is kind of standard operating procedure

13   that we would just simply give him the cane when it comes in.

14   Q.  And that has been going on for years that the offenders

15   have had canes?

16   A.  Yes.

17   Q.  With respect to the portable electronic magnifier, that

18   has never been inspected by security at Dixon?

19   A.  Not in person.  Not in person.

20   Q.  It would have been inspected in 2012 when he got his first

21   one?

22   A.  Yes.

23   Q.  And it would have been inspected in 2014 when he got his

24   replacement?

25   A.  Yes.

Allen - Cross

1   Q.  But since Dr. Stelmack has prescribed or recommended a

2   PEM, it has not been inspected by security?

3   A.  No, because that item --

4           MR. BRENER:  Objection, your Honor.

5           Your Honor, can we clarify what magnifier they are

6   talking about?  Because there is a couple.  So she keeps on

7   saying "magnifier," and I just want clarification which one

8   they are talking about.

9   BY MS. CHARDON:

10  Q.  So no Aukey PEM or no portable electronic magnifier?

11          THE COURT:  Well, you had mentioned the $1,275 was an

12  HD desktop, right?

13          THE WITNESS:  Yes.

14          THE COURT:  You are talking about a portable digital

15  magnifier, right?

16          MS. CHARDON:  Oh, yes, desktop versus portable.

17          THE WITNESS:  A portable one was actually offered to

18  him in April of 2017 by Dr. Lundford and he refused it.  So I

19  don't know if it was something that was in hand or if he

20  simply was offering it to him to order.  I don't know that

21  piece of the puzzle.  That was never inferred to me by

22  Dr. Lundford.

23  BY MS. CHARDON:

24  Q.  Are you referring to a portable electronic magnifier or a

25  portable magnifier?

Allen - Cross

1  A.  I'm referring to whatever was written in the note by

2  Dr. Lundford because that's all I can go by because he never

3  spoke to me in person about it.  It is just based on the note

4  that he wrote.

5  Q.  What date are you referring to?

6  A.  That was April of 2017.

7        MS. CHARDON:  It might take a moment.  We need to

8  find that medical record.  So it is April 2017, Dr. Lundford.

9        THE COURT:  It was referred to earlier by somebody

10  because I believe it said 6X or something on it.

11  BY MS. CHARDON:

12  Q.  I'm going to bring you that.

13  A.  Okay.

14        THE COURT:  Why don't you identify the document.

15        MS. CHARDON:  Yes.  It is IDOC 141.

16        Counsel, do you know if this was part of 11 or 9 of

17  your exhibits?

18        MR. BRENER:  It would have been part of Exhibit

19  No. 9 --

20        THE REPORTER:  I can't hear you.  Counsel, I can't

21  hear you.

22        THE COURT:  The court reporter can't hear you,

23  Mr. Brener.

24        MR. BRENER:  It would have been part of Exhibit

25  No. 9 --

Allen - Cross

1    THE REPORTER:  I still can't hear you.  You have to

2  use the microphone.

3    MS. CHARDON:  I will try to repeat it --

4    MR. BRENER:  I can come up to the microphone.

5    This would have been from Exhibit No. 9 because it is

6  part of Mr. Woodley's optometric file, and I believe this is a

7  record that the witness has already seen today.

8    THE COURT:  Yes, document 141, it is in Exhibit 9,

9  which is correct -- Mr. Brener is correct on that.

10  BY MS. CHARDON:

11  Q.  And so this refers to a 3X magnifier, correct?

12  A.  Yes.

13  Q.  And it says that got approved, correct?

14  A.  Yes.

15  Q.  And at that point, a sheet magnifier had been approved for

16  him, correct?

17  A.  A sheet magnifier is what the ADA coordinator gives him.

18  I think it is a plastic item is what it is.  That's different

19  from this because this is something that we would not -- we

20  would not address something that ADA can give to them.

21  Q.  Do you know -- are you aware that the sheet magnifier that

22  he got from the ADA was 6X power?

23  A.  I don't know that.

24  Q.  Okay.  And that 3X magnifier, it doesn't say electronic

25  magnifier on it?

Allen - Cross

1    A.  It does not.

2    Q.  And at the bottom it says:  "Patient refuses magnifier and

3    would like to wait"?

4    A.  Yes.

5    Q.  It doesn't say "electronic"?

6    A.  It does not.

7    Q.  And you didn't speak to Dr. Lundford about this record?

8    A.  No.

9    Q.  And so your only basis for testifying today that he was

10   offered an electronic magnifier is this record?

11   A.  Is based on this note.

12   Q.  And it doesn't actually say electronic magnifier?

13   A.  It does not.

14   Q.  So nobody else told you that he was offered one?

15   A.  Max Blackburn told me that he had offered him -- the

16   plastic one that came for him does not go through our health

17   care unit.  So it should have been something separate from

18   this that Dr. Lundford would have spoke to him about.

19   Q.  Okay.  And the plastic one that Max Blackburn offered is

20   not electronic?

21   A.  No.

22   Q.  And in terms of magnification, were you aware that his

23   magnifier back in 2010 was a 10.5 magnification level?

24   A.  No.

25   Q.  And you aren't aware of any kind of medical opinion in his

Allen - Cross

1    record saying that a 3X magnification would be sufficient for

2    Mr. Woodley, are you?

3    A.  I am not aware of that.

4    Q.  And were you aware in 2012 the dean -- or the associate

5    dean of Lakeland College e-mailed the ADA coordinator saying

6    that the magnifier that he had back in 2012 wasn't sufficient

7    for Stephon to take classes?

8    A.  No, I was not aware.

9    Q.  To your knowledge today, one reason why the PEM, the

10   portable electronic magnifier, has not been purchased is

11   because it hasn't been cleared by security, right?

12   A.  Correct.

13   Q.  And that is the reason why it hasn't been --

14   A.  That is the only reason.

15   Q.  Okay.  And security was concerned about the cord, right?

16   A.  That was one of the things.  They actually cited different

17   things, and, again, this did not come directly to me from the

18   assistant warden.  This came to me through speaking to

19   Mr. Blackburn, just speaking to Max from ADA, that the issues

20   that they associated with what they were able to ascertain

21   based on what they found online -- because that's how they did

22   their research, because they didn't have the actual

23   thing -- had to do with the cord, the size, the misuse -- the

24   potential misuse, and also the potential of it being

25   mishandled in population to where you get something of high

Allen - Cross

1    value that's out there that it can be possibly damaged or be

2    stolen or what have you out there for something like that.

3        Those were the different situations, but the

4    prominent one they said to me had to do with the power source,

5    the cord, because it could be switched out to be used for

6    cellphones, and that's something that's a concern in prison

7    that we don't have anything like that in there that would

8    contain that kind of power source.

9    Q.  Okay.  And security needed to see it to inspect it?

10   A.  Yes.

11   Q.  They did not reject it based on those concerns you

12   mentioned, but they were just concerns?

13   A.  They were concerns, yes.

14   Q.  And they have not seen it to inspect it?

15   A.  Not in person.

16   Q.  And are you aware that inmates at Dixon are now allowed to

17   have portable tablets?

18   A.  They are not.  No, they are not, not at Dixon.

19   Q.  They are allowed to have desk lamps?

20   A.  Yes.

21   Q.  They are allowed to have MP3 players?

22   A.  Not at Dixon.  They have -- all they have at Dixon right

23   now, and I'm not the expert on this, is that I know they have

24   like access to radios and like a Walkman style, but that's it.

