**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| Stephon Woodley, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18 CV 50050 |
| | ) | |
| v. | ) | |
| | ) | Judge Philip G. Reinhard |
| John Baldwin, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

  Defendant Wexford's and defendant Dr. Ritz's motions for summary judgment [163, 165] are granted. The IDOC defendants' motion for summary judgment [172] is denied in part and granted in part. It is granted as to individual defendants Varga and Keane. Thus, summary judgment is granted to defendants Wexford, Dr. Ritz, Varga, and Keane on all counts against them. IDOC is the sole remaining defendant. Counts I and II are the only two remaining counts, and they are limited to the reasonable accommodation allegation. The failure-to-hire allegation is dismissed. This case is referred back to Magistrate Judge Schneider to explore settlement options and to supervise any remaining discovery issues.

**STATEMENT-OPINION**

  Plaintiff Stephon Woodley suffers from an inherited eye disease called Stargardt disease. From 2010 to 2018, he was an inmate at Dixon Correctional Center ("Dixon"). During his stay, he was seen by many doctors, including several outside eye specialists, to treat the Stargardt disease. They all came to the same basic conclusions: he was legally blind, his eyesight would continue to worsen, there was no way to cure or reverse this progression, and the only steps that could be taken were to provide him with aids (such as magnification devices) to help him manage his activities in prison.

  During the initial portion of his eight-year stay at Dixon, plaintiff was provided with and allowed to use these types of aids, although in several instances he had to get help from officials when these aids were broken. The main visual aid at issue was a magnifying device to help him read.[1] In 2010, plaintiff was seen by Dr. Hicks, a Dixon optometrist, who diagnosed him as being legally blind and gave him a traditional glass magnifier. In 2012, Dr. Hicks again saw plaintiff and concluded that he needed a stronger device because his eyesight was worsening. The Dixon ADA coordinator at the time worked on this issue and got approval for plaintiff to be able to purchase an Aukey Portable Video Magnifier with a rechargeable battery. Plaintiff purchased the Aukey

---

[1] Reading was important to plaintiff because he was diligently trying to improve himself during his stay at Dixon. He earned his GED and took multiple college courses, earning straight As and a 4.0 GPA.

device himself, at a cost of $316. (It is not clear why he purchased it rather than IDOC or Wexford paying for it.) The Aukey magnifier worked well until it broke in the summer of 2014. But again the Dixon ADA coordinator stepped in to help plaintiff. The coordinator obtained a replacement device. This time Wexford paid for it. (Again, it is not clear how it was decided who paid for the item.) The cost this time was $219. Plaintiff received the replacement in December 2014.

Meanwhile, over the latter half of 2014, plaintiff was referred to several eye doctors to see what additional aids might help with his worsening eye problem. Dr. Hicks first referred plaintiff to an ophthalmologist (Dr. Friedrichs) who then referred him to a retina specialist who in turn referred him to Dr. Joan Stelmack, the director of Low Vision Services at UIC's Department of Ophthalmology. In February 2015, Dr. Stelmack, recommended that plaintiff be given four aids: (i) a more powerful digital magnifier known as the Amigo HD magnifier; (ii) a monoscope, which was a device to help him to see in the distance and thus help him walk through the prison without bumping into things; (iii) a bright light to use in his cell; and (iv) a folding cane. IDOC and Wexford medical officials did not have any initial, obvious medical objections to plaintiff receiving these four items. But a concern was raised by Dr. Ritz, a Wexford utilization management physician working in Pittsburgh, that IDOC security officials might have a security concern about these devices. For example, the cord on the magnifier might be used to charge a cell phone. Because there might be a security concern, Dr. Ritz thought it was best to wait on purchasing these items until IDOC officials made a determination. Thereafter—and this is the problem triggering this whole lawsuit—the security review question languished, unresolved, in a bureaucratic black hole for several years. At the preliminary injunction hearing later held by then Magistrate Judge Johnston, this delay was described as being a Catch-22 problem created by IDOC and Wexford. Here is how Judge Johnston framed the problem in his Report and Recommendation:

> [T]he IDOC Defendants object to issuing [the items] to Plaintiff based on a security concern. The IDOC Defendants state that these items have not been approved by Dixon's security unit for distribution because the particular items have not been inspected. However, the items have not been inspected because Wexford has refused to purchase them for inspection without prior security approval. This is a classic Catch-22 that resulted in a federal lawsuit and a preliminary injunction hearing before any reasonable action would be taken – including the acquisition of a folding cane that Plaintiff first requested back in 2015 and that other inmates have been using at Dixon Correctional Center for years.

[62 at p. 2 (footnote omitted).]

While the approval process for the four items was stalled in bureaucratic limbo, a separate effort was made to accommodate plaintiff's eye problem. In July 2016, the Aukey magnifier, which plaintiff had been using up until this point, was broken when guards searched his cell. Plaintiff immediately asked that this magnifier be repaired or replaced. (To be clear, this magnifier was not the more powerful Amigo magnifier that Dr. Stelmack recommended previously in 2015.) Plaintiff's request for a replacement Aukey magnifier was sent to the Dixon ADA coordinator (Max Blackburn) who looked into the issue and concluded that it would cost in the range of $300 to $700 to replace the device. Mr. Blackburn asked the acting Agency ADA coordinator for approval, but the coordinator rejected the request on cost grounds, and suggested that Mr.