25   I'm not aware of MP3 players yet.  I know that it is up for

Allen - Cross

1  discussion within the Department of Corrections, that they are

2  looking at possibly giving out MP3 players and doing the kiosk

3  and the tablets.  That is something that has been discussed

4  within the department, but it does not exist at Dixon yet.

5  Q.  But you are not a specialist in that.  That isn't your --

6  A.  No.

7  Q.  -- within the realm of HCU?

8  A.  Correct.

9  Q.  So it is possible that there could be tablets there that

10  you wouldn't know about yet?

11  A.  There are not.

12  Q.  Okay.

13  A.  There are not.  I would know about it.

14  Q.  But it is under investigation, though?

15  A.  Okay.

16  Q.  That's what you said?  I'm trying to characterize it.

17  A.  When they had a roundtable discussion last year, the

18  assistant director came out from the Department of

19  Corrections, and they said they were looking at doing this.

20  This was the process -- or the plan that they were looking at

21  for the Department of Corrections as a whole in the next year.

22  But has it come to Dixon yet?  No.

23          MS. CHARDON:  Okay.  Thank you very much, Ms. Allen.

24          THE WITNESS:  You're welcome.  Thank you.

25          THE COURT:  Any redirect?

Allen - Redirect

158

1          MR. BRENER:  Very briefly, your Honor.

2                    REDIRECT EXAMINATION

3    BY MR. BRENER:

4    Q.  Ms. Allen, you mentioned that there was a concern

5    regarding the glass in the digital magnifier.

6              Do you remember that?

7    A.  Based on what was told to me by Max Blackburn, yes.

8    Q.  Did Mr. Blackburn tell you what the specific concern was

9    with respect to the glass?

10   A.  It just -- it would be a safety concern out in the

11   population as far as it being broken.  It could be misused and

12   used potentially as a weapon.

13   Q.  You testified on cross-examination that you noted in

14   Dr. Chamberlain's January 26, 2017, note, he recorded in the

15   objective section of his note that there were bruises and

16   scrapes on Mr. Woodley's shins.

17             Do you remember that?

18   A.  Yes.

19   Q.  In your review of Mr. Woodley's medical file, did you see

20   anywhere else where any medical provider recorded bruises on

21   his shins?

22   A.  Not since then, and I don't recall before.

23             MR. BRENER:  Thank you.  Nothing further.

24             MS. CHARDON:  May I ask one last one?

25             THE COURT:  One, and don't make it compound.

Allen - Recross

1        MS. CHARDON:  Okay.  All right.  Back to grammar to

2  make sure I don't violate it.

3                   RECROSS EXAMINATION

4  BY MS. CHARDON:

5  Q.  Are you aware that Mr. Woodley's hand-held magnifier is

6  made of glass?

7  A.  No.

8        THE COURT:  You took my question.

9        MS. CHARDON:  Okay.

10       THE COURT:  You can ask another one.  Go ahead.

11       MS. CHARDON:  I will sit down while I'm hot.

12       THE COURT:  Okay.  Why in my head did I think you

13  were at East Moline?

14       THE WITNESS:  I was.

15       THE COURT:  Well, there is a reason why it was in my

16  head.

17       THE WITNESS:  Yes, I was the last time I was here

18  with you.

19       THE COURT:  Okay.  A couple questions, Ms. Allen.

20       THE WITNESS:  Sure.

21       THE COURT:  These are going to be in no particular

22  order because they were just written down as I listened to the

23  testimony.

24       Okay.  I'm going to disengage from the microphone.

25       All right.  Ms. Allen, I'm going to show you a

1    document that was submitted to me that is Plaintiff's

2    Exhibit 16, and in particular I will refer you to Page 5 of

3    14.  It is a University of Illinois Hospital Health Science

4    System document.  Why don't you take a moment to look at that.

5              THE WITNESS:  Okay.

6              THE COURT:  So my first question is have you ever

7    seen that document?

8              THE WITNESS:  No.

9              THE COURT:  Didn't think so.

10             Because it does say -- let me get their exact

11   language.

12             THE WITNESS:  "Prescription of assisted devices."

13             THE COURT:  "Prescription of assisted devices."

14   Right.

15             So if you have never seen that document, you wouldn't

16   know that somebody prescribed those devices?

17             THE WITNESS:  That is correct.

18             THE COURT:  Would that document be helpful in the

19   determination on whether something was prescribed?

20             THE WITNESS:  Yes.

21             THE COURT:  Thought so.  Thank you.

22             THE WITNESS:  Sure.

23             THE COURT:  You have discussed the distinction

24   between a recommendation and a prescription.

25             THE WITNESS:  Correct.

1        THE COURT:  Now I'm going to throw a curve ball at

2    you.  If you can answer it, just tell me as best you can; if

3    you can't, that's fine as well.

4        THE WITNESS:  Okay.

5        THE COURT:  These words have been kind of thrown at

6    you and been used.  What's the difference between a

7    recommendation and an accommodation?

8        THE WITNESS:  Accommodation means something that we

9    must do based on the guidelines.

10       THE COURT:  Okay.

11       THE WITNESS:  A recommendation would be something

12   that would be beneficial but not necessarily necessary.

13       THE COURT:  Okay.  How about treatment versus

14   accommodation?

15       THE WITNESS:  I would read "treatment" as something

16   medically indicated as compared to "accommodation," that could

17   be something that could be managed, like, for ADA, where it is

18   not necessarily medically indicated.

19       THE COURT:  Okay.  Does the Plaintiff have any

20   follow-up questions based upon those questions?

21       You know what?  Let me ask Ms. Allen one more

22   question.

23       And I think you may have answered this in sort of a

24   more general scope -- no pun intended -- the monocular scope,

25   that was presented sort of as a group?

1    THE WITNESS:  Yes.

2    THE COURT:  So it was not provided, again, under

3  security?

4    THE WITNESS:  All of them were grouped in together,

5  and it was denied based on security.

6    THE COURT:  To your knowledge, if you know, has

7  anybody inspected the monocular scope?

8    THE WITNESS:  The one that they recommended or the 6X

9  scope that they issued to him?

10    THE COURT:  Good question.  The one they recommended.

11    THE WITNESS:  No, not that I am aware of.

12    THE COURT:  Okay.  Any follow-up based upon my

13  questions?

14    MS. CHARDON:  I do have one follow-up.

15    THE COURT:  Actually, it should start with Mr. Brener

16  since it is Mr. Brener's witness.

17    MR. BRENER:  I have nothing further.

18    THE COURT:  Okay.  Thank you, Mr. Brener.

19    MS. CHARDON:  False alarm.  I don't have any

20  follow-up questions.  Thank you.

21    THE COURT:  Okay.  Thank you very much.  I appreciate

22  it.

23    THE WITNESS:  Thank you.

24    THE COURT:  Get outside and stay outside.

25    MR. BRENER:  May Ms. Allen be excused?

1          THE COURT:  Absolutely.  Go outside.  Go.

2      (Witness excused.)

3          MS. CHARDON:  And, your Honor, there is one piece of

4      testimony that Ms. Allen made about the monocle -- the

5      monocular, which I can understand.  I would like to ask one

6      question of Stephon to clarify.  It is a factual issue in

7      terms of whether he got the monocular.