2

Blackburn provide plaintiff with a plastic sheet magnifier, along with a traditional glass magnifier. Plaintiff then filed a grievance, stating that the plastic sheet and glass magnifiers were insufficient and asking that he be given a replacement Aukey magnifier. This grievance was denied because IDOC did not want to pay several hundred dollars. Also sometime in 2016 or 2017 (the precise date is not clear to the court), plaintiff was a assigned an "ambulatory aid," which was another inmate who walked beside plaintiff to keep him from bumping into things and who also read to him at times. Details about this arrangement are sparse. It is not clear, for example, how much the aid cost or how often the aid was with plaintiff.

Plaintiff did not believe that the plastic sheet magnifier or the ambulatory aid were adequate to address his needs. He wanted the four items recommended by Dr. Stelmack. He filed several grievances to get those items. Then, after waiting several years, he retained counsel and filed a complaint in this court in February of 2018. The defendants named were John Baldwin, in his official capacity as the director of the Illinois Department of Corrections (hereinafter "IDOC"); Patrick Keane, an IDOC ADA coordinator; John Varga, warden of Dixon; and Wexford Health Sources, Inc. ("Wexford"). The complaint asserted three counts: (i) a claim under the Americans with Disabilities Act ("ADA") against only IDOC; (ii) a similar claim under the Rehabilitation Act, also against only IDOC; and (iii) a § 1983 Eighth Amendment claim against Keane and Varga in their individual capacities and § 1983 *Monell* claim against Wexford. Although the focus of the complaint was mostly on the failure to get the four items, plaintiff also included a separate allegation that he was not hired for a job with Dixon Correctional Industries allegedly because of disability discrimination.

A month later, plaintiff moved for a preliminary injunction against IDOC. Judge Johnston held a hearing on April 23, 2018. Plaintiff, IDOC, and Wexford all filed trials briefs. Numerous exhibits were submitted. There were only two witnesses—plaintiff and Amber Heard, the Dixon Healthcare Administrator. At the start of the hearing, IDOC's counsel informed the court that plaintiff's request for the folding cane (one of the four items) had been approved and plaintiff would be receiving it within a week. After the hearing, Judge Johnston issued a 15-page Report and Recommendation recommending that the preliminary injunction be granted and that Wexford be ordered to purchase the three other items and that IDOC officials then be ordered to make a determination as to whether they presented any security risk. Judge Johnston analyzed the factors for issuing a preliminary injunction and found, among other things, that plaintiff demonstrated more than a negligible chance of success on the merits of his three claims. No objections were filed to the R&R, and it was subsequently adopted by this court.

The court will look more closely at the R&R below. Plaintiff believes that this ruling is important, perhaps even dispositive, regarding the issues now before this court. Here's how plaintiff puts it in his response brief:

> Judge Johnston's [R&R] ticked through [all] the arguments made by the IDOC defendants, which those same defendants have largely repeated in their summary judgment motions now. Judge Johnston's legal reasoning was sound. It was based on a factual record that subsequent discovery only bolstered its material respects. The simple facts of this case have not changed: the defendants employed a circular

> set of policies that denied Plaintiff access to visual aids that every practitioner to examine him concluded he needed in order to regain any use of his vision.

[186 at p. 5.] Plaintiff is correct that many of the arguments are the same, but there are also some new issues and arguments that were not previously addressed.

Soon after the R&R was issued, the three items were purchased and then inspected by IDOC officials who approved them and then they were given to plaintiff. Thus, in the middle of 2018, plaintiff had already achieved one of his primary objectives in filing this lawsuit. Then in the fall of 2018, he was released from Dixon. But this case continued on. In 2019, plaintiff filed a separate complaint against Dr. Ritz (19 CV 50136), asserting a single § 1983 Eighth Amendment claim alleging that Dr. Ritz was deliberately indifferent by failing to approve these four items. The two cases were then consolidated under the present case number.

## ANALYSIS

Three summary judgment motions are now pending. Each will be addressed separately.

**I.    The IDOC Defendants' Motion**

First issue to address is the individual IDOC defendants. In plaintiff's response, he now agrees that summary judgment should be granted in favor of these two defendants (Keane and Varga). Therefore, the only IDOC defendant remaining is IDOC itself.[2] IDOC is named as the sole defendant for Count I (ADA) and Count II (Rehabilitation Act).

Two other preliminary issues before turning to the merits. First, IDOC argues that, because plaintiff was released from Dixon in late 2018, he may no longer seek any injunctive relief. Plaintiff agrees, and states that he is not seeking any additional injunctive relief beyond what he already received in 2018. Second, in its opening summary judgment brief, IDOC argued that plaintiff could not seek money damages on his ADA claim in Count I based on the affirmative defense of sovereign immunity. IDOC informed the court that it was contemporaneously filing, with its summary judgment motion, a motion to amend its answer to include this affirmative defense, which had apparently not been raised previously, either in its answer or at the preliminary injunction hearing. However, in reviewing the docket, the court does not see that any such motion was filed. Thus, this court finds that this defense has been waived. In any event, it would not make any practical difference because, even if the ADA claim were dismissed, the Rehabilitation Act claim would remain, and it is governed by the same standards and can provide the same relief.[3] For convenience, from here on out, the court will generally refer to the two claims together in the singular as the ADA claim.