8          THE COURT:  Before we do that, let me see if the

9      Defendant has any other evidence they want to present.

10         MR. BRENER:  We have no other witnesses.  We have no

11     other evidence to offer other than what has been admitted into

12     evidence.

13         THE COURT:  So you rest.  Okay.  All right.

14         For rebuttal, you can ask that question.

15         MS. CHARDON:  That is much more sensible.  Thank you.

16         MR. ESPINOZA:  Your Honor, do you mind if we take a

17     two-minute restroom break?

18         THE COURT:  I do not mind at all.

19     (Recess taken.)

20         THE CLERK:  Recalling 18 CV 50050, Woodley vs.

21     Baldwin, et al.

22         THE COURT:  All right.  Any rebuttal testimony?

23         MS. CHARDON:  Yes, your Honor.  We would like to call

24     Stephon back just to ask two short questions.

25         THE COURT:  All right.  Mr. Woodley, remember that

Woodley - Direct

164

1    you are still under oath, okay?

2              THE WITNESS:  Yes, sir.

3        STEPHON WOODLEY, PLAINTIFF'S REBUTTAL WITNESS, SWORN

4                      DIRECT EXAMINATION

5    BY MS. CHARDON:

6    Q.  Hi, Stephon, it is Ally.  I just have two short questions

7    for you.

8              The first is:  Were you ever given a monocular scope?

9    A.  No.

10   Q.  No.

11             And were you -- at one point, was there a grievance

12   response indicating that you would get the monocular scope?

13             MR. BRENER:  Objection to foundation.

14             THE COURT:  Are you familiar?  I mean, just lay a

15   foundation.  Go ahead.

16             MS. CHARDON:  You know what?  I will strike the

17   question.

18             THE WITNESS:  The grievance, as far as I was told at

19   one time, my grievance was --

20             THE COURT:  Hold on.  Mr. Woodley, hold on.

21   Mr. Woodley, hold on.  There was a question, and there was an

22   objection.  Are you withdrawing the question?

23             MS. CHARDON:  I will withdraw the question.

24             THE COURT:  Okay.

25

Woodley - Direct

165

1   BY MS. CHARDON:

2   Q.  The important thing, Mr. Woodley, is that you have never

3   received a monocular scope while you were at IDOC, correct?

4   A.  No, I never received one.

5   Q.  Okay.  My other question is:  Do you remember seeing

6   Dr. Lundford in 2018, this year?

7        Oh, excuse me, 2017.

8   A.  Yes, yes.

9   Q.  And did Dr. Lundford offer you a portable electronic

10  magnifier?

11  A.  No.

12  Q.  What did he offer you, if anything?

13  A.  From my understanding, he was telling me it was basically

14  the same magnifier that Max Blackburn gave me.

15  Q.  Okay.  Have you ever been offered a portable electronic

16  magnifier since visiting Dr. Stelmack?

17  A.  No.

18  Q.  And today what you want is a portable electronic

19  magnifier, correct?

20  A.  Yes.

21  Q.  And the portable electronic magnifier that was broken in

22  2016, that worked for you, correct?

23  A.  Yes, at that time --

24  Q.  You cut out.  Could you say your answer again?

25  A.  I said, "Yes, at that time, it worked for me."

Woodley - Direct

166

1    Q.  And it would work for you today, right?

2    A.  Yes.

3              MS. CHARDON:  Thank you.  That's all, your Honor.

4              THE COURT:  Okay.  Any cross-examination?

5              MR. BRENER:  I have nothing, your Honor.

6              THE COURT:  Okay.  Give me one moment, please.

7    (Brief pause.)

8              THE COURT:  Mr. Woodley, that hand-held device that

9    you showed me earlier, you held it up to the camera.

10             Can you hold it up again, please?

11             THE WITNESS:  Yes, sir.

12             Can you see it?

13             THE COURT:  I can see it.  I got it.  Thank you.

14             So if you know, that magnifying glass, do you know if

15   that's glass or plastic in there?

16             THE WITNESS:  It is glass.  I don't know if you can

17   hear it.

18             THE COURT:  Okay.  All right.  Thank you, sir.

19     (Witness excused.)

20             THE COURT:  Okay.  So we had an agreement on the

21   exhibits.  Those have been entered.  I admitted those.

22             The one exhibit, which was Exhibit 33, Mr. Brener was

23   concerned because Dr. Stelmack, at least in two paragraphs,

24   uses the word "prescribed."  "Prescribed," it is in

25   Paragraph 7, "prescribed" in Paragraph 8, and my recollection

1    and understanding was the concern was she said "prescribed,"

2    and the view was they weren't prescribed, that they were

3    "recommended," right?

4           MR. BRENER:  That is what the records in the chart

5    showed, Judge.  That is what the doctor had put in that form

6    that she filled out when she said, "This is a list of my

7    recommendations," yes.

8           THE COURT:  Okay.  But if we go to the actual

9    document that Dr. Stelmack completed, which is Exhibit No. 16,

10   Plaintiff's Exhibit No. 16, I showed to Ms. Allen Page 5 of

11   14.  This is what I started on, one of the issues I started on

12   at 10:00 o'clock this morning:

13          "Prescription of assistive devices:  Salters,"

14   S-a-l-t-e-r-s, "monocular for distance, spot checking; Amigo

15   HD PEMT for reading; long cane and flashlight for mobility;

16   and a task light," all under "Prescription of assistive

17   devices."

18          For whatever reason, Ms. Allen didn't see that

19   document, and had she seen that document -- I couldn't write

20   the testimony fast enough.  I can look it up because I have

21   got my little fancy-dancy thing here in front of me.  My

22   recollection is it would have been very helpful for Ms. Allen

23   to have seen Dr. Stelmack's document where she uses the word

24   "prescription."

25          Is there still an issue about whether it was

 1   prescribed?

 2         MR. BRENER:  I think there is an issue about what

 3   people in the health care unit knew, yes.

 4         THE COURT:  Okay.

 5         MR. BRENER:  But no, I don't think so, Judge.

 6         THE COURT:  Right.  And that's why I asked her did

 7   she ever see it, if she saw it.  That's why I asked those

 8   follow-up questions, if things would have been different.

 9         Why it wasn't provided to IDOC or Wexford -- I don't

10   know if it wasn't provided to Wexford because we didn't have a

11   Wexford witness, but Mr. Woodley was specifically referred to

12   the outside treaters, and this was actually a two-step dance.

13   It went to a different doctor, I want to say Dr. Liederman,

14   who then, because he didn't have the specialty, referred

15   Mr. Woodley to Dr. Stelmack because that's her specialty,

16   low-vision rehabilitation.

17         So it seems really odd that a patient would be

18   referred to an outside medical treater who says, "Yes, this

19   isn't my specialty, but I know somebody who is.  Let's refer

20   the patient to that doctor."  Everybody says agreed, which is

21   reasonable, not surprising.  That treater then says -- fills

22   out a medical record and says, "Here's my prescription.

23   Provide these one, two, three, four things," and that document

24   never makes its way, apparently, into the medical records.

25         MR. ESPINOZA:  Your Honor --

1        THE COURT:  Go ahead.

2        MR. ESPINOZA:  -- one of the things that I was
3   talking with co-defense counsel was that these aren't in the
4   actual IDOC medical records that were provided to all counsel
5   of record.  So for some reason, the UIC records were not in
6   the IDOC records.