---

[2] Technically, the claim is against John Baldwin who is sued in his official capacity as director of the Illinois Department of Corrections.

[3] *See, e.g.*, *Jaros v. Ill. Dept. of Corrections*, 684 F.3d 667, 671-72 (7th Cir. 2012) ("The relief available to Jaros under [the ADA and the Rehabilitation Act] is coextensive. [] And, with respect to this lawsuit, the analysis governing each statute is the same except that the Rehabilitation Act includes as an additional element the receipt of federal funds, which all states accept for their prisons. [] As a practical matter, then, we may dispense with the ADA and the thorny question of sovereign immunity, since Jaros can have but one recovery.") (footnote omitted).

The ADA claim has two parts—the failure to provide the four items (reasonable accommodation) and the failure to hire plaintiff for a job with Dixon Correctional Industries.

**A. Reasonable Accommodation**

The parties agree that, because plaintiff was legally blind and because IDOC is a public entity, IDOC was required to provide a reasonable accommodation to allow him to perform major life activities, which include (among other things) performing manual tasks, walking, seeing, communicating, reading, and working. 29 C.F.R. § 1630.2(i)(1)(i)-(ii).

IDOC raises one central argument for summary judgment. It is the same one raised at the preliminary injunction hearing—namely, that the alternative visual aids plaintiff received in the 2016-17 timeframe (the plastic sheet magnifier, the glass magnifier, and the ambulatory aid) were reasonable accommodations by themselves. In making this argument, IDOC is sidestepping the whole debate over who is responsible for the failure to get the four items prescribed by Dr. Stelmack in early 2015. One might question whether these two questions can or should be disentangled and evaluated independently. The mere fact that an eye doctor specializing in low vision aids recommended these four specific items to best help plaintiff's eye problems is fairly strong evidence that these items were, at a minimum, *better* accommodations than the alternative ones. And at trial, plaintiff likely will argue that these doctor-prescribed accommodations were therefore the *only reasonable* accommodations. But here, the court must consider IDOC's argument that the alternative aids were still sufficient. As IDOC correctly notes, the ADA does not require a "perfect" accommodation. *See generally Stewart v. Cnty. of Brown*, 86 F.3d 107, 112 (7th Cir. 1996) ("The fundamental problem with Stewart's theory is his erroneous assumption that 'accommodation' means the same thing as 'a perfect cure for the problem.' If this were true, the statutes would require more from employers than *reasonable* accommodations.") (emphasis in original).

Each side presents reasonable arguments regarding the reasonableness and adequacy (or inadequacy) of these alternative accommodations. However, after reviewing these arguments, the court finds that this is a jury question, not a question for which the evidence is clear enough to answer indisputably in IDOC's favor. In his R&R, Judge Johnston considered the same basic arguments IDOC is now making, and did not find them persuasive. His analysis was thorough and worth quoting at length:

> As to the magnifiers, the IDOC Defendants admitted that back in June 2012, Dr. Hicks determined that Plaintiff's vision loss had deteriorated to the point that he could no longer be accommodated by a glass magnifier. *See* IDOC's Answer at 6, Dkt. 40. In response, Plaintiff was allowed to purchase an Aukey portable video magnifier. Accordingly, it is disingenuous for the IDOC Defendants to now claim that they reasonably accommodated his vision loss through the use of a traditional magnifying glass, when the record reveals that such measures were insufficient even back in 2012. Plaintiff's vision has only deteriorated since then. Furthermore, Plaintiff testified that the magnifying glass only had a two inch lens, which made it difficult to read more than a few letters at a time.

5

As for the ambulatory aid, the evidence revealed that the primary purpose of this accommodation was to assist Plaintiff is navigating the prison. Even for this specific task, Plaintiff testified that this is an insufficient accommodation without the other requested visual aids, namely a monocular scope for distance vision and folding cane to account for uneven surfaces and objects. Furthermore, Plaintiff testified that in his cell, where he has limited lighting and does not have the use of an ambulatory aid, he continuously fumbles with his belongings and bang[s] into objects. This was supported by the medical records describing injuries to his shins. At the hearing, Plaintiff also showed the Court the extensive bruising on his shins caused by bumping into objects in his cell and elsewhere.

Plaintiff has also attempted to use his ambulatory aid to assist him with reading, but to no avail. Plaintiff's college course reading work is too complicated to benefit from someone else reading the course work to him, especially when it comes to digesting complex ideas or understanding charts and diagrams. Plaintiff also lacks the confidentiality he should be provided when he needs his ambulatory aid or other inmates to read his medical records or personal correspondences. Based on this evidence, the IDOC Defendants have not shown that the accommodations they provided were effective or that the requested visual aids would have resulted in an undue burden. Accordingly, Plaintiff has set forth sufficient evidence to show that he has a better than negligible chance of proving he cannot effectively participate in the programs and services offered at Dixon Correctional Center.