7        THE COURT:  Well, that's my whole point --

8        MR. ESPINOZA:  Sure.

9        THE COURT:  -- is why, in the name of all things good
10  and sacred in this world, would somebody be referred out of
11  the facility to one doctor, a specialist, who then says, "Yes,
12  this person needs to see a specific specialist, and everybody
13  agrees you are right, outside specialist.  Let's send the
14  patient to the next outside specialist," and the medical
15  condition is right in her wheelhouse.  She makes what
16  are -- look, it says, "Prescription of assistive devices," and
17  she says, "There needs to be these four things."  She is
18  prescribing four things, and that document doesn't make its
19  way into a medical record at IDOC.

20       Does Wexford keep records?  I'm always told that the
21  documents are in the custody of IDOC.

22       MR. ESPINOZA:  I don't have knowledge of that, your
23  Honor.

24       THE COURT:  Okay.  Because you would think that's why
25  they sent the man out in the first place.  Okay.

```
1              All right.  So over the objection, 33 is coming in.

2              All right.  Anybody want to make arguments?

3              MR. WEIL:  Plaintiff has argument.

4              THE COURT:  Okay.  Pardon me?

5              MR. WEIL:  I'm sorry?

6              THE COURT:  I didn't hear what you said.

7              MR. WEIL:  We have argument.

8              THE COURT:  Okay.  I don't know if you said you had

9    or you are waiving argument.

10             MR. WEIL:  Okay.  It is good to be clear on that.

11             THE COURT:  Okay.  Go ahead.

12             MR. WEIL:  Just give me a moment, Judge.

13             THE COURT:  And at some point in your argument, you

14   are going to have to address what I raised at 10:00 o'clock

15   this morning, which is we are not keeping status quo with what

16   you are asking for.

17             MR. WEIL:  Understood, Judge.

18             THE COURT:  All right.  Go ahead.

19             MR. WEIL:  Judge, you went over much of the back and

20   forth with Ms. Stelmack, but I called it a pyramid this

21   morning, and you can talk about going sort of up and down a

22   mountain.  I think the point is, and I'm going to -- well, I

23   will back up for a second.

24             You have heard Mr. Woodley talk about how this

25   condition affects him.  You have heard his testimony about how
```

1   he can't read, can't take college courses, has difficulty with

2   other courses, can't read his medical records, can't read

3   letters.  That's for the reader.  For these other devices, the

4   monocular, even with a cane, which he is now getting, the

5   monocular allows him to see things even within his cell so he

6   is not crawling around on the ground, and Mr. Woodley

7   demonstrated that physically, how he has to crawl on his hands

8   and knees on the ground without the spot magnifier and without

9   the desk lamp.  Those are his needs.

10      You have testimony in the form of an affidavit from

11  Dr. Stelmack corroborating that and saying that Mr. Woodley

12  could perform the tasks of everyday living if he was given

13  accommodations, specifically the accommodations she prescribed

14  and that he has not been given them.

15      And I think one important point, we had this

16  discussion about prescribed versus recommended, but it is

17  clear that she did prescribe them.  Whatever IDOC might have

18  thought about it -- and this is a preliminary injunction

19  hearing.  So it is what matters going forward.  It is not some

20  casual opinion of Dr. Stelmack's either at the time or now.

21  This was her prescription.  She has made that clear it is a

22  prescription from a doctor that we are dealing with and

23  whether Mr. Woodley is entitled to that.

24      So the first point the Defendants make, and I think

25  one of the larger points, is his basic point of, "Well, he has

1  kind of been given a bunch of other stuff, and this is just

2  one doctor's opinion," and I think there is a couple of

3  documents that are worth pointing out in that respect, and

4  this, again, goes to what did Dr. Stelmack's opinion matter

5  for.

6        The first one, this is Plaintiff's Exhibit 10, Judge,

7  and if I -- I hope I'm not messing up the Elmo.  So this is

8  after Dr. Hicks says, "You know, this guy has a serious visual

9  impediment.  I, as his medical doctor, think he should be

10 referred out for vision aids."  That's approved by Wexford,

11 and the specific reason is approval for "evaluation for vision

12 aids."  So that's the beginning of this mountain that

13 Mr. Woodley starts climbing up, and our brief goes over the

14 various doctors he saw and all of them pointing in one

15 direction, so I'm not going to belabor that, Judge.  That's

16 all set forth in our brief.  But the point we all know is that

17 Dr. Stelmack in February of 2016, and then eventually she gets

18 the prescription back to Wexford, says he needs these

19 particular aids.  That's the top of the mountain.

20        We come down the other side, and every single doctor

21 who sees him, who gets those recommendations, says, "Yes, I

22 concur.  The medical director for Dixon concurs with the

23 recommendations."  Every time a medical opinion is expressed,

24 there is a concurrence with the recommendation, until it gets

25 sent out for collegial review with Wexford corporate.  At that

1    point, there is no difference of medical opinion.

2         THE COURT:  Right.

3         MR. WEIL:  The only question is should security see

4    these aids first, and I think -- I'm embarrassed I forgot the

5    witness's name, but the IDOC witness that just testified said

6    that security had said, "Well, maybe this might be an issue,"

7    but they hadn't seen them, and the whole point is whether

8    Wexford was going to acquire these items to see them.

9         Again, this is the collegial review.  It is the only

10   thing that you could call a medical opinion about whether he

11   needs these aids, and, again, it is not a medical opinion.  It

12   is just a question of do we have to buy these things before

13   they get approved.

14        I think in that regard -- so that happens in

15   Ms. Stelmack's recommendation.  Dr. Stelmack's recommendation

16   is in March of 2016.  It is sent for collegial review

17   immediately after that.  Collegial review makes this opinion:

18   "Well, essentially, no medical disagreement, but we need to

19   get them approved by security without them actually seeing

20   them, essentially, or how can we do this?"  And what you see

21   after that is the medical director of Dixon, this is

22   Dr. Chamberlain -- and I'm pulling these documents, Judge,

23   from IDOC Exhibit 11.  I will start with 00158.

24        So this is September 2015, a few months after.  I

25   have highlighted this.  It is not -- but this is

1   Dr. Chamberlain. You see his stamp there. It is very helpful

2   for a doctor to have an actual stamp instead of a signature.

3   But he is saying, "Go here and see if they can get a release,

4   see if security responded." So that's September.

5         November -- November 3rd, 2015 -- again, Mr. Woodley

6   comes back, again asks Dr. Chamberlain. "Staff still checking

7   with security. They may need to see equipment before

8   approving. See if" -- I'm reading -- "See if equipment can be

9   returned for a refund." Okay.

10         And then this is the document that Ms. Chardon showed

11   the IDOC witness: "Equipment returnable per the companies

12   that sell them." And then Dr. Chamberlain goes into this

13   process of -- this is the actual doctor that was treating

14   Mr. Woodley, and, again, you won't find a disagreement in

15   these records that they are medically necessary. The only

16   disagreement is this issue of we don't want to buy them before

17   security reviews them.

18         So, in essence, there is this business of

19   Dr. Lundford, and these other medical doctors, and, again,

20   this is all laid out in our brief, but in no instance is any

21   doctor saying he actually doesn't need this stuff. The

22   prescriptions for non-electronic devices are all under the

23   ceiling of he is not allowed to get the PEM, this digital

24   magnifier. So everything the doctors are giving him are

25   cabined by that. There is no idea that this is what he

1    actually needs.  And the irony at the end, he is being sent

2    out again to see another vision specialist for the same aids

3    he was prescribed before.  The 6X magnifier doesn't work.  I

4    will get that -- well, it is in our brief.  I won't belabor

5    that.  The 6X magnifier doesn't work.