\*   \*   \*

[T]he alternative visual aids were known to be ineffective, despite what Wexford claims. *See Arnett*, 658 F.3d at 752 (continuing a treatment known to be ineffective can also constitute deliberate indifference). Plaintiff has tried these alternative visual aids and he and other treaters have reported numerous times that they are insufficient. *See, e.g.,* Plaintiff's Exhibit 4, Dkt. 42-1; IDOC's Answer at 6, Dkt. 40 (June 2012: Dr. Hicks concluded that Plaintiff's vision loss had deteriorated again and could no longer be accommodated by a glass magnifier; Plaintiff's Exhibit 24, Dkt. 42-1 (November 2016: Plaintiff's grievance for receiving sheet magnifier instead of a reasonable accommodation to replace his Aukey portable video magnifier); Plaintiff's Exhibit 27, Dkt. 42-1 (February 2017: Dr. Fahy highly recommended low vision aids in 2017); Plaintiff's Exhibit 31, Dkt. 42-1 (December 2017: Dr. Lundford determined that Plaintiff's 6x was insufficient and referred him to a low vision specialist).

\*   \*   \*

Plaintiff argues he will suffer irreparable harm because no remedy can undo his physical injuries or lost educational and programming opportunities. Plaintiff testified that he is injuring himself daily around the prison without the necessary visual aids and even an ambulatory aid does not prevent these injuries. Plaintiff further testified that he has had to strain his eyes to see without the assistance of the

> prescribed visual aids. He noted that at his recent medical appointment his retina was swollen from eye strain. Additionally, since his Aukey portable video magnifier broke in 2016, Plaintiff has been unable to register for any courses that rely on written materials or read his own medical records or personal correspondences.

[62 at pp. 9, 11, 12.]

The court recognizes that Judge Johnston's conclusions in the R&R are not strictly binding on this court in the sense of law of the case. But they are nonetheless persuasive. And the parties have not suggested that any of the facts Judge Johnston relied on have changed in any material way after discovery. The basic question now is whether, under Rule 56, a reasonable jury could find that the alternative accommodations were unreasonable. And in a way, Judge Johnston acted as a surrogate reasonable juror to assess that question when he considered whether, under the preliminary injunction standard, plaintiff had more than a negligible chance of success. Here, there are many facts to be considered. *Dadian v. Village of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001) (the reasonableness of an accommodation is a "highly fact-specific" inquiry determined on a "case-by-case basis"). Judge Johnston provided a good overview of some of the disputed issues. To add to those, this court also notes that, even if a jury found that these alternative aids were sufficient, questions about timing would still exist. For example, when did plaintiff receive these accommodations? Were there significant gaps when he had no aids? How often did plaintiff have the ambulatory aid with him? These and other questions can be better considered in the context of a trial. *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) ("[B]ecause summary judgment is not a paper trial, the district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.").

The court notes one final issue. Hovering over the preliminary injunction hearing, and also to some degree present in the background now, is the argument over the relative fault as between IDOC and Wexford. Arguments have been made at points in this lawsuit that Wexford was the party primarily at fault because it (specifically Dr. Ritz) allegedly would not pre-order the items so that Dixon security officials could physically inspect them. But the court does not believe that IDOC is now explicitly making any such finger-pointing argument. However, if such an argument were made, it would not change the analysis. This is because IDOC, the institution, is the sole defendant to the ADA claim. As plaintiff points out, Dr. Ritz and Wexford, as private contractors to IDOC, are IDOC's agents for purposes of ADA liability. *See* [186 at p. 20 n.5 (quoting 28 C.F.R. § 35.130(b)(1)(i) ("A public entity, in providing a [service] may not, directly or indirectly or through *contractual, licensing, or other arrangements* [] deny a qualified individual with a disability the opportunity to participate in [the] service.") (emphasis added))].

### B. Failure To Hire

The second part of the ADA claim is plaintiff's allegation that he was not hired for a job with Dixon Correctional Industries. DCI is a program that selects inmates to work in certain jobs, thus allowing them to earn skills and possibly receive some reduction in their sentence. This

7

failure-to-hire allegation was not addressed by Judge Johnston. The parties now, in their summary judgment briefs, do not spend much time on this allegation. Perhaps this is because there does not appear to be a lot of evidence one way or another.

IDOC raises two main arguments to defeat this claim. The first argument was raised in IDOC's motion to dismiss. This court rejected the argument in denying that motion. *See* [105 at pp. 5-7]. The argument is that Title I of the ADA provides the exclusive remedy for any employment-related discrimination claim. If a claim is brought under Title I, then plaintiff must have obtained a right-to-sue letter from the EEOC. It is undisputed that plaintiff has not provided any evidence that he received such a letter. Plaintiff argues, however, that his claim is brought under Title II, which does not contain this requirement. The issue, as framed by the parties, is whether the DCI job was more like a traditional job, in which case Title I applies, or was instead more of a vocational benefit, in which case Title II applies. Each side makes arguments based on the Supreme Court's decision in *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206 (1998) and on the Seventh Circuit's decision in *Neisler v. Tuckwell*, 807 F.3d 225 (7th Cir. 2015). These arguments are substantially the same ones this court considered in denying the motion to dismiss.

This court need not re-consider these arguments because, even assuming Title II applies as plaintiff argues, the court finds that IDOC prevails under its second main argument, which is that no reasonable jury could find that plaintiff was not hired *on account of his disability*. Plaintiff applied for a DCI job in April of 2010, but was never hired or even given an interview. His argument that he was discriminated against is based mostly on this general assertion: "discovery revealed that DCI consideration for hiring occurs in a queue, none of Plaintiff's attributes were disqualifying, and yet multiple people who got in the hiring queue after him were hired." [186 at p. 17.] Plaintiff himself, however, had no personal knowledge of how these hiring decisions were made.