6          THE COURT:  Get me the witch's broom.  Isn't that

7    from the Wizard of Oz?  You did all that.  Now go back and get

8    her broom.  I can't remember what -- what does Dorothy get

9    sent back to get?

10          MR. WEIL:  I'm sorry, Judge.  It has been a while.

11          THE COURT:  You did what you were supposed to do, but

12    not good enough.  Go back and get something else.

13          MR. WEIL:  We have this problem that he is not being

14    given something he needs, and, again, this is in large part an

15    ADA case.  Again, I'm showing you Plaintiff's Exhibit 4 here.

16    This is Woodley's ADA accommodation for the digital magnifier.

17    He has -- you don't hear any disagreement with Defendants that

18    he has a disability.  Under the ADA, they have an affirmative

19    duty to assist him with that disability, provide him devices

20    that assist with the disability.  They did that, and then

21    since then they have to come up with something or some opinion

22    that he doesn't actually need these things, and there is none.

23    The record is empty on that.  There is nothing on the other

24    side of the scale suggesting that at any point that

25    Mr. Woodley doesn't need these devices.

1           I think one ironic thing about all this is that

2   Wexford says, "Well, we are not going to get the device until

3   security reviews it," and therefore we are in this Catch-22

4   situation.  Mr. Woodley grieves that issue, and if you go to

5   Plaintiff's 22, the IDOC agrees with Mr. Woodley.  Wexford

6   should at least buy the devices so they can be evaluated.  So

7   this is -- this is right at the beginning of 2016, March 2016.

8   Wexford says, "Yes, Mr. Woodley, you are right."  Wexford has

9   no -- again, there is no medical opinion on the other side of

10  the scale here.  The IDOC says, "Yes, you are right."  And

11  what happens is --

12          THE COURT:  Well, Wexford, everybody says he needs

13  these.

14          MR. WEIL:  Yes.

15          THE COURT:  Chamberlain says it, Amber Allen just

16  said it, Dr. Stelmack said it, everybody.  There is no

17  contrary medical evidence.

18          MR. WEIL:  Everybody says it, Judge.  And what

19  happens between March of 2016, when you saw what just

20  happened, and today is that Mr. Woodley's -- the IDOC realizes

21  that they might have to pay for this device because they

22  ordered Wexford to go and actually --

23          MR. BRENER:  Objection, your Honor.  That is not in

24  the testimony.

25          THE COURT:  It is argument.  It is argument.

1    MR. WEIL:  I will support that, Judge.

2    THE COURT:  Overruled.

3    MR. WEIL:  So March of 2016, the IDOC is saying to

4 Wexford, "Go out and get these devices and at least check and

5 see if they can be provided by security."  That's March, March

6 2016.

7    Mr. Woodley's own portable digital magnifier, the one

8 that Dr. Stelmack thought she replaced with something a bit

9 better, breaks in July of 2016.  Now, Mr. Woodley goes and

10 asks, "Can I please get another one?"  You know, "Can you

11 please replace this?  It was broken by the tac team."  And

12 what we get -- bear with me one moment.

13    I'm sorry, Judge, one moment.

14    It is the January response.  Sorry for the

15 interruption, Judge.

16    So Mr. Woodley has a magnifier broken in July of

17 2016.  Remember, IDOC ordered Wexford to get these things,

18 "See if you can get them."  Mr. Woodley's magnifier breaks in

19 July of 2016.  He files a grievance because nothing -- he

20 files a grievance because nothing had happened.

21    Then this history unfolds, and this is going to be

22 hard to read, obviously, but this is, again, Plaintiff's 26.

23 It is probably better if you follow along.  Essentially, this

24 is a response from Max Blackburn explaining what happened.  He

25 says, "Magnifier broke in 2016."

1          THE COURT:  You said Plaintiff's 26?

2          MR. WEIL:  Plaintiff's Exhibit 26.  Am I right there?

3    Hold on, Judge.

4          MS. CHARDON:  25, perhaps?

5          MR. WEIL:  Yes.  I'm sorry, Judge.  It is 25.  That's

6    probably the source of all these problems.

7          THE COURT:  Okay.

8          MR. WEIL:  Plaintiff's 25 is the January 13th, 2017,

9    response.

10          THE COURT:  Right.

11          MR. WEIL:  So in this response, it is in January of

12    2017, but he recounts what happened since July of 2016.

13    Essentially, he says, "You know, the magnifier broke.  The

14    digital magnifier broke.  Mr. Woodley asked me to provide one.

15    I did some research and saw that it might cost $300."  317, I

16    think.  "I have to kick that upstairs."  This is Defendant

17    Keane.  Eventually, I think, he says, "Well, we are just not

18    going to pay for it," essentially.

19          And what he says here is they found plastic sheets

20    and those were determined to provide magnification capacity.

21    There is no indication that it provides sufficient

22    magnification capacity.  There is no medical opinion anywhere

23    of any doctor suggesting that this is enough for Mr. Woodley.

24    The one opinion -- you know, IDOC hires Wexford to figure

25    these things out.  The one opinion that Wexford has is from

1   Dr. Stelmack saying this is not enough, and we have that

2   today, by the way, as well, in clear terms on Dr. Stelmack's

3   affidavit.

4          So the IDOC, which has the duty to accommodate

5   Mr. Woodley's disability, says, "Well, we will just give him

6   this magnifier.  It is cheaper."  I mean, you don't have to

7   read very closely between the lines to figure that out.  "And

8   that's what we are going to give him."  No indication they

9   actually think this is going to help him.  And what

10  Mr. Woodley does is he says, on the next page here, he

11  explains -- Mr. Woodley wrote another grievance and very

12  plainly just said, "Look into my actual condition and, you

13  know, see that this magnifier doesn't work."  They do, there

14  is no disagreement, but they said, "That's what you are going

15  to get," and that becomes the ADA accommodation that's

16  possible for Mr. Woodley.  The IDOC just refuses to provide

17  it.  It is flat out.  There is no indication that there is any

18  opinion anywhere by these gentleman that this magnifier is

19  actually going to help.

20         So that more or less brings us up to the present

21  date, Judge.  I mean, we have yet again in the brief where

22  there is yet another doctor, Dr. Fahey, saying, "He really

23  needs visual aids.  He needs to go see a vision specialist."

24  You have Dr. Lundford providing all the little magnifiers that

25  they can provide under the ceiling that IDOC has set saying,

1    "No digital magnifier," but no one is pretending that this

2    ever is going to be anything that is useful.

3            And eventually we have right at the end Plaintiff's

4    32.  This brings us up to date.  This is January 2018, a

5    Wexford collegial review saying they want to send him out for

6    low-vision specialist evaluation because he has a 6X magnifier

7    that doesn't work.  Right back at square one.

8            There is no medical opinion anywhere in the record

9    suggesting that any of these cheaper magnifiers that he has

10   been provided are providing him with any efficacy.  The one

11   expert that Wexford relied on said back then and has said

12   today in that affidavit that, indeed, none of those things are

13   going to help.  Mr. Woodley needs that magnifier.