The only witness deposed in this case who knew about this hiring process was Chris Melvin. He was the director of the DCI program and the person who made the hiring decisions during this general time. The court has read his entire deposition. Melvin testified that he could not remember anything specifically about plaintiff or his application. Melvin testified generally that he "never came across the issue where somebody had a direct issue with an ADA compliance situation." Dep. at 15. As for the hiring process, Melvin stated that it begins when an inmate submits an application. Once the application is received, DCI would do a background check to see if the inmate met certain initial criteria. If the inmate did, then his name would be put in a hiring pool. *Id.* at 13. Applications were arranged chronologically based on the date the application was submitted. *Id.* at 18. Later, when a specific job came open, Melvin would "pull a sampling of files out of [] the pool of labor." *Id.* at 21. Melvin described a hypothetical hiring situation:

> Let's say I had two positions, I would pull ten files and I'd look at their work history, their job history, their TABE scores, which is, educational scores on math and [] reading, look at their past discipline, any type of work experience they had prior to incarceration. And then I would garner a list of people that had wanted an interview.

*Id.* At this point, Melvin would again look at the initial hiring criteria. One criteria, relevant here, is that an inmate could not be considered for the job if he had more than seven years left on his sentence or fewer than three years. That is, he had to be in the three-to-seven-year range. This fact is relevant because plaintiff was released in 2018, but he initially applied in 2010.

Continuing with the hypothetical, Melvin testified that after screening out any of the ten names for not meeting the initial criteria, the remaining names would usually be assembled in a list by chronological order based on the date the application was submitted. When asked whether he pulled the first names from the list, Melvin testified: "Sometimes. Sometimes I pull further down the list. [] Honestly, it was just a random draw. [] I never had a science to it." *Id.* at 27-28.

It is important to remember that Melvin's testimony is unrebutted. He was the only witness who testified about the hiring process. Plaintiff believes that it is suspicious that other individuals, who applied after him, and who allegedly had no better qualifications than he did, were interviewed and hired when he was not even given an interview.

This argument, which is based on limited evidence, is perhaps enough to raise a question as to whether, in a general sense, the hiring process was equitable and fair. But there are several non-discriminatory explanations that could account for the failure to hire plaintiff. As a general point, Melvin repeatedly stated in his deposition that this was not a scientific process. When the names were drawn from the list, it was sometimes "just a random draw." So it's possible that plaintiff was simply the victim of bad luck in this loosely structured, non-scientific process. Perhaps one could fault Melvin for not having a more rigorous and documented process, but this criticism is not sufficient to prove disability discrimination. Moreover, there is the additional confounding factor that plaintiff was not always in the three-to-seven-year window. This fact would explain why, at least to some portion of the time, he was not interviewed or hired.

But even putting these possible explanations to the side, the critical missing link in plaintiff's argument is that there is no evidence suggesting that Melvin's decision not to interview him was based on plaintiff's disability. Plaintiff has not pointed to evidence that Melvin *knew* about his disability. IDOC asserts that Melvin did not have access to an inmate's medical file. *See* [174 at p. 12.] Plaintiff has not rebutted this fact. And it is undisputed that Melvin never interviewed plaintiff. Thus, if Melvin did not know about plaintiff's disability, the jury would have no ground, other than speculation, for concluding that he was trying to discriminate against inmates who had visual impairments. For all these reasons, summary judgment is granted to IDOC on this portion of the ADA claim.

## II.    Wexford's Motion

Plaintiff is asserting a single claim, which is a § 1983 *Monell* policy claim, against Wexford. The legal framework was set forth in this court's motion to dismiss ruling. A plaintiff cannot proceed under a § 1983 claim on a theory of *respondeat superior* liability against an employer like Wexford. *Shields v. Illinois Department of Corrections*, 746 F.3d 782, 790 (7th Cir. 2014). Plaintiff may only proceed against Wexford under the premise that "his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy." *Id*. at 796; *Monell v. New York City*

9

*Department of Social Services*, 436 U.S. 658 (1978). Moreover, the policy or practice "must be the direct cause or moving force behind the constitutional violation." *Woodward v. Correctional Medical Services of Illinois, Inc*., 368 F.3d 917, 927 (7th Cir. 2004).

  Wexford argues that plaintiff's *Monell* claim fails because he is only relying on his own individual case to prove that there was a custom or policy. This court agrees. In its opening brief, Wexford cites to a long line of Seventh Circuit cases where summary judgment was affirmed when the plaintiff failed to present any evidence of a broader pattern of misconduct. *See* [170 at pp. 8-11 (citing to eleven Seventh Circuit cases).] Wexford discusses at greater length the Seventh Circuit's fairly recent decision in *Hildreth v. Butler*, 960 F.3d 420 (7th Cir. 2020). In that case, Wexford moved for summary judgment, arguing that the inmate's allegation that his medication was delayed was insufficient to state a *Monell* claim because the inmate presented no evidence that other inmates experienced similar delays. The Seventh Circuit affirmed, holding that there must be "systemic and gross deficiencies" and "more than a showing of one or two missteps." *Id.* at 426 (quoting earlier cases). The Seventh Circuit noted that only three prescription delays over a 19-month period (and those only involved the plaintiff) were not enough to show a widespread practice. *Id.* at 427.