14           So, again, there is nothing on the other side of the

15   scale, and that is to say nothing of the cane, which

16   apparently I'm shocked to learn IDOC provided all this time

17   and just didn't bother to give to him.  The monocular, there

18   is nothing on the other side of the scale saying that the

19   monocular isn't necessary.  And there is nothing on the other

20   side of the scale suggesting that the bright lights that he

21   needs for Stargardt's aren't necessary and that task lamp

22   isn't necessary.  They just haven't provided those things.

23   There has been no actual review.

24           So he has a disability that's not being accommodated.

25   He has a serious medical need that's being ignored.

1    Mr. Woodley testified how he continues to trip over things.
2    He is reduced to crawling down around in his cell to look for
3    those things.  Those things would not have to be happening if
4    he had these aids.
5           What the Defendants are left with, then, is several
6    defenses that go to, first, the idea that, "Well, we provided
7    it."  I think we have gone over that.  They mentioned the
8    digital watch in there as if that helps.  Mr. Woodley isn't
9    complaining about the digital watch.  He is not complaining
10   about any of these evaluations.  The evaluations don't deal
11   with the issues he is complaining about, which is he doesn't
12   have these aids.
13          There is also an argument that these injuries are
14   speculative.  Mr. Woodley is testifying about how he is trying
15   to take classes right now.  He is eligible.  He is trying to
16   read correspondence courses.  He is getting hurt as he walks
17   around every day.  You saw the scars on his legs.  It is just
18   not -- there is no argument about speculation.
19          I think what that leaves, Judge, is your concern
20   about a mandatory injunction, and, you know, reading Wexford's
21   brief, I think it is interesting.  I took what you were
22   referring to from Pages 5 and 6 of the brief where there is a
23   case very much on point here which is Foster v. Ghosh, and in
24   Foster v. Ghosh, Judge Kendall says -- in Foster v. Ghosh, it
25   is in our brief.  It has been briefed on both sides.  But

1    essentially there is a man with cataracts who is tripping and

2    would like to be evaluated for cataract surgery, and

3    Judge Kendall says, "Yes."  I don't know the phrase "mandatory

4    injunction" is the issue here.  She orders the Defendant to

5    send him out for surgery.

6              So, you know, it is interesting, looking at the

7    bottom of 5 here for Wexford's brief -- so this is document

8    47, 5 of 9, in Ghosh -- according to Ghosh found that "The

9    Plaintiff should be entitled to the opinion of a specialist

10   and granted an injunction" --

11             THE REPORTER:  Wait.  You have to slow down a little.

12             MR. WEIL:  I'm sorry.  Sure.

13             This is Wexford's brief:  "The court in Ghosh found

14   that Plaintiff should be entitled to an opinion of a

15   specialist and granted an injunction to allow Plaintiff to be

16   evaluated," their emphasis, "by an ophthalmologist to

17   determine how to treat his cataracts."  So they distinguish

18   Ghosh there, where ours is where Plaintiff is requesting the

19   physical object should be provided to him, and that's on 6.

20             Now, I think there is a couple points about Ghosh,

21   and, one, Judge Kendall acknowledges that that is a mandatory

22   injunction, and the way I read what Wexford wrote here is the

23   passive voice does a whole lot of heavy lifting for Wexford.

24   They allow Plaintiff to be evaluated.  I mean, Wexford

25   doesn't -- it is not Wexford doesn't open some door and let

1   him walk out and find a doctor.  She is ordering them to take

2   him to a doctor to be evaluated.

3          If you want to identify some difference between

4   ordering Wexford to take him to a doctor to be evaluated and

5   ordering the Defendants here to get aids to be evaluated by

6   security, I don't see any daylight between those two things,

7   Judge.  Again, Wexford, it is a mandatory injunction.  She is

8   ordering them to do something, to provide a service for him,

9   which in this case is an evaluation.  I think the next thing

10  that would happen if they refuse is a cataracts surgery.

11         Mr. Woodley doesn't have that option, of course.  The

12  option he does have, the thing they can treat in the sense of

13  treatment of ameliorating his condition is being provided with

14  visual aids.  It is the same functional remedy in Ghosh as it

15  is here.  They are both mandatory injunctions.  They don't ask

16  for anything complicated.  They both essentially ask to be

17  provided some basic thing.  In Ghosh, it is "Send this guy out

18  and get him an evaluation," and here it is "Get this guy some

19  visual aids."  I struggle to find any substantive difference

20  between those two things.

21         THE COURT:  Well, the difference is what the alleged

22  concern is.  In Ghosh, it wasn't a security concern, which is

23  the alleged concern in this case.

24         MR. WEIL:  That's fine, Judge.

25         THE COURT:  Which we know, at least as far as the

1  cane goes, not true.

2      MR. WEIL:  Cane, monocular.  You didn't hear -- I

3  mean, the only thing -- apparently, the IDOC witness here went

4  and tried to talk to security to see what their hypothetical

5  concerns were.  And so cane, not a concern.  Monocular, I

6  didn't hear anything.  I didn't hear anything about a task

7  lamp.  The only thing that they are talking about is the

8  screen of the reader, which glass or plastic -- I mean, he has

9  been provided glass or plastic screens from the get-go.  And

10 this cord, which, again, no security has actually seen.

11     If we can cabin our order -- and we have no problem.

12 We don't disagree that there may be security concerns, but we

13 will call it send him in for an evaluation of the digital

14 magnifier.  Send the digital magnifier in for an evaluation.

15 That makes it 5 by 5 with the relief Ghosh order.  We would

16 never pretend to step right over security, but they have never

17 offered -- they have never provided that to security for an

18 evaluation.

19     And maybe it needs two.  Maybe they can do a little

20 research.  I mean, it is not different in character from the

21 relief that was ordered for Ghosh.

22     The other thing, Judge, you know --

23     THE COURT:  Hold on one second.

24     MR. WEIL:  Sure.

25     THE COURT:  Okay.  Go ahead.

1       MR. WEIL:  Ms. Chardon just reminded me of this.  It

2   is important.  With the digital magnifier, he is essentially

3   trying to get back to the status quo, which is an

4   accommodation, which he had, and which he now has been

5   deprived since 2016.  He is trying to get back to the status

6   quo.

7       As for the other remedies that he is asking for, the

8   cane, which is being provided, and, indeed, the other two, you

9   know, in Ghosh, you can't take back a medical evaluation.

10  Here, if the Defendants eventually win, they can take back all

11  his aids.  It is a very light burden.

12      I just point out, too, Judge, and this is in our

13  preliminary injunction brief.  It is the same thing in the

14  Lyons case we cite on Page 13 of our original preliminary

15  injunction brief.  That is just requiring -- that involves

16  education.  It is a young man who has a disability and wants

17  to get on a wrestling team, and it is a mandatory injunction.

18      THE COURT:  Yes, there is a bunch of those.  Terry

19  Ekl always files those on behalf of athletes all over the

20  state.  I don't know how he gets those injunctions, but he

21  does.

22      MR. WEIL:  The courts award them.

23      THE COURT:  The courts award them.  I don't know how

24  he convinces judges to do it, but he does it, and it is

25  usually a finite period of time, and by the time it can go up

1    on appeal, the season is over.

2         MR. WEIL:  The relief we are asking for here is so

3    narrow, Judge.  I mean, it is -- the heavy lifting, I think,

4    for everybody is apparently an evaluation of a portable

5    digital magnifier.  Try to find something that works, not

6    different than Ghosh.  The other things are frankly miniscule.