  Relying on *Hildreth* and this long line of Seventh Circuit cases, Wexford argues that plaintiff has brought forth no evidence that the alleged policy identified by plaintiff was widespread. The complaint describes the alleged policy as follows: "Wexford has a policy and practice of not procuring medical devices for inmates without knowing in advance they will be approved by prison security, even when those devices have been prescribed by a physician to address a serious medical need." [1 at ¶ 39.] Wexford argues that no such policy existed and that plaintiff's situation was unique, not driven by any underlying policy. It is undisputed that Wexford has no written policy for handling durable medical equipment pertaining to visual aids. Plaintiff has not cited to any other inmates who have been denied visual aids based on a similar security issue. In sum, in its opening brief, Wexford makes a strong argument, supported by ample case authority, for why plaintiff cannot prevail on the *Monell* claim.

  Plaintiff filed a consolidated 18-page response brief that addressed all three summary judgment motions together. But this brief only devotes one paragraph to the *Monell* issue. [186 at pp. 12-13.] And, in this one paragraph, plaintiff does not address *any* of the Seventh Circuit cases Wexford cited, nor does plaintiff cite to any affirmative cases of its own. Thus, an argument could be made that his *Monell* claim has been forfeited. *See Schaefer v. Univ. Scaffolding & Equip.,* 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

  Wavier aside, the court agrees with Wexford's argument on the merits. The alleged policy, as articulated by plaintiff in his compliant (which is quoted above), is vague and does not sound like a policy on its surface. As a general matter, it would not be unreasonable for Wexford and IDOC to have at least considered the question initially of whether devices could get through security. And in some cases, fact-specific questions may arise about rare unique items and their possible security concerns, which may never have been considered before. But the above-stated policy (which again is one articulated by plaintiff, not Wexford) does not really address these specific nuances. As for the facts of this particular case, they are complex and even confusing at

10

times, involving the interaction of many people sprawled out geographically, temporally, and hierarchically in a complex bureaucratic web. If anything, the problem was that there was an unclear line of command and *no* clear policy or procedure for handling this unusual scenario. *See Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008) (affirming summary judgment on a *Monell* claim because allegations suggested only a random event and not an official policy); *Thomas v. Martija*, 991 F.3d 763, 774 (7th Cir. 2021) ("It is enough to say that this single incident of a lapse in follow-up medical care is not enough to show either a formal policy on Wexford's part or an informal custom."). Plaintiff himself has several times referred to the events in this case as being "bizarre." *See* [186 at p. 5 ("bizarre bureaucratic indifference"); *id.* at 15 ("bizarre refusal to pay for the items")]. In this court's view, the word "bizarre" is more consistent with a one-off, random event rather than a systemic policy.

Plaintiff's theory of the case is that Wexford's actions were driven by a desire to save money. This theory relies heavily on one document. It is a form that Wexford's utilization management nurses used in tracking information relating to requests for medical services or devices. It is called the Collegial Consult notes or table or sometimes referred to as a spreadsheet. It contains several columns of information. One is entitled "Additional Information." Plaintiff has submitted one of these collegial notes, specifically the one for March 18, 2015, and it includes an entry referencing plaintiff's request for the four vision aids. In the "Additional Information" column, the table states, among other things, that Wexford, not the UIC clinic that Dr. Stelmack worked for, would be paying for the four items. These notes also include references to other inmate requests, some of which also include cost information in the same "Additional Information" column. Plaintiff retained an expert witness, Dr. Ryan Herrington, who reviewed the March 18, 2015 collegial notes and who then opined, in a 3-page expert report, that including this information in this table is inappropriate because a doctor should not be concerned about cost and should instead focus on the medical appropriateness of the request.

The court does not find that this evidence is enough to establish a policy under the *Monell* standards. Plaintiff's cost-saving theory will be discussed further in Section III, but the bottom-line is that little evidence exists to suggest that cost-saving was a factor causing the security hang-up in this case. The correspondence back and forth between the various people working on this problem does not mention cost as being a driving factor or even a minor factor for Wexford or Dr. Ritz in deciding whether to medically approve these items.[4] And the alleged policy articulated by plaintiff does not explicitly mention cost as being a factor either. Wexford states that this information was included for administrative tracking purposes and not as a guide for the doctor considering the medical appropriateness of the item. Perhaps Dr. Herrington has a valid point that, all things considered, it would be a better practice for Wexford not to put cost information in a communication that *may have* been given to Dr. Ritz. But even granting this point and further assuming that Dr. Ritz even saw this information, the overwhelming evidence does not suggest that it affected his decision-making about the medical appropriateness of these items. For all these reasons, the court finds that summary judgment should be granted to Wexford.[5]

---

[4] It is undisputed that Dr. Ritz thought it did not make sense to pay for an item that clearly would not pass through security. In this respect, Dr. Ritz was worried about the cost issue, but this is a different type of cost argument from the one plaintiff is making. No one here is arguing that it would be improper to refuse to order an item that security unequivocally would not allow in the building.