7    Again, security should be easy, an evaluation by security, and

8    give him the aids.  That's the only stumbling block

9    between -- at least as articulated by the Defendants is the

10   security evaluation.

11        So that's the relief we are asking for, Judge, just

12   get him these aids.  If it takes going through security, fine.

13   It is an evaluation.  It shouldn't be very hard, and it is

14   pretty narrow.  The idea that this is some sort of extremely

15   burdensome injunction that we are seeking just doesn't hold

16   water, and, again, in terms of mandatory, it is

17   indistinguishable from Ghosh.

18        So, Judge, with that said, thank you for your time.

19        THE COURT:  All right.  Let's see if I have got any

20   questions for you.

21        Okay.  I will raise it so that you don't have to come

22   back on rebuttal.

23        Look, they are going to say he has been without

24   the -- it was raised when the motion was presented.  He has

25   been without the portable digital magnifier since 2016.  It is

1   now almost May 2018.  He is going to be released, fingers

2   crossed for Mr. Woodley, September 28th, 2018.  If you crunch

3   the numbers, that's five months.  The timing isn't so good for

4   you guys.

5          Do you want to address that?

6          MR. WEIL:  Every college class that Mr. Woodley is

7   able to take matters in his rehabilitation.  The

8   correspondence courses that Mr. Woodley is able to take affect

9   his ability to get a job, which right now and in parole the

10  IDOC says matters a lot.  So we are talking $300 here.  It is

11  not a lot to ask for.

12         THE COURT:  See, that's different.  See, you had me,

13  and now you are going to lose me.  There is a difference, a

14  very important difference, between me ordering them to buy

15  them and give them and me ordering them to buy them and you

16  can return them, but you got to buy them, and you have got to

17  tell me what the security issues are.

18         So, yes, $300, which isn't much, which is less than

19  what we paid for the filing fee, which is less than what

20  Wexford is paying for attorneys' fees to have counsel sit here

21  for the whole day, which goes to my point at the beginning of

22  the day:  What are we doing here?

23         But it is a little different between me ordering them

24  to purchase these, inspect them, come up with a -- either give

25  them -- once they inspect them, give them to Mr. Woodley

1  because there aren't security concerns or come back with a

2  justification that makes some sense because right now I

3  haven't heard much that makes any sense.  In fact, I haven't

4  heard any testimony from a security expert that these are

5  dangerous.

6          So keep going.

7          MR. WEIL:  Sure, Judge.  I think to that point, you

8  know, we are talking about whether we are likely to succeed

9  and --

10          THE COURT:  It is a preliminary injunction.  It is a

11  preliminary injunction.  If it is a mandatory permanent

12  injunction, then you have to succeed on the --

13          MR. WEIL:  Bear with me, Judge.

14          THE COURT:  Okay.

15          MR. WEIL:  I agree with you from everything I have

16  seen.  This is very unlikely to be a security issue.  All the

17  documents here strike me as pretextual.  It seems to have to

18  do with cost.  It doesn't seem like -- you know, we can

19  speculate that security might find something wrong with it,

20  but it is unlikely.

21          If the problem is that you are going to order a

22  mandatory injunction and everybody is going to drag their feet

23  along the road, and therefore Mr. Woodley shouldn't get this

24  because IDOC will drag their feet, Wexford will drag their

25  feet, security will takes three weeks to evaluate it, yes,

1    they can drag this out all the way to September, sure, but

2    they shouldn't.  You shouldn't be able -- you should be able

3    to order this relief pretty quickly.  It is not rocket

4    science.

5             Look up some stuff, buy it.  It should take maybe an

6    hour, you know, maybe a little more, but we are not talking

7    weeks.  It comes in from Amazon to security.  They can take a

8    look.  It shouldn't take them weeks to figure it out.  Look it

9    over.  You know, they know if there is an issue or there

10   isn't.  Again, we have the magnifiers being provided with the

11   screens.  If the cords are an issue, that shouldn't be too

12   hard to find.

13            Do what my sister does, buy -- she buys eight pairs

14   of shoes at a time and then finds the one she likes and sends

15   the rest back for a refund.  That's a business model, and they

16   can do this here, too.  That's simple, Judge.  I mean, the

17   steps here are not hard.  Some steps are required, but they

18   shouldn't be hard to take.  So I don't see a problem in terms

19   of going to September.

20            I will say, also, you know, in terms of the filing

21   fee, we pay the filing fee, not Mr. Woodley.  His attorneys

22   did.

23            THE COURT:  I know.  I assumed that.  It was either

24   that or Access For Equity, or whatever the agency goes by now.

25   I did pro bono work for them.  But it seems like if you are

1   willing to pay a filing fee, you could have bought these

2   things and given them to Mr. Woodley.  He would have had them

3   for two weeks now.  And then you can throw it in your damages

4   pile.

5           MR. WEIL:  Understood, Judge.  We commenced

6   litigation, and damages, possibly we are incorrect there.  In

7   any event, that was the basis of our proceeding.  It did feel

8   strange to be paying a filing fee that's larger than the cost

9   of this case, but that's the box we understood that we were

10  in.

11          THE COURT:  Okay.

12          MR. WEIL:  And again -- I will say again, Judge, you

13  know, we could have bought the thing and I guess gone through

14  this whole runaround with Wexford security and IDOC security,

15  too.  I mean, should we have bought ten of them and brought

16  them in?

17          THE COURT:  We don't know because it wasn't done.

18          MR. WEIL:  Something that is easy for the prison to

19  do, I think something that would be a little harder for us to

20  do.  But in any event, thank you, Judge.

21          Anything further?

22          THE COURT:  No, I have no other questions.

23          All right.  So, Mr. Brener, you can say whatever you

24  want to say, but here are some issues you might want to

25  address:  I didn't hear any contrary medical opinions that

1    these devices were not an appropriate accommodation, and I

2    didn't hear anything that says they shouldn't be prescribed.

3    In fact, every witness, including -- every doctor in the

4    exhibits and Amber Allen said they were appropriate and

5    addressed the determined and unrebutted medical condition

6    Mr. Woodley possesses.  There is no evidence on that to the

7    contrary.  If there is, tell me so I can find it.

8           And then I didn't hear any witnesses or see any

9    evidence, other than certain vague things in documents, that

10   there is a security concern.

11          So tell me whatever you want to tell me, but

12   somewhere in the discussion talk about those items.

13         MR. BRENER:  I will start with the security.  Look,

14   Judge, it is true that these items haven't been reviewed by

15   security yet.  They are going to want to review them first.

16   Counsel called this a pretext and that this is about money.

17   It is nonsense.  It is not true.  You heard testimony today

18   from Ms. Allen.  She said it is not a money issue.  It really

19   truly is not.

20         THE COURT:  I believe Ms. Allen, and I think she's a

21   credible witness, and I know she gets sued a lot and I see her

22   name.  But when you see the documents, and they start putting

23   dollar figures on it, if money is not an issue, who cares what

24   the dollar figure is?

25         MR. BRENER:  Not the health care unit at Dixon.  I

1    mean, that's what I will say.

2           THE COURT:  And I'm not -- look, Ms. Allen said what

3    she said, and I'm with her, but I'm looking at these IDOC

4    documents, and even the IDOC documents, when they give a

5    dollar figure, they say but they are still medically -- there

6    is no issue as to it, but if money is not an issue, why would

7    there be in a grievance officer's report specific mention of

8    that Aukey, or whatever it is, A-u-k-e-y, portable video

9    magnifier costs $316.64, and then another statement that

10   replacement units range from 300 to 700 depending on the

11   vendor?