[5] Wexford and Dr. Ritz have argued that Dr. Herrington's testimony should be barred pursuant to Federal Rule of

11

**III.    Dr. Ritz's Motion**

Plaintiff is asserting a § 1983 claim against Dr. Ritz in his personal capacity. The legal framework is agreed upon. Plaintiff must meet a two-part test. The first part asks whether he had an objectively serious medical need. *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016). The second part, sometimes referred to as the subjective prong, requires that he show that Dr. Ritz "*actually* knew of and disregarded a substantial risk of harm." *Id.* at 727-28 (emphasis in original). Deliberate indifference is comparable to criminal recklessness. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Dr. Ritz asserts four reasons why he should be granted summary judgment: (i) plaintiff has not alleged that Dr. Ritz was acting under the color of state law; (ii) plaintiff is improperly imposing a burden on Dr. Ritz to have acted as an ombudsman (*i.e.* someone in charge of coordinating all aspects of this ADA request); (iii) Stargardt disease is not an objectively serious medical condition because there are no cure for it; and (iv) plaintiff cannot show the subjective element of deliberate indifference. The court does not find that either the first or third arguments are convincing. Plaintiff's brief provides a good explanation for why this is so. But the court finds that Dr. Ritz prevails under his second and fourth arguments.

These two arguments can be discussed together because they both get at the same larger point, albeit from slightly different angles. The gist of Dr. Ritz's position is that he was working remotely in Pittsburgh and had no say-so over security matters, even though he was the one to initially raise a question about possible security concerns. He testified that he didn't think it made sense to go through all the work to do a full evaluation of the request for the four items if security would never approve them. At the same time, he testified that he had no obvious initial concerns, from a medical perspective, about eventually approving the items. What little written documentation there is from Dr. Ritz supports this assertion. Specifically, in a March 20, 2015 email to a Wexford nurse, he wrote: "Site [*i.e.* Dixon officials] to review items requested with security; *if cleared, ok to approve*." [164-8 at p. 8 (emphasis added).] He argues that it was not his job to resolve this security issue and that it is common for bureaucracies to divide tasks. In this case, he argues, the Wexford on-site doctors, Dr. Bautista and Dr. Chamberlain, would typically be responsible for monitoring this issue. Dr. Ritz also argues that this was a unique situation, with no clear procedure. He testified that he "has never had a situation where the site director says 'look, security needs to look at this item so we're going to have to buy it.'" [171 at p. 11.] He argues that, at worst, he was merely negligent (and he does not even concede this point).

In response, plaintiff takes issue with these individual arguments and assertions, but plaintiff's broader thesis is that Dr. Ritz was the one most responsible for the Catch-22 dilemma identified by Judge Johnston. According to plaintiff, over time, it became clear that security would not approve the four items unless they were first purchased so that security could look at them and inspect them. And plaintiff thinks that Dr. Ritz became aware of this specific problem sometime in December 2015 but still refused to allow the items to be purchased. In short, he was supposedly the main culprit throttling the security review.

---

Evidence 702 because plaintiff cannot survive a *Daubert* challenge. Because this court does not find that the *Monell* claim survives even if Dr. Herrington's report is considered, the court will not address any motion to bar this testimony. It does not appear that a separate motion was filed, but any such motion is denied as moot in any event.

The court is not persuaded that plaintiff's argument (and the evidence supporting it) could allow a reasonable jury to conclude that Dr. Ritz was deliberately indifferent. To start with, the evidence that Dr. Ritz even was aware of and fully understood what the security problem was is thin. His position is that he thought the items were denied outright, and that he did not know there was even an issue about needing to physically inspect them. Plaintiff relies on circumstantial evidence to show that Dr. Ritz was aware of the real problem. Plaintiff notes, as one piece of evidence, that Dr. Bautista, on April 1, 2015, "reported back that the staff in Dixon's security unit had decided that they needed to physical inspect the items in order to approve them," but that "Dr. Ritz took no action" in response to this communication. [186 at p. 10.] Plaintiff also relies on evidence from Dr. Chamberlain who checked into the security issue in the November-December 2015 timeframe and learned from that inquiry that security needed to physically inspect the items. At his deposition, Dr. Chamberlain stated that he likely "would have relayed [this] information" back to Dr. Ritz. *Id.* However, plaintiff has no clear documentary evidence that Dr. Ritz received these communications. Plaintiff is relying on a series of inferences, some of which are attenuated in this court's view.

But even giving plaintiff the benefit of the doubt on these underlying factual questions, the court still finds that several other factors suggest that no reasonable jury could conclude that Dr. Ritz acted with the type of intentional or reckless manner that would meet the relatively high deliberate indifference standard.

First, it is undisputed that Dr. Ritz was not on-site and was not in charge of security issues and also was not in charge of making sure that plaintiff had the appropriate accommodations for his disability. He testified that he had "not been involved with the logistical part of actually procuring items." Dep. at 48.

Second, there was a person whose job was to handle this type of problem. It was the ADA coordinator at Dixon. And in several earlier instances, this is exactly what happened. Dixon ADA coordinators took steps to make sure plaintiff received devices to help with his vision problems. *See* Varga Dep. at 37-38 (stating that one of the ADA coordinator's jobs was "to review situations" involving ADA requests for medical devices). In fact, it is IDOC's position, as discussed above, that plaintiff did not even need these four items because he had adequate alternative aids. The court has already determined that there is a jury question on whether these alternative aids were reasonable and adequate. If they were, then Dr. Ritz would not be liable on that ground alone. But the larger takeaway here is that the ADA coordinator was taking action on this issue during this general time. The ADA chose to procure alternative aids. However, the ADA coordinator could have stepped in and tried to find a solution to the security impasse or gotten approval for IDOC to itself pay for these four items so that security could inspect them. In sum, the evidence suggests that it was the ADA coordinator—and not Dr. Ritz—who was supposed to play the ombudsman role by shepherding this request through the alleged bureaucratic inertia and miscommunication.[6]

---

[6] Also, Dr. Ritz testified that Dr. Chamberlain and those on-site at Dixon had the primary responsibility for checking into this issue and, if they disagreed with any decision he made in Pittsburgh, they had the option of appealing that decision to a different Wexford doctor whose decision would then be the final one. *See* Ritz Dep. at 20, 37.