12          So if cost is not an issue, there is no reason to say

13   that as well as that they were able to secure a replacement

14   for $219.  If money is not an issue, then money shouldn't be

15   mentioned.

16          MR. BRENER:  I'm not going to speculate on why they

17   said that, Judge.  I'm not.

18          THE COURT:  Okay.

19          MR. BRENER:  But the testimony was clear.  The money

20   is not an issue.

21          Look, Plaintiff's counsel talked about the relief

22   that Mr. Woodley is seeking.  He talked about what the doctors

23   have said.  He didn't talk much about what he actually has to

24   prove in order to get these things, and that's that he is

25   likely to be successful should this case go forward.

1    He has got to prove that he was denied the benefits

2    of services that were provided by the Department of

3    Corrections generally and that their reason for that denial

4    was because of his disability.  He did not prove that.  He did

5    not prove that he missed classes.  He didn't take a class in

6    the fall of 2015 because it was a class he had already taken.

7    Then classes went on hiatus because of the budgetary issues.

8    Then classes were reinstated in January.  He went -- he got

9    himself on the waiting list.  He has not missed a single class

10   as a result.

11        THE COURT:  There is classes coming up in June,

12   right?  That's the unrebutted testimony.

13        MR. BRENER:  That's his testimony.

14        THE COURT:  Do you have any evidence to contradict

15   it?

16        MR. BRENER:  No, I have no reason --

17        THE COURT:  And he said he wants to take those

18   classes, and all the evidence I heard is he is not going to be

19   able to function in those classes absent these devices,

20   especially the digital magnifier.

21        MR. BRENER:  He is also -- he still has to show that

22   there has been that denial of services, and there hasn't been.

23        THE COURT:  Are you going to send him to a class that

24   he can't read?  I mean, why don't you go send him to a

25   painting class to tell him about colors.  I mean, that is a

1    classic futile act, right?  If he can't -- he has already

2    testified that he can't read that broker's exam book, and he

3    is going to be taking these other classes, and he wants to

4    take the other classes, and they are coming up, and there is

5    no evidence that he won't be allowed to take those other

6    classes or he is not going to take the other classes.  Does he

7    need to come back in June and say "I can't read this book"?

8              MR. BRENER:  There was testimony that there were

9    alternatives, and I know that these are not nearly as nice

10   alternatives, but he has an ambulatory aide who does read to

11   him.

12             THE COURT:  Did you see him try to read a graph?

13   Have you ever tried to read a graph to somebody?  Graph a

14   vector.  Explain the chart of graphing a vector in physics to

15   somebody verbally.

16             MR. BRENER:  I'm not sure I could do that if I was

17   sitting there and reading it, Judge, but that's --

18             THE COURT:  All right.  Okay.  Go ahead.

19             MR. BRENER:  I'm not suggesting that these things

20   wouldn't be helpful.

21             THE COURT:  Well, it was prescribed.  It is

22   undisputed.  They were prescribed.  Not just helpful.  They

23   were prescribed.  "Do this."  Doctor said, "Do this."  Every

24   doctor says, "Yes, he has got the problem.  Do it."  They

25   won't do it because it is a security issue, and I didn't hear

1  any evidence on security other than Amber Allen said, "Yes, I

2  talked to a couple of people, and they said, yes, security

3  hasn't looked at it.  Yes, they lumped in all four things.

4  The cane was in there, too.  Our bad."  I told you the day you

5  stepped up "Don't tell me about security with a cane."

6         MR. BRENER:  And I don't believe I have, Judge.

7         THE COURT:  You haven't.  You haven't.  But the first

8  day you stepped up, you said, "security," and I said, "Don't

9  go there," right?  Is that correct on my memory?

10        MR. BRENER:  Understood.  That's correct, Judge.

11        THE COURT:  Okay.  Go ahead.

12        MR. BRENER:  So with respect to both the courses and

13 the other vocational trainings offered at Dixon, he has not

14 missed them.  He has alternatives.  They may not be good

15 alternatives, but he has them.  He has been accommodated.

16        With respect to the Eighth Amendment claim, he has

17 got --

18        THE COURT:  How has he been accommodated?

19        MR. BRENER:  He has been provided with the -- he has

20 shown the scope, the 6X scope.  It has the light on it.

21        THE COURT:  And he said it doesn't work.  Is there

22 any evidence that it works?

23        MR. BRENER:  Is there any evidence that it works?

24 Yes.  Does it satisfy Mr. Woodley?  No, it doesn't.

25        THE COURT:  Fair characterization.  Any evidence that

1  he is able to read more than one or two letters, maybe a word,

2  with the device that he was provided?

3  　　　　MR. BRENER:  That was his testimony, Judge.

4  　　　　THE COURT:  Okay.  Any evidence contrary to that?

5  　　　　MR. BRENER:  I don't know.

6  　　　　THE COURT:  Okay.  I'm going to use the moniker

7  "worked."  "Effective" seems a little overstated.  But if

8  somebody has cancer in IDOC, and a doctor says, "Drink

9  cranberry juice," if somebody has bladder cancer, prostate

10  cancer, drink cranberry juice, "Well, I'm prescribing

11  something, I'm doing something, I'm seeing a lot, I'm telling

12  you to do this all the time, I don't have evil intent," but

13  you know it is not going to help, that is not really a choice

14  of medical judgment or treatment options.  That's doing

15  something you know is, essentially, completely ineffective and

16  doesn't "work."

17  　　　　So he has got -- he has been accommodated by giving

18  him a device for which the sole testimony is it is ineffective

19  for what he is trying to accomplish.

20  　　　　MR. BRENER:  I will just add that he has been

21  accommodated with respect to the mobility issues and that he

22  is getting a new accommodation this week.  He has the

23  ambulatory aid and he has had the ambulatory aide for some

24  time.  Going forward, he will have the cane.  That's an

25  adequate accommodation to meet his --

1      THE COURT:  Again, he has been accommodated on the

2  ambulatory aide, but the man just got up in front of a video

3  screen and showed me his shins that were bruised from the top

4  of the ankle to the bottom of the knee, and there is medical

5  evidence to support it.

6      MR. BRENER:  And he will be getting a cane, and that

7  should help him to avoid bumping into things because he can

8  use the cane to feel where things are in front of him.

9      THE COURT:  He doesn't have the cane yet.

10      MR. BRENER:  That's true.  It has been ordered,

11  Judge.

12      THE COURT:  All right.  How is he going to use the

13  cane to find things that are falling on the floor in his cell?

14      MR. BRENER:  That won't be effective.

15      THE COURT:  All right.  Go ahead.

16      MR. BRENER:  Judge, I'm going to stand on my brief.

17      THE COURT:  Okay.  All right.  I will get something

18  to you when I have the opportunity.  I have the exhibits and

19  we have a transcript.  Ms. Perkins-Reiva has been here all

20  day, so we will be able to get a transcript, and I will be

21  able to get a report and recommendation filed on CM/ECF.

22      Thank you.  Have a good day.

23   (Which were all the proceedings heard.)

24

25

```
1                        CERTIFICATE

2       I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4    /s/Heather M. Perkins-Reiva          January 22, 2020

5    _____    _____
                                                   Date
     Heather M. Perkins-Reiva
6    Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```