Third, everyone agrees that the problem in this case was unusual and unique. Dr. Chamberlain, one of the witnesses plaintiff is relying on to build his case, testified as follows: "This is kind of an unusual situation. I don't run into ADA issues like this all the time. So I don't know that I had a standard practice." [Chamberlain Dep. at 27.] Dr. Ritz testified that the approval process was fluid, with a lot of back and forth involving many people, from nurses to doctors to others. Although it was a "a multiple step process," it was at the same time *not* "a cookbook process." [Ritz Dep. at 17.] Dr. Ritz also was not acting alone. *Id.* at 80-81 ("this is a process; it's done by a team, a team at the site level, a team here at the corporate office in Pittsburgh"). Dr. Ritz would personally "review several hundred requests on a weekly basis" *Id.* at 26. He thus relied on nurses to listen in on meetings and to document things. Issues would sometimes be handled informally by nurses without the doctor being involved. Given all these moving parts and given all this uncertainty about how to handle this unique situation, it would be easy for miscommunications to occur, and for one person to mistakenly believe that another person was taking care of things. This is not an uncommon scenario, and the Seventh Circuit has held that the failure of one individual to be more proactive in resolving larger institutional communication issues is usually not by itself deliberate indifference, even if it might be negligence. *See Glisson v. Ind. Dept. of Corrections*, 849 F.3d 372, 378 (7th Cir. 2017) ("Without the full picture, each person might think that her decisions were an appropriate response to a problem; her failure to situate the care within a broader context could be at worst negligent, or even grossly negligent, but not deliberately indifferent."); *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) ("The assumption underlying this choice of defendants—that anyone who knew or should have known of his eye condition, and everyone higher up the bureaucratic chain, must be liable—is a bad one. Section 1983 does not establish a system of vicarious responsibility. [] Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise.").

Fourth, the issue of motivation is another stumbling block for plaintiff's theory. If Dr. Ritz was truly acting with deliberate indifference to plaintiff's medical issues, why did he act in the way he did? Plaintiff's theory is that he was trying to save his employer money. But this theory must overcome, first of all, the fact that Wexford repeatedly approved of plaintiff going to see outside eye doctor specialists. When the whole record is looked at fairly, it is clear that Wexford and IDOC gave plaintiff's eye problem much attention over the years. This is not a case where an inmate's medical issue was being ignored. Another problem with plaintiff's theory is that the record contains little direct evidence that Dr. Ritz was motivated by any concern over cost. No document directly from him mentions any such concern. As noted above, in March of 2015, he gave his conditional approval that these items were medically justified. Plaintiff relies heavily on the Collegial Consult notes to argue that Dr. Ritz may have been subconsciously influenced by cost. Again, it is not clear that he even saw these notes or, if so, that they influenced his decision. But ignoring these concerns, plaintiff's theory requires a further inferential leap. Plaintiff is proceeding under a pretext theory. As the court understands the theory, Dr. Ritz supposedly could not simply say outright that these items were too expensive. So he raised the security issue as a type of a smokescreen, hoping that it would throw a monkey wrench into the approval process. Later, he dragged his feet as Dr. Chamberlain and others tried to get the items approved. But Dr. Ritz did not have full control over the IDOC security approval process. It is possible that IDOC security officials would have approved the items right away, without needing to physically inspect them. In his deposition, Dr. Ritz testified: "[T]here's numerous different ways that we can provide security with seeing an item. One can see an item in person. In my experience security usually

wants to see pictures of an item. They will sometimes do internet searches. So seeing an items doesn't mean, in my view, that it has to be purchased, physically delivered, and physically handled by security." [Ritz Dep. at 86]. So Dr. Ritz would not have known ahead of time what IDOC security officials would do with this request and whether his alleged pretextual excuse would succeed.

In sum, if Dr. Ritz were trying to save money as plaintiff alleges, this was an awfully convoluted way of trying to accomplish that goal. The simpler explanation, a much more plausible one in this court's view, is that he was busy and did not fully understand the problem and thought security rejected the items outright and that, finally, he did not feel it was his primary responsibility in any event and so was not motivated to dig deeper into the issue. Again, the person whose job it was to dig deeper was the ADA coordinator. This is another reason why this court believes that plaintiff's only viable claim is his claim against IDOC, which this court has already concluded should go forward. There is nothing that would preclude plaintiff from using the allegations against Dr. Ritz in plaintiff's broader claim against IDOC since, as noted above, Dr. Ritz was working for Wexford who in turn was hired by IDOC. For all these reasons, the court grants summary judgment to Dr. Ritz on the individual § 1983 claim against him.

Date: 2/17/2023　　　　　　　　　　ENTER:

　　　　　　　　　　　　　　　　　_Philip G. Reinhard_
　　　　　　　　　　　　　　　　　United States District Court Judge

　　　　　　　　　　　　　　　　　　　　　　　　Electronic Notices